# APPENDIX

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re: BAMBI HERRERA-EDWARDS,                 Case No.: 8:12-bk-15725-KRM

      Debtor.

_____/

BAMBI HERRERA-EDWARDS,

      Plaintiff,

v.                                            Adv. Pro. No.: 8:14-ap-247-KRM

ERIC L. MOORE,

      Defendant.

_____/

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, Bambi Herrera-Edwards (the "**Debtor**" or "**Herrera-Edwards**"), by and through undersigned counsel, responds to the Motion to Dismiss Counts I, II, and III of Plaintiff's Counterclaim filed by Defendant Eric L. Moore ("**Moore**") (Doc. 21). For the reasons stated below and those stated in Plaintiff's Trial Brief (Doc. 28), incorporated herein, the motion to dismiss must be denied.

On the eve of trial, Moore filed a *pro se* motion to dismiss, long after he answered the complaint. In his motion, Moore strays far outside the four corners of the complaint, relying on Debtor's discovery responses, his own denial of the allegations, and even his own assertions of fact. Such matters, of course, cannot be considered on a motion to dismiss. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).

In Count I, Herrera-Edwards properly stated a cause of action for fraud in the inducement. A claim for fraud requires:

> (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.

*Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010). "Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003). Likewise, a duty to disclose arises when one party has information that the other has a right to know because they are in a relationship of "trust or confidence." *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003).

The complaint properly alleges facts demonstrating that a duty to disclose arose both because Moore disclosed material information regarding extensive experience in numerous areas of the entertainment industry (Compl. ¶¶ 15, 78, 116), and because Debtor was in a relationship of trust and confidence with Moore, as she was required to provide and entrust him with her confidential financial, personal, and tax information for the alleged purpose of locating and obtaining royalties and other rights that belonged to her. (Compl. ¶¶ 79, 117).

Moore argues that Herrera-Edwards had a duty to discover his criminal background which was already public knowledge. However, because Moore had an affirmative duty to disclose the information, Herrera-Edwards was not required to perform any due diligence. As the Florida Supreme Court has made clear, "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation." *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010). In an action for fraud, plaintiffs "do not need to allege that they had investigated the truth of the

misrepresentations because for this claim, 'a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him.'" *Id.* This reinforces the policy of "prohibit[ing] one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing." *Id.* (quoting *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So.2d 334, 336-37 (Fla. 1997)).

Further, the fraudulent inducement claim satisfies Rule 9(b), which requires pleading "the who, what, when, where, and how of the allegedly false statements and then alleg[ing] generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Debtor sufficiently pled:

- "who" – Eric Moore (Compl. ¶¶ 15, 16, 17, 78, 116),

- "what" – failure to disclose a criminal conviction for stealing money from individuals under the false pretense that the funds would be invested in his promotion of a Prince concert (Compl. ¶¶ 15, 16, 17, 78, 116),

- "when" – in December 2010, January 2011, and July 2012 (Compl. ¶¶ 15, 16, 17, 78, 116),

- "where" – never disclosed in conversations with the Debtor (Compl. ¶¶ 15, 16, 17, 78, 116), and

- "how" – never disclosed in conversations with the Debtor (Compl. ¶¶ 15, 16, 17, 78, 116).

And Debtor alleged the requisite intent. (Compl. ¶¶ 118). Accordingly, the complaint satisfies Rule 9(b).

Moore argues that unjust enrichment is improper because an adequate remedy at law exists. "However, this doctrine does not apply to claims for unjust enrichment." *Williams v. Bear Stearns & Co.,* 725 So.2d 397, 400 (Fla. 5th DCA 1998). And while an express contract does

3

exist, the Debtor sent money to Moore as a product of harassment and misrepresentations that he had performed work that he did not in fact perform. (Compl. ¶¶ 122-124). The money was therefore sent to Moore outside the contract, and it constitutes a benefit to which he was never entitled. Regardless, parties may plead in the alternative. Fed. R. Civ. P. 8(d); Fed. R. Bankr. P. 7008. Moore's remaining contentions are based on claims and matters outside the pleadings and cannot be addressed on a motion to dismiss.

Finally, Moore argues that equitable disallowance is improper.[1] The bankruptcy court has the broad power to equitably disallow a claim where it deems disallowance proper. *See In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 71-73 (Bankr. S.D.N.Y. 2007) *aff'd in part sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008).

The bankruptcy courts' power to disallow claims on equitable grounds was approved by the Supreme Court in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). While generally cited as an equitable subordination case, the question before the Supreme Court in *Pepper v. Litton* was the power of the bankruptcy court to equitably disallow a claim predicated on a judgment obtained against the bankrupt corporation. *Id.* at 296. The claim was initially disallowed by the district court but the disallowance was reversed on appeal to the Fourth Circuit Court of Appeals. *Id.* The Supreme Court granted *certiorari* because the Fourth Circuit's decision imposed a restriction "on the power of the bankruptcy court to disallow or to subordinate [the claim] in exercise of its broad equitable powers." *Id.* In the course of its decision, the Supreme Court held that, "in the exercise of its equitable jurisdiction the

---

[1] Moore relies on a pre-Code case, *In re Mobile Steel Co.*, 563 F.2d 692, 699, n.10 (5th Cir. 1977).

1680424.1

bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Id.* at 308. Thus, in *Pepper v. Litton,* the Supreme Court affirmed the bankruptcy court's order equitably disallowing a claim.

### Conclusion

Accordingly, Moore's motion to dismiss, filed on the eve of trial and after his answer, lacks merit and should be denied.

Dated: May 20, 2014

/s/ Bryan D. Hull
Jeffrey W. Warren
Florida Bar No. 150024
Bryan D. Hull
Florida Bar No. 20969
Bush Ross, P.A.
Post Office Box 3913
Tampa, Florida 33601-3913
Telephone: (813) 224-9255
Facsimile: (813) 223-9260
jwarren@bushross.com
bhull@bushross.com
*Special Counsel to the Debtor*

5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2014, I electronically filed a true and correct copy of the foregoing Plaintiff's Trial Brief with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system and I furnished a copy of the foregoing document(s) to the following parties in the manner of service indicated below:

/s/ Bryan D. Hull
ATTORNEY

**Via the CM/ECF system which will send a Notice of Electronic Filing to:**

Noel R Boeke
Christopher M Broussard
Colleen Murphy Davis
Kathleen L DiSanto
William C Falkner
David S Jennis
Angelina E Lim
Jimmy D Parrish
Jimmy D Parrish
Tiffany D Payne
Nicole Peair
Pinellas County Tax Collector
Steven J Solomon
Christopher C Todd
Clay M Townsend
United States Trustee
Alison Verges Walters

**Via U.S. Mail, postage prepaid and Electronic Mail to:**

Eric Moore
202 Island Avenue, #118
San Diego, California 92101
**Elmoore75@Aol.com**

1680424.1

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re

BAMBI ALICIA HERRERA-EDWARDS,

     Debtor.

_____/

BAMBI ALICIA HERRERA-EDWARDS,

     Plaintiff/
     Counter-Defendant,

vs.

ERIC MOORE,

     Defendant/
     Counter-Claimant.

_____/

Case No. 8:12-bk-15725-KRM
Chapter 11

Adv. No. 8:14-ap-247-KRM

## MEMORANDUM OPINION ON
## OBJECTIONS TO CLAIMS FILED BY ERIC L. MOORE

Since 1997, the debtor, Bambi Alicia Herrera-Edwards ("Herrera-Edwards" or "debtor")

has received royalty income derived from the music compositions of her late husband, Bernard

Edwards. In this adversary proceeding, she is challenging claims filed by Eric L. Moore, who

holds himself out as a "treasure hunter" of artists' royalties.[1] He has filed multiple claims in this

case (the latest being Claim No. 18) and a counterclaim in this adversary proceeding, seeking up

to $10 million from the debtor's royalty income, for alleged services under a pre-petition

---

[1] Mr. Moore was represented at different times in this case by separate attorneys, both of whom withdrew (Doc. Nos. 193, 371). As a result, Mr. Moore represented himself in this proceeding. He did so with remarkable skill.



Consulting Agreement.[2] Alternatively, he makes the same claim, as an administrative expense or for *quantum meruit,* for providing post-petition services to the debtor's bankruptcy estate.

Herrera-Edwards contends that the Consulting Agreement was procured by fraud and that Moore, a convicted felon, did not discover anything she did not already own or that her lawyers were not already working to recover. She argues that he is ineligible for an administrative expense claim because his employment was never approved by the court. She asks that Moore be made to repay about $45,000, a payment he received as compensation under the Consulting Agreement shortly before the Chapter 11. After hearing testimony over 6 days, considering the documentary evidence, and post-trial briefs, the Court is compelled to conclude that the debtor's objections should be sustained, Mr. Moore's claims should be disallowed, judgment should be entered on all counts for plaintiff, and judgment entered against Mr. Moore on his counterclaim.

## BACKGROUND FACTS

Herrera-Edwards is currently employed as an airline flight attendant. At one time, however, she was married to the late Bernard Edwards, a co-founder – along with the debtor's cousin, Nile Rodgers – of the American disco/funk band *Chic*. Together, Mr. Edwards and Mr. Rodgers authored and performed many popular songs including *"Le Freak," "We are Family," "Dance, Dance, Dance,"* and *"Gettin' Jiggy with It."*

---

[2] The Chapter 11 petition was filed on October 17, 2012. All of Mr. Moore's initial claims (Claims 14 and 15 - each in the amount of $1,360,000 - and 16 - in the amount of $10,203,519.09) were filed after the claims bar date, December 31, 2012. The debtor objected to the untimely filed proofs of claim and the Court sustained the objections. (Doc. No. 267). Mr. Moore hired Attorney Christopher Todd to file a motion for reconsideration of that order. (Doc. No. 274). On July 7, 2013, Mr. Moore filed a Motion for Payment of Administrative Expenses, in the amount of $2,720,000, accusing debtor's bankruptcy counsel of bad faith. (Doc. Nos. 188, 274). The debtor was then compelled to employ special counsel to represent her and file this adversary proceeding to contest Mr. Moore's claims and applications for payment. (Doc. Nos. 336, 354). With the consent of the debtor, Moore was allowed to file a final, all-in claim, which he did. His Claim No. 18, at issue here, amends prior proofs of claim and requests for administrative expenses. (Doc. No. 355).

2

Mr. Edwards died in 1996.  His share of the music copyrights was included in his estate, which was probated in Connecticut.  The debtor asserted substantial tort claims against the probate estate, but settled them in 1997 in exchange for a 37.5% interest in Edwards' copyrights.

Since 1997, Herrera-Edwards has received royalty payments from an intermediary, Jess S. Morgan & Co., Inc. ("JSM").[3]  The royalty income flows through several levels of payors – from ASCAP to Warner/Chappel Music ("Warner/Chappel") to JSM, each of which takes a fee before disbursing.[4]  It was not until the fall of 2010, after comparing her royalty payments to those of her cousin, that Herrera-Edwards came to suspect that she had been underpaid for years. (7/15 Tr. pp. 15-16).[5]

Between 2010 and September 2012, the debtor hired various lawyers, accountants, and financial advisers to resolve her debts and recover the suspected royalty underpayments.  By this time, she had accrued a substantial federal income tax debt and attempted to borrow against her royalty income to resolve it.  In the midst of these difficulties, Mr. Moore came to be involved in her financial affairs.

1.    The Debtor's Copyright Interests.

On July 9, 1997, Edwards' probate estate and its beneficiaries settled substantial tort claims filed by Herrera-Edwards.[6]  Initially, the parties executed a hand-written mediation settlement agreement, dated July 9, 1997.  They executed a more detailed agreement on July 30,

---

[3]  JSM was Bernard Edwards' financial management firm.  One of JSM's founders, Wallace Franson, was the executor of Bernard Edwards' estate.

[4]  Warner/Chappel takes a 10% fee.  JSM takes a 5% fee.

[5]  Since Nile Rodgers and Bernard Edwards had equal 50%/50% shares to their compositions, a rough estimate of the magnitude of any underpayment would appear to be the difference, since 1997, between 37.5% of what Rodgers received and what the debtor actually received.

[6]  The parties were Mr. Edwards' children, the late Alexis Edwards (Mr. Edwards' first wife), and the debtor.

1997.  (Pl.'s Ex. 5).  The same day, the probate court held a hearing on the settlement.  (Pl.'s Ex. 3).  The fully executed July 30, 1997 Agreement was filed under seal in the probate case on August 28, 1997.  (Pl.'s Ex. 5).

Herrera-Edwards and Edwards' probate estate later entered into another agreement, dated August 21, 1997, referred to as the "Co-Publishing Agreement."  (Pl.'s Ex. 6).  The Co-Publishing Agreement provided for (a) the sale and assignment to Herrera-Edwards of 37.5% of all of the probate estate's right, title, and interest in the Edwards' compositions and copyrights; and (b) her relinquishment to the probate estate of "administration rights" to the copyrights.[7]

It appears that the two settlement agreements and the Co-Publishing Agreement were parts of a single settlement transaction.[8]  As a result, Herrera-Edwards received an outright ownership interest (except for administration rights) in 37.5% of the copyrights owned by the Edwards estate.  All parties to these three 1997 agreements were represented by counsel.  This 37.5% ownership in Edwards' copyrights is the principal asset in this Chapter 11 case.

To address his cousin's suspicions of underpayment, Nile Rodgers arranged for her to consult with Richard Leher, a highly regarded entertainment attorney with Greenberg Traurig LLP, in Los Angeles, and Michael Ostin, a music executive.  (7/15 Tr. pp. 16-17).  In the fall of 2010, they reviewed Herrera-Edwards' royalty statements and the probate settlement documents. They concluded that her payments did not seem to reflect her full royalty rights.  (5/22 Tr. pp.

---

[7]  Where the author, like Bernard Edwards, is both a songwriter and performer, there are copyrights for the compositions and for recorded performances.  Thus, Edwards' copyrights would include performance royalties, mechanical royalties for records, CD's and streaming play; artistic royalties; and synchronization royalties (for use of a work within another work).  A single artist, as owner of these rights, would also have "administration rights," with authority to give permissions for exploitation of the rights and the right to sell or assign the rights included in the copyrights.

[8]  The July 9, 1997, mediation settlement agreement provides, in paragraph 9, that "*The Estate by its Executor Wallace Franson, Bambi Edwards, Alexis Edwards and Bernard Edwards' children agree to execute such documents, contracts and agreements as are necessary to effectuate the terms and conditions of this Stipulation.*"

184-86, 188-90; 7/15 Tr. p. 17).  They believed that she had not been receiving "record," "artist," or "producer" royalties.  (5/22 Tr. pp. 188-90).

Instead of hiring Mr. Leher, who commanded a premium billing rate, Herrera-Edwards selected Morgan & Morgan, P.A., who agreed to work on a 40% contingency fee to recover the unpaid royalties.[9]  (5/23 Tr. pp. 22-24).  She provided Daryl Rouson, Tucker Byrd, and Clay Townsend at Morgan & Morgan with all of the probate documents.  (5/23 Tr. p. 24).  After review and analysis of the documents over several months, the Morgan & Morgan lawyers prepared a draft complaint to recover the unpaid royalties.  (5/23 Tr. p. 28).

### 2.  Mr. Moore Becomes Interested in the Debtor's Financial Affairs.

In late 2010, Herrera-Edwards needed funds.  Marvin Washington, Herrera-Edwards' investment advisor, suggested that she pursue a loan.  Washington introduced her to Chuck Biddle, who had a connection to a lender, Music Royalty Consulting, Inc. ("MRCI").  (7/15 Tr. p. 20).  Biddle brought in his associate, Mr. Moore, to help him and Washington close a loan.[10] (5/22 Tr. p. 44).

Without her knowledge, Washington sent Biddle and Moore copies of Herrera-Edwards' documents.  (7/15 Tr. pp. 20-22; Pl's Exs. 9, 10).  Washington told Herrera-Edwards that Moore was considered a "closer" and that Biddle had contacted Moore for assistance so that Moore could help Biddle close a deal with MRCI.  (7/15 Tr. p. 26).  Although he and Herrera-Edwards did not meet until July 2012, Moore began gathering information about her and her royalty rights.  (Pl.'s Exs. 10, 14; 7/15 Tr. pp. 20-24).  But, this initial effort to borrow funds stalled.

---

[9]  Herrera –Edwards retained Morgan & Morgan on November 24, 2010.  (Def.'s Ex. 39).

[10]  Moore disputes the characterization that he and Biddle were partners, in the sense that they have no written contract.  But, they did call each other "partner" as a term of endearment.  (5/22, Tr. p. 40).  When asked whether Moore had put in writing in an email that he had an oral fee sharing agreement with Mr. Biddle, Moore responded that he knew that he had an oral agreement with Mr. Biddle.  (5/22 Tr. pp. 85-86).

The debtor resumed discussions with MRCI in 2011, without the direct involvement of Moore. On June 28, 2011, she executed an agreement with MRCI to obtain about $1.8 million secured by a lien on her royalty income, to be released only after MRCI had received $3.6 million.[11] She executed an assignment of her rights; but, JSM and Bernard Edwards Co., LLC ("BEC"), as administrator and co-beneficiary of the copyrights, respectively, refused to consent to the assignment.[12] (7/15 Tr. pp. 27-28). As a result, MRCI never made the loan.

Instead, MRCI sued JSM and BEC in California state court for interfering with the Herrera-Edwards deal. (5/22 Tr. p. 192). Initially, the claims were dismissed, but MRCI repled one claim and added Herrera-Edwards as a defendant. (5/22 Tr. pp. 192-93). In response to MRCI's lawsuit, ASCAP began withholding (in escrow) the royalty payments that were due to the debtor. Herrera-Edwards then retained Attorney Leher to represent her in the lawsuit. (5/22 Tr. p. 192).

The royalties withheld by ASCAP had grown to about $265,000 by June 2012. That's when Herrera-Edwards informed her attorney in the MRCI transaction, Mr. Minter, that her "money ran out." (Pl.'s Ex. 34).

3.    The Consulting Agreement.

On June 24, 2012, Mr. Minter informed Herrera-Edwards by email that Chuck Biddle claimed that "he and Moore" had found new money for her to collect.[13] (Pl's Ex. 34). That is the same claim that Moore had made directly to Attorney Minter in January 2012, when Moore told Minter that he had "discovered" over $500,000 that he could recover for Herrera-Edwards

---

[11] The debtor was represented in this transaction by Atlanta attorney Kendall Minter. Minter was to receive about $92,000 from the loan proceeds, $45,000 of which the debtor paid to him in advance.

[12] BEC is an entity owned by Bernard Edwards' children.

[13] The June 24, 2012, email from Minter to Herrera-Edwards says: "Let's talk today or tomorrow. I got a call yesterday from Chuck Biddle about $$ outside of [MRCI] and [JSM] that he and Eric have located that you can collect." (Pl.'s Ex. 34).

in seven to fourteen days. (Pl.'s Exs. 29, 31). Although they were not partners in any formal

business, Moore and Biddle were acting in concert. The week following June 24, Moore

obtained from MRCI copies of the Morgan & Morgan draft complaints, which outlined the

rights, parties, and avenues of recovery that Herrera-Edwards should pursue. (Pl.'s Ex. 37a).

In his subsequent conversations with Herrera-Edwards, Moore referred generally to

funds that he had located, describing them as "hidden" or "misappropriated." (7/15 Tr. p. 34;

7/28 Tr. pp. 22-23). He assured her that he had located money other than what she had

historically received since 1997 (7/28 Tr. pp. 22-23; 7/15 Tr. pp. 35, 39); but, he did not

reveal the sources. (7/28 Tr. p. 22). In addition to claiming a quick recovery of $500,000 or

more, Moore touted his work with high profile clients. (7/15 Tr. p. 42).

What he did not tell Herrera-Edwards was that he had been convicted of grand larceny

in 1999 for taking investor money under the false pretense that their funds would be invested in

the promotion of a *Prince* concert. (7/15 Tr. p. 43; Doc. 15, Answer ¶ 74, n.1, Ex. B (attaching

articles describing the crime)). Moore also did not disclose that he had an oral agreement with

MRCI to receive 50% of any royalty payments that he was able to recover for MRCI through its

lawsuit against JSM and BEC. (Pl.'s Ex. 60).

Ultimately, Moore gained the debtor's confidence. Unlike others, Moore took time to

sit down and explain the documents to her, line by line. (7/15 Tr. p. 61, 117). To her, Moore

was a like a "security blanket." (7/15 Tr. p. 63). He convinced her that he had found

"treasure" that her attorneys had been unable to collect. (7/28 Tr. pp. 51-52). With her

historical royalty payments being withheld because of the MRCI litigation, Herrera-Edwards

was led to sign the Consulting Agreement, dated July 11, 2012, because of Moore's

representations that he had "found" new money. (7/15 Tr. p. 33; Pl.'s Ex. 38).

The Consulting Agreement includes three bases of compensation for Moore: (a) 17% of the funds or tangible liquid property recovered as a direct result of his services; (b) an unspecified "fee" for any recovery to client, including removal of fees, liens, etc.; and (c) an hourly fee at a rate to be agreed and a percentage of the recovery for assisting any of her legal counsel.[14] (Pl.'s Ex. 38). Attorney Minter reviewed the Consulting Agreement, but the Morgan & Morgan lawyers did not. Nor did Attorney Leher, who was then representing her in the MRCI lawsuit. At trial, Attorney Leher testified that Herrera-Edwards should not have signed that agreement and that Mr. Minter did not sufficiently protect her. (5/22 Tr. pp. 196, 205-08).

4.    Moore Takes Control.

Having placed her confidence in Moore, Herrera-Edwards wanted him to be involved in her affairs, as her "strategist." She insisted that her attorneys work with him.

Moore advised her that a Chapter 11 would be necessary; he then selected the boutique law firm of Jennis & Bowen, P.L., to be her bankruptcy counsel. According to the debtor,

---

[14] In part, the Consulting Agreement (with emphasis added) provides:

> . . . Consultant hereby *represents to Client that he is in the unique position to collect property and/or funds on Client's behalf* and is willing to perform services on behalf of Client subject to the terms and conditions set forth below. . . .

> Consultant will not adversely impact other rights or claims which are the subject of her current litigation. Consultant is in possession of months of confidential information and research that may assist client in future litigation. *Consultant agrees to assist client's legal counsel with the litigation and provide information providing the firm is willing to compensate him at an hourly rate to be agreed upon and a percentage of recovery.* Legal counsel agrees not to interfere with Consultant's collection efforts in any way during the term of the Agreement. . . .

> COMPENSATION: *Consultant shall be paid seventeen (17.0%) percent of funds or tangible liquid property recovered as a direct result of the Consultant's services hereunder.* In the event Consultant's efforts should result in Client receiving tangible assets such as copyrights as part of a recovery, then the parties shall secure an independent appraisal which values the asset and Consultant's fees shall be based upon the fair market value of the asset. *Client is due a fee for any recovery to client including but not limited to reduction or removal of fees, liens, etc.*

Moore selected Jennis & Bowen because it lacked entertainment law capabilities and, thus, could be "controlled" by him. (7/28 Tr. p. 137-38).

Asserting his authority per Herrera-Edwards' instructions, Moore initially insisted on language being added to Jennis & Bowen's engagement letter, making him the sole contact with her bankruptcy lawyers. (7/15 Tr. p. 117). Jennis & Bowen would not do that. Instead, all the firm would agree to was the addition of the following to the engagement letter: "*Moreover, pursuant to this Agreement, the Client consents and agrees that the Firm can take instructions and make communications regarding this matter from and through Eric L. Moore ("Mr. Moore").*" (Pl.'s Ex. 186).

Attorney Leher succeeded in getting MRCI's lawsuit dismissed by the California court. He was engaged to obtain the release of the escrowed royalty payments. Following execution of the Consulting Agreement, but before the Chapter 11, Moore commenced a series of phone calls and emails to Attorney Leher and to ASCAP's in-house counsel and others to insert himself into the effort to obtain the withheld royalty payments. According to Moore, the "sticking point" to un-freezing these funds was MRCI's recorded UCC lien that he could get removed. (5/22 Tr. p. 83; 5/23 Tr. pp. 255-56).

The funds were ultimately released to Attorney Leher in late August 2012. (5/22 Tr. p. 195). Moore then demanded payment of 17% of the released funds as being due to him under the Consulting Agreement. He sent the debtor an invoice on September 6, 2012. (Pl.'s Ex. 91). She paid $44,953.53 on advice of Mr. Jennis that Moore's entitlement could be reviewed and challenged later in the bankruptcy case. (7/15 Tr. pp. 47-49).

Asserting Herrrera-Edwards' authority, Moore directed each of her attorneys – Leher, the Morgan & Morgan lawyers, and Mr. Jennis – *not* to communicate with each other. (E.g., 7/14

Tr. p. 72). According to Herrera-Edwards, Moore frequently disparaged her lawyers' efforts. (7/28 Tr. p. 52). Mr. Leher testified that Mr. Jennis was led to believe that Leher was "compromised" and should not be contacted; but Leher learned later that the source of that view was Moore, who had made that characterization to Herrera-Edwards. (5/22 Tr. p. 218). The debtor testified credibly that Moore "sold" her on the feeling that her attorneys were not doing their jobs. (7/28 Tr. p. 52).

Moore arranged a meeting at Morgan & Morgan on September 14, 2012, before the Chapter 11 filing, among himself, Herrera-Edwards, and Attorneys Darryl Rouson and Clay Townsend. Mr. Jennis was not invited to the meeting. Moore insisted that Morgan & Morgan reduce its contingency fee from 40% to 30% and that they retain him at $275 per hour, plus a percentage of any recovery. Attorney Rouson described the reaction of his firm's entertainment law specialist, Clay Townsend, as "why is Moore driving the train?" (5/23 Tr. pp. 35-36). No fee arrangement was made.

Moore then discouraged the debtor from moving forward with the lawsuit Morgan & Morgan was ready to file. (5/23 Tr. pp. 31-33). Moore's rationale was that, with the Chapter 11 filing, all that would be needed was the filing of a motion for turnover of assets to cause JSM and BEC to capitulate; that would make the proposed Morgan & Morgan lawsuit unnecessary. At the debtor's direction, based on Moore's influence, Morgan & Morgan's services were terminated by a letter from Mr. Jennis, dated October 29, 2012. (Def.'s Ex. 65).[15]

Attorney Jennis and his colleagues instructed Moore, before the Chapter 11 petition was filed and several times thereafter, that his post-petition employment and terms of compensation must be approved by the bankruptcy court. (Pl.'s Ex. 108; 5/23 Tr. pp. 222- 23; 7/14 Tr. pp.

---

[15] Moore counters the inference that he sabotaged Morgan & Morgan as payback for their not hiring him by claiming that he is the one who alerted that firm to the necessity of filing a claim before the bar date. Morgan & Morgan did file a timely claim in the amount of $173,000.

132-33; 7/17 Tr. p. 83). On or about October 12, 2012, Attorney Tate of Jennis & Bowen so advised Moore, by email. Moore's written and oral communications show that he understood that court approval was required. (Pl.'s Exs. 125, 138; 5/23 Tr. p. 231; 7/17 Tr. p. 84; 7/28 Tr. pp. 83-84).

James Cinque, a prominent New York entertainment attorney, was retained, with court approval, in November 2012, to negotiate an employment agreement with Moore. But, Moore insisted on being paid a "commission" on Herrera-Edwards' entire royalty stream, not just on any new assets found by him. After three weeks of discussions, no agreement was reached. No application for the employment of Mr. Moore was ever presented to this Court. (5/23 Tr. p. 119; 7/17 Tr. p. 84).

Even though his employment was never approved by the court, Moore held himself out as the debtor's "strategist." He continued to broadcast various theories by which he claimed to have uncovered assets, reduced fees that Herrera-Edwards owed, or eliminated claims against her estate. (5/23 Tr. pp. 197, 260; 7/15 Tr. p. 65; 7/28 Tr. p. 52).

In November 2012, Moore sent a document request to the Connecticut probate court clerk. He received back a certified copy of that court's order, entered on September 4, 1997, and a typed copy of the July 9, 1997, mediation settlement agreement. (Def.'s Ex. 18). This is what Moore has consistently referred to as the "treasure map," because, to him, it "proves" that the later-executed July 30, 1997, agreement and the Co-Publishing Agreement (which purport to give BEC all of the administration rights and allow JSM to charge certain fees) were not approved by the probate court and are therefore invalid.

Moore also took it upon himself to contact potential creditors and third parties, advising them of what claims to file or not file. (Pl.'s Exs. 80, 106, 120, 127, 128). In December 2012,

Moore contacted the U. S. Trustee's office to tell them that he had "discovered" substantial claims and funds for Herrera-Edwards that he believed were not being pursued by her attorneys. (7/15 Tr. pp. 57-58; Pl.'s Exs. 133, 150, 151).

The debtor and her attorneys became increasingly troubled by Moore's undirected activities, particularly his contact with the U. S. Trustee's Office. With the recent knowledge of Moore's 1999 criminal conviction, the impossibility of reaching agreement for his employment, and his continued interference with counsel, Herrera-Edwards concluded that she could no longer trust him. (7/15 Tr. pp. 57-64). The Court approved the debtor's rejection of the Consulting Agreement on April 15, 2013. (Doc. No. 146).

Nevertheless, Moore continued to contact Herrera-Edwards with promises of "found" money. (Pl.'s Exs. 157, 159, 160, 161, 162, 170, 173, 174, 175a). As late as June of 2013, Moore suggested to Mr. Jennis that he could procure either a $2.5 million loan from MRCI or a purchaser of her royalty rights for $8-12 million, for a 5% commission payable to Moore. (Pl's. Ex. 159).

## DISCUSSION

1.    Compensation under the Consulting Agreement.

Mr. Moore argues that he is entitled to payment because he fully performed compensable services under the Consulting Agreement by discovering copyright interests (including publisher, artist, and producer shares, administration rights, and back royalties). (Claim 18, Part 2, Ex. A). He also claims that he did copyright and probate research, put together a binder of documents, prepared charts and timelines, articulated theories of recovery, and obtained the "treasure map" from the Connecticut probate court, all of which he shared

with Herrera-Edwards and her attorneys. He argues that his work will eventually lead to a substantial recovery for Herrera-Edwards.

It is evident that for more than a year – before they met and without her knowledge – Moore devoted considerable time to informing himself about Herrera-Edwards' financial condition, the 1997 probate case, her copyright interests, and her personal life. He acquired documents initially through his associate, Mr. Biddle, and his contacts at MRCI and, later, from the debtor and her attorneys. At a time when her royalty payments were being escrowed, because of a lawsuit in which he had an undisclosed financial interest, Moore promoted himself – first to Herrera-Edwards' attorney Minter, through Biddle, and then directly to the debtor herself – as being in a "unique position" to recover $500,000 or more of new money very quickly.

Under Florida law, the requirements for a claim of fraud or fraudulent inducement are (1) a false statement regarding a material fact, (2) the statement maker's knowledge that the representation is false, (3) intent that the representation induces another's reliance, and (4) consequent injury to the party acting in reliance. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294 (11th Cir. 2007) (citing *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So.2d 631, 632 (2005).

The Court is compelled to conclude that the claim of having found $500,000 (or other new sources of money) that could be recovered quickly was a falsehood and, therefore, constitutes fraud and a false pretense. There is nothing in the record to support that claim. This "$500,000" has never been identified or recovered. But, it was the critical "hook" to induce Herrera-Edwards to sign the Consulting Agreement. The fraud is compounded by Moore's undisclosed financial interest in the lawsuit which put Herrera-Edwards in a financially

13

vulnerable position when he offered his "unique position" for a fee.[16] The conclusion is inescapable that Herrera-Edwards and her royalty income were targeted by Moore and that he used false pretenses to induce her to sign the Consulting Agreement.

Apart from the Consulting Agreement being fraudulently induced and unenforceable, the Court concludes that Moore provided no compensable services under the document's terms. First, he did not recover any tangible liquid property. There were never any additional "copyrights" to be recovered. Since the 1997 settlement, Herrera-Edwards has owned a 37.5% interest in everything that Bernard Edwards once owned. The essence of the dispute with BEC, JSM, and other parties is not whether there are copyrights to be found, but whether these intermediary payors have faithfully disbursed the proper amounts to her and whether any fees taken out of the royalties are warranted by the parties' agreements.

Second, Mr. Leher testified that he had identified the nature of possible royalty shortfalls in 2010, before Moore was involved. Morgan & Morgan was retained in November 2010, also before Moore became involved. Morgan & Morgan was prepared in 2011, before the Consulting Agreement was signed, to assert claims to recover the artist, producer, and other royalties that apparently had not been paid to Herrera-Edwards. (5/23 Tr. pp. 24-29).

Mr. Rouson testified, convincingly, that Moore provided no value to Herrera-Edwards. ("I didn't see [Moore] do anything."). (5/23 Tr. p. 73). Likewise, Mr. Cinque regarded Moore as providing no value to Herrera-Edwards. (5/23 Tr. p. 188). According to Herrera-Edwards, who testified credibly, the binder of Moore's work that he delivered to Jennis & Bowen consisted of her own documents. (7/15 Tr. pp. 65-67).

---

[16] In light of the foregoing, Moore's protest that Herrera-Edwards could have learned of his 1999 felony conviction by a Google search is of no consequence.

14

Moore's "treasure map" provides no value. The certified copy of the probate court's order, entered on September 4, 1997, and the typed copy of the July 9, 1997, mediation settlement agreement proves only that those documents are in that court's files, a fact which nobody disputes. (5/23 Tr. p. 251). But, it is nothing short of far-fetched to suggest that two agreements (the July 30, 1997 Agreement and the Co-Publishing Agreement), executed by well-represented parties, are invalid solely because they post-date the July 9 agreement which contemplated (Paragraph 9) that subsequent agreements would be made by the parties.

Herrera-Edwards retained Attorney Leher to represent her in the MRCI litigation (5/22 Tr. p. 192), and, as Herrera-Edwards' attorney in that lawsuit, it was Attorney Leher's responsibility to obtain the release of the withheld royalty payments. He and his firm succeeded in having the MRCI lawsuit dismissed; Leher corresponded with MRCI's counsel, counsel for JSM and BEC, and counsel for ASCAP regarding the escrowed royalties. (Pl.'s Exs. 83, 87). The escrowed funds were released to Leher. (5/22 Tr. p. 195; Pl.'s Exs. 86, 87).

Even though Moore inserted himself into the process, there is no proof that Moore's efforts contributed anything to what Attorney Leher was already doing to obtain the funds. Further, these funds were historical royalties that Herrera-Edwards would have received in the ordinary course if MRCI had not sued her payors. They were not from any new source that Moore discovered in his capacity as her "consultant."

Based on the admitted evidence, as well as credible testimony at trial, the Court finds that Moore's other claims of recovery are equally valueless.

*1. Moore claims that he removed MRCI's lien on the debtor's royalties following the failed MRCI loan transaction.*

Moore testified that he is the one who "persuaded" MRCI to terminate its lien by telling MRCI's principals that "this is illegal and we'll file charges if you don't remove it." (5/22 Tr. p. 83). But he discouraged Herrera-Edwards from taking any legal action against MRCI. (5/23 Tr. pp. 255-56; 7/14 Tr. p. 169). The MRCI "loan" closing never occurred; MRCI never funded the loan that was to be secured by the lien.[17] Because the loan was never funded, there was no consideration for the lien. There was no legal basis for the continuation of the lien, which could have been avoided in the bankruptcy case. Moore contributed nothing of value in this matter.

*2. Moore claims that he persuaded Lyric Financial not to file a claim in the bankruptcy case.*

Counsel for Herrera-Edwards scheduled a debt to Lyric Financial based on information provided by Moore or Herrera-Edwards' accountants. (5/23 Tr. pp. 256-57). However, Lyric Financial acknowledged to Herrera-Edwards' bankruptcy counsel that it had already been paid in full. (Pl.'s Ex. 116). Moore accomplished nothing by "persuading" Lyric Financial not to file a claim in the bankruptcy case.

*3. Moore claims that he persuaded the debtor's probate case attorneys, Ryan Ryan Deluca, not to file a claim in the bankruptcy case.*

Moore contacted Ryan Ryan Deluca repeatedly, but they refused to deal with him. (Pl.'s Ex. 127). Ryan Ryan Deluca informed Moore that it would only communicate with Herrera-Edwards' bankruptcy counsel. (5/23 Tr. p. 257). When Herrera-Edwards' bankruptcy counsel contacted Ryan Ryan Deluca to obtain their probate case files, they were advised that that Ryan Ryan Deluca was not asserting a retaining lien on the files and would not be filing a bankruptcy

---

[17] The MRCI contract defined the "Closing" as the time when "[t]he Purchase Price shall be paid." (Pl.'s Ex. 23, ¶ 2.a). While the contract provided for payment of $50,000 in "due diligence and closing costs and charges," such payment was to be made in connection with the Closing, with MRCI having the right to deduct the amount from the Purchase Price. (*Id.* ¶ 8).

claim. (5/23 Tr. p. 257). Again, Moore did nothing to "persuade" Ryan Ryan Deluca not to file

a claim. That firm had refused to communicate with him and never intended to file a claim.

> 4.     *Moore asserts that the debtor has a claim against Ryan Ryan*
> *Deluca of more than $1,000,000 under a contingency fee agreement for the tort*
> *lawsuit that resulted in the 1997 settlement.*

There is no evidence that Ryan Ryan Deluca owed the debtor anything on the petition

date. The Ryan Ryan Deluca 1997 contingency fee agreement was expressly made "subject to"

the Connecticut statutory limitation on contingency fees. (Pl.'s Ex. 10, MOORE, Bates stamp

000098-100). Accordingly, the fees due to that firm, by contract, could not exceed or violate the

statutory cap. Years later, Herrera-Edwards settled her fee issues with Ryan Ryan Deluca and

executed a general release of any claims against the firm. (Pl.'s Ex. 10, MOORE, Bates stamp

000108). Accordingly, Herrera-Edwards did not have a valid "million dollar" claim against

Ryan Ryan Deluca.

> 5.     *Moore asserts that he discovered a $160,000 spousal share of the*
> *Edwards' estate that was never paid to her.*

The $160,000 spousal share would have been due and payable prior to the closing of the

probate estate, long before Moore was involved. Herrera-Edwards' entitlement to the spousal

share was expressly acknowledged in the 1997 settlement. (Pl.'s Ex. 5, p. 2). The succession tax

assessment, prepared some 15 years ago, reflects her receipt of the payment. (Def.'s Ex. 49,

Doc. 374-5, p. 4). At trial, Herrera-Edwards was unable to confirm that she had not received the

payment. (7/28 Tr. p. 72).

      *6.     Moore maintains that Herrera-Edwards can eliminate her IRS liability by taking a "theft loss" tax deduction for royalty underpayments.*[18]

Tanisha Mills, a CPA, testified for Moore that she was of the opinion that a potential theft loss deduction could be taken based on (1) an overpayment of fees to Ryan Ryan Deluca, (2) the 5% fee that JSM deducts from her royalties, and (3) the "theft" of Herrera-Edwards' copyright interests by JSM, BEC, and others. (7/17 Tr. pp. 113, 128, 137). Mills relied entirely on the factual information provided by Moore. (7/17 Tr. pp. 115, 117-20). She never discussed the underlying facts with Herrera-Edwards or her accountants. (7/17 Tr. pp. 117-20, 131, 137-38).

But, it has not yet been established that royalties were underpaid, or that any of the upstream payors have engaged in criminal conduct.[19] These claims, however, are the subject of pending civil litigation seeking a money judgment for compensatory damages. Where there is "a claim for reimbursement with respect to which there is a reasonable prospect of recovery," the taxpayer has not sustained a loss until "it can be ascertained with reasonable certainty whether or not such reimbursement will be received." 26 CFR §1.165-1(d)(3). Any contention that Herrera-Edwards has sustained a theft loss related to alleged underpayments is premature.[20]

Second, "[i]f the theft is accomplished in a manner that results in the taxpayer failing to include the cash or property in income, or in claiming the amount of the loss as a business

---

[18] Although not pleaded in Claim 18, Moore implied at trial that he was entitled to payment for presenting his theory that Herrera-Edwards was entitled to a theft-loss deduction to reduce or eliminate her federal tax debt.

[19] For purposes of a deduction under 26 U.S.C. § 165(a), "theft" covers "any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956) (emphasis added); Revenue Ruling 72-112 (taxpayer must prove "loss resulted from a taking of property that is illegal under the law of the state where it occurred and that the taking was done with criminal intent").

[20] Moore also asserts that Ryan Ryan Deluca stole from the debtor when it overcharged attorney's fees. The statute he relies on, Connecticut General Statutes § 52-251c, is a civil statute. The statute does not make it "illegal" or a "criminal act" to exceed the statutory caps, and it does not provide for punishment under the state penal code. Further, as noted above there is no proof that the Connecticut statute was violated.

expense, no theft loss will be allowed."[21] There has been no proof that Herrera-Edwards did not

deduct the attorney's fee payments she made to Ryan Ryan Deluca. It is also unlikely that she

included the unknown amount of unpaid royalties in her reported income.

Moore's theft loss deduction strategy is not realistic. Herrera-Edwards' special tax

counsel, Mr. Heinkel, was employed to investigate the theft loss deduction being asserted by

Moore. Mr. Heinkel determined that a theft loss deduction was inappropriate at this time, given

the debtor's situation. (5/23 Tr. p. 259-60).

Instead of limiting or reducing the debtor's liabilities, Mr. Moore substantially hindered

the administration of, and increased the claims in, the Chapter 11 case:

> (a) Mr. Jennis estimated that to maintain Herrera-Edwards' trust some
> $300,000 of attorney time was expended to analyze and advise her regarding
> Mr. Moore's theories.

> (b) His disparagement of the attorneys, while advising them not to
> consult with each other led to wasteful duplication of effort.

> (c) Moore's unauthorized and, ultimately ineffectual, effort to
> dissuade Ryan Ryan Deluca from filing a bankruptcy claim could have been a
> significant blunder; if it had turned out that the debtor did have a claim against
> that firm, the filing of a proof of claim might have provided the legal basis for
> adjudicating her claim against them in the bankruptcy court in Tampa.[22]

> (d) Herrera-Edwards was compelled to deploy Mr. Cinque to work for
> three weeks to negotiate a post-petition employment agreement, which failed
> because Moore insisted on a percentage commission on historical royalties not
> just on new assets recovered through his efforts.

> (e) Moore takes credit for encouraging Morgan & Morgan to file a
> $173,000 claim in the bankruptcy case.

---

[21] BNA U.S. Income Portfolio, McCoy, 527-4th T.M., Loss Deductions, p. 298 (2014); *Alsop v. Commissioner*, 290
F.2d 726, 727-29 (2d Cir. 1961) (embezzled royalty payments which were never reported as income by a cash basis
taxpayer had a zero basis and thus could not be claimed as a theft loss); *U.S. v. Spencer*, 178 F.3d 1365, 1369 (10th
Cir. 1999); *U.S. v. Kleifgen*, 557 F.2d 1293, 1298-99 (9th Cir. 1977); *Martin Gluck & Sons, Inc. v. U.S.*, 1977 WL
1088, at *1-2 (W.D. Pa. 1977).

[22] See *Stern v. Marshall*, 564 U.S. 2, 131 S.Ct. 2594, 2616-19 (2011) (Justice Roberts' analysis of bankruptcy
court's authority to adjudicate a counterclaim based on facts that overlap a proof of claim).

Third, none of the debtor's attorneys ever agreed to hire or compensate Moore. (5/22 Tr. p. 202; 5/23 Tr. pp. 37, 119, 217). Moore never requested an agreement with Jennis & Bowen. (5/23 Tr. p. 217). Draft applications for employment by the bankruptcy estate were prepared, but never signed or filed. (Def.'s Exs. 15, 41; 5/23 Tr. pp. 225-26, 229). Moore had earlier attempted, without success, to negotiate an employment agreement with Morgan & Morgan, and he prepared a draft amendment to their retainer agreement (5/23 Tr. pp. 34-35; Def.'s Ex. 11); but Morgan & Morgan never signed the amendment, and did not agree to compensate him. (5/23 Tr. p. 37).

For the reasons stated above, the Court concludes that the Consulting Agreement, procured by fraud or false pretenses, is invalid. The Court concludes, as well, that Moore has not provided any services which would be compensable under the Consulting Agreement even if it was valid. Mr. Moore's Claim No. 18 will be disallowed in its entirety, with prejudice. Mr. Moore will not be allowed any damage claim arising out of the rejection of the Consulting Agreement. And, judgment will be entered against him on his counterclaim.

2.    Administrative Expense Claim.

Sections 327 and 330 of the Bankruptcy Code govern the employment and compensation of professionals. Specifically, section 327 authorizes a trustee (or debtor-in-possession), with bankruptcy court approval, to employ certain named professionals, including attorneys, appraisers, and "other professional persons." 11 U.S.C. § 327(a). Section 330(a) allows an award to a professional person employed under section 327, for reasonable compensation and actual, necessary expenses. 11 U.S.C. § 330(a)(1)(A) & (B).

The term "professional" is not limited to licensed individuals, but is to be defined more generally. For example, in *In re Interstate Restaurant Systems, Inc.*,[23] the court employed a functional test to determine whether someone is a professional ("[w]hether services rendered are sufficiently 'professional' in nature does not turn solely on the type of educational degree that one possesses . . . . Rather, this Court holds that services of a 'professional' nature are manifested by workmanship based on sound knowledge and conscientiousness. This sound knowledge can be acquired through the results of education, training or experience.")

Even though Moore is not a "professional," by education or credentials, he held himself out as being an expert on the financial workings of the music industry. He claimed to the debtor and her lawyers to possess exclusive knowledge that put him in a "unique position" to recover "hidden" funds and other assets owed to the debtor, for which he wanted compensation based on a percentage of estate assets. In addition to his claims of expertise and private knowledge, Moore held himself out as a professional consultant. In the "bio" he sent to several of Herrera-Edwards' attorneys, Moore advertised himself as the President and Founder of Moore Consulting, while plugging his experience as both a "consultant" and "bankruptcy consultant." Because Moore sold himself as having the attributes of a professional person, he cannot now disavow that status for purposes of Sections 327, 330, and 503(b)(2). [24]

---

[23] 61 B.R. 945, 949 (Bankr. S.D. Gla. 1986).

[24] In his Request for Judicial Notice (Doc. No. 53), Moore points to a statement made in Herrera-Edwards' trial brief, that Moore "is clearly not a professional." (Doc. No. 28 at 25). Moore asks the Court to take judicial notice of this statement in an attempt to counter a finding by the Court that Moore is a "professional" for purposes of Sections 327 and 330, or an administrative expense claim under Section 503(b)(2). However, those references are made in more of a vernacular sense, not a technical sense, and the status of a "professional" is based on the attributes of the applicant, services to provided, and terms of compensation.

Pursuant to Sections 327 and 330 of the Bankruptcy Code, Moore's employment and terms of compensation had to be approved by the Court for Moore to receive compensation from the estate.

But, his employment was never approved. Moore claims that he reasonably relied on Herrera-Edwards' promises to continue working under the terms of the Consulting Agreement and that he delivered his work product to Herrera-Edwards and her legal counsel until January 1, 2013.[25] He asserts that he was misled by Herrera-Edwards, Mr. Jennis, Ms. Tate, and others – who took his work product, but then denied him employment by the estate. He claims that this is an "extraordinary circumstance" that excuses him from prior court approval.[26]

There is no evidence, however, that Moore was misled, abused, or improperly influenced by the debtor, Mr. Jennis or his colleagues, or any of her other attorneys regarding his employment. Moore was advised repeatedly that his employment would have to be approved by this Court for him to be paid.[27] Even in the absence of approval – indeed even after rejection of the Consulting Agreement – Moore voluntarily pushed his theories and proposals on Herrera-

---

[25] In the main bankruptcy case, the debtor initially opposed Moore's administrative expense claim (Doc. No. 221) by filing a motion for summary judgment on the premise that Moore was ineligible because his employment had never been approved by the court (Doc. No. 276). Although the debtor's motion was premised on well-established law regarding the pre-requisite of court approval, the Court denied it (Doc. No. 328) because Moore raised a plausible claim that he had been misled by Jennis & Bowen into providing services without compensation. Moore argued that such misconduct could be an "extraordinary circumstance" excusing prior court approval. Motion for Reconsideration (Doc. No. 274).

[26] In *In re United Container, LLC*, 305 B.R. 120 (Bankr. M.D. Fla. 2003), Judge Glenn acknowledged that courts generally agree that the employment of a professional must be approved, but may be made effective retroactively, provided that extraordinary circumstances are present in the case. (citing *In re Aultman Enterprises*, 264 B.R. 485, 489 (E.D. Tenn. 2001); see also *In re Little Greek Restaurant, Inc.*, 205 B.R. 484, 486–87 (Bankr. E.D. La.1996) ("[B]ankruptcy courts retain equitable powers, in the exercise of their sound discretion, under exceptional circumstances, to grant such approval nunc pro tunc.")).

[27] Moore seeks to legitimize his claim to have been working for the estate by the several references to him in the debtor's schedules, in motions, drafts of employment applications, letters, e-mails, and Jennis & Bowen's engagement letter. On October 18, 2012, Moore was listed by name in the Case Summary (Doc. No.14) as someone to be hired on an expedited basis. Moore was also listed on Schedule G/Executory Contracts. See Debtor's Schedule (Doc. 5, pg. 103-104). None of those references to him has any legal significance because this Court was never presented with an application to employ him to work on behalf of the estate.

Edwards and her legal team. The Court concludes that there are no "extraordinary circumstances" excusing Moore from the requirement of prior court approval.

Alternatively, Moore argues that he is entitled to an administrative expense claim for his services, without court approval, under Section 503(b)(1)(A) of the Bankruptcy Code as a necessary cost of preserving the estate. This Court finds compelling, however, the majority view of courts that Bankruptcy Code Section 503(b)(1)(A) is not to be used by unapproved professionals to avoid the requirements of section 503(b)(2) and the related obligations under sections 327 and 330(a).[28] This Court will not allow Mr. Moore to "sidestep" the provisions of the Code mandating court approval of a professional's term of employment, particularly so, where he held himself out as being a uniquely qualified consultant and demanded compensation at a double-digit percentage of the estate's principal asset. For this reason, Moore's argument of entitlement to fees under section 503(b)(1)(A) fails.

Beyond the fact that his employment and compensation were not approved by the Court, there is another reason to deny an administrative expense claim. For a claim to be afforded administrative expense priority, it must not only be "actual" and "necessary," but also "there must be an actual, concrete benefit to the estate before a claim is allowable." *In re Subscription Television of Greater Atlanta*, 789 F. 2d 1530, 1532 (11th Cir. 1986). For the reasons stated above, the Court has determined that Mr. Moore provided no benefit to the bankruptcy estate.

---

[28] See *F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.)*, 844 F.2d 99, 108–09 (3d Cir. 1988); *In re Albrecht*, 245 B.R. 666, 670–71 (10th BAP 2000), *aff'd*, 233 F.3d 1258 (10th Cir. 2000); *In re Cutler Mfg. Corp.*, 95 B.R 230, 231-32 (Bankr. M.D. Fla. 1989) ("As Judge Brumbaugh stated in *In re Martin Oil Company*, 83 B.R. 50 (Bkrtcy.D.Colo., 1988), 'The Bankruptcy Code contains numerous and detailed provisions concerning the employment of professional persons and their compensation and payment: See 11 U.S.C. § 327, § 328, § 330 and § 503(b)(2). In light of these provisions, Congress cannot have intended that a professional person could sidestep the specific requirements set forth and come in later and claim payment under the general provisions of § 503(b)(1)(A) as an actual, necessary cost of preserving the estate. . . . .;' *Matter of Concrete Products, Inc.*, 208 B.R. 1000 (Bankr. S.D. Ga. 1996) ("To apply Section 503(b)(1) to professional compensation would make the language of Sections 503(b)(2) superfluous. Congress enacted Sections 327, 330(a), and 503(b)(2) to provide the exclusive method for a debtor's retention of professionals, subject to numerous safeguards, including the requirement of disinterestedness. A court should not circumvent the limitations placed on retention of professionals by compensating a disqualified professional under Section 503(b)(1)(A)."); *In re Villa Luisa, L.L.C.*, 354 B.R. 345 (Bankr. S.D. N.Y 2006).

23

His strategies and theories of the case did not contribute to the recovery of any asset. They were proved to be without merit and lacking evidentiary support. His involvement actually hindered the administration of the case and caused legal resources to be deployed in efforts to verify his theories, maintain the debtor's confidence in the face of those theories, and negotiate with Moore regarding his desired commission.

The Court is compelled to conclude that Mr. Moore is not entitled to an administrative expense claim because he was never appointed by the Court, the terms of compensation were never approved, and he provided no benefit to the bankruptcy estate.

3.      Quantum Meruit:

Lastly, Moore asserts that he is entitled to recover compensation under a claim of *quantum meruit.* Under Florida law, any party seeking a *quantum meruit* claim must show that they provided, and the counter-party assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it. *Babineau v. Federal Exp. Corp.*, 576 F.3d 1183 (11th Cir. 2009). Moore's initial retention by Herrera-Edwards in July 2012 was induced by fraud. Mr. Moore's efforts thereafter did not contribute anything of value to the debtor or to the estate. He used information provided to him initially by third parties, without Herrera-Edwards' knowledge. He seeks credit for the work of attorneys employed by the debtor (Leher). Otherwise, his efforts were of no value and actually hindered the administration of the case. For these reasons, he is not entitled to a *quantum meruit* claim.

4.    Unjust Enrichment:

In Count II, Herrera-Edwards asserts a claim for damages based on being fraudulently induced to enter into the Consulting Agreement. She asks that monies paid to Moore under the Consulting Agreement leave Moore unjustly enriched.

Under Florida law, "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendant[ ] to retain it without paying the value thereof." *Lesti v. Wells Fargo Bank, N.A.*, 2013 WL 6095441, *4 (M.D. Fla., Nov. 20, 2013) (quoting *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir.2012) (citations omitted)).

In this proceeding, the elements for a claim of unjust enrichment are easily established. After ASCAP's release to Mr. Leher of the escrowed $265,000, Moore demanded payment of 17% of the released funds as being due to him under the Consulting Agreement. He sent the debtor an invoice on September 6, 2012. Herrera-Edwards did not believe she owed Moore any fee on the release of these historical royalties; but, Moore – whom she trusted as her "strategist" – was calling and emailing her for payment. (7/15 Tr. pp. 47-48). She only paid Moore after bankruptcy counsel advised that the payment could be reviewed and challenged later. (7/15 Tr. pp. 47-49).

Because the funds were released as direct result of Attorney Leher's efforts, not Moore's (5/22 Tr. pp. 194-95), and because these were historical royalties that already belonged to Herrera-Edwards, Moore was not entitled to compensation under the terms of the Consulting Agreement. Beyond that, the Consulting Agreement, pursuant to which he demanded payment,

was induced by his fraud. Therefore, Herrera-Edwards has established the elements of an unjust enrichment claim. It is inequitable for Moore to keep the fees he unjustly demanded and accepted.

## CONCLUSION

Having learned of Herrera-Edwards' difficulties through Mr. Biddle and MRCI, Mr. Moore spent considerable effort informing himself about her financial affairs long before they met. Then, while her cash flow was severely diminished, he sold her on his "unique position" to find new money for her, based on the false statement that he could recover $500,000 or more very quickly. Mr. Moore had an undisclosed interest in the very MRCI lawsuit that was causing her historical royalties to be withheld. He failed to disclose his prior felony conviction. For these reasons, the Consulting Agreement was induced through fraud and is invalid. There is no entitlement to compensation thereunder or for rejection damages.

None of Mr. Moore's efforts provided any benefit to Herrera-Edwards or the bankruptcy estate. He did not find or recover any assets she did not already own or that her attorneys were not working to recover. Moore's "treasure map" is little more than a theatrical prop. Mr. Leher's efforts were the necessary and sufficient cause of the release of her escrowed royalties.

Mr. Moore was never appointed by the Court, not because of false promises by Herrera-Edwards or her attorneys, but because of the unreasonable terms of compensation he demanded. His efforts actually undermined the administration of the estate.

For these reasons, all of Mr. Moore's claims will be disallowed, with prejudice.

Judgment will be entered for the debtor on all counts of her complaint; judgment will be entered

against Mr. Moore on his counterclaim.

January 29, 2015

DONE and ORDERED in Chambers at Tampa, Florida, on _____.

_____
K. RODNEY MAY
United States Bankruptcy Judge

Clerks' office to serve

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re: BAMBI HERRERA-EDWARDS,                     Case No.: 8:12-bk-15725-KRM

        Debtor.

_____/

BAMBI HERRERA-EDWARDS,

        Plaintiff,

v.                                                Adv. Pro. No.: 8:14-ap-247-KRM

ERIC L. MOORE,

        Defendant.

_____/

## ORDER DENYING MOTION TO DISMISS
## AND MOTION FOR SUMMARY JUDGMENT

THIS CASE came before the Court to consider the entry of an order on the Motion to

Dismiss Counts I, II, and III of Plaintiff's Counterclaim filed by Eric L. Moore (Doc. 21) and

Defendant Eric L. Moore's Motion for Summary Judgment (Doc. 22). The Court reserved ruling

on the motion to dismiss and motion for summary judgment pending trial in this adversary

proceeding. The Court orally announced its extensive findings of fact and conclusions of law at a

hearing held on January 8, 2015, and the findings and conclusions were incorporated and formed

the Memorandum Opinion entered by the Court (Doc. 76) regarding (a) the Objection to Claim

Nos. 14, 15, 16 and 18 of Eric L. Moore and Complaint for Damages and Equitable Disallowance

of Claims (Doc. No. 1) ("Complaint") filed by the Debtor, Bambi Herrera-Edwards (the "Debtor"

or "Herrera-Edwards"), and (b) the Complaint and Countersuit for Damages (Doc. 48)

("Counterclaim") filed by Defendant, Eric L. Moore ("Moore"). Consistent with and to

implement the Court's ruling, it is appropriate to enter this order denying Moore's motion to dismiss and motion for summary judgment. Accordingly, it is

**ORDERED**:

1.     The Motion to Dismiss Counts I, II, and III of Plaintiff's Counterclaim filed by Eric L. Moore (Doc. 21) is **DENIED**.

2.     Defendant Eric L. Moore's Motion for Summary Judgment (Doc. 22) is **DENIED**.

January 29, 2015

**DONE** and **ORDERED** in Tampa, Florida on _____.

K. RODNEY MAY
United States Bankruptcy Judge

Attorney Jeffrey W. Warren is directed to serve a copy of this order on interested parties who are non-CM/ECF users and to file a proof of service within 3 days of entry of the order.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ERIC L. MOORE,**

      **Appellant,**

**vs.**

                                     **Case No. 8:15-cv-446-T-27**

**BAMBI HERRERA-EDWARDS,**

      **Appellee.**

_____/

## <u>ORDER</u>

**BEFORE THE COURT** is Eric L. Moore's appeal from a final judgment entered in a bankruptcy adversary proceeding. (Dkts. 18, 22, 26).

After Bambi Herrera-Edwards filed for Chapter 11 bankruptcy protection, Moore filed a claim seeking over $10 million for services he allegedly performed under a consulting agreement. The bankruptcy court determined that the agreement was void for fraud and alternatively found that Moore performed no compensable services under the agreement. The bankruptcy court further held that Moore would be unjustly enriched if he retained a $45,000 payment that Herrera-Edwards had previously made under the agreement and entered judgment against Moore in that amount.

Moore, who is proceeding *pro se*, argues that the bankruptcy court erred by considering unpleaded allegations of fraud, by considering parol evidence in interpreting the terms of the agreement, and by allowing Herrera-Edwards to recover on an unjust-enrichment theory despite the existence of an express contract. Upon consideration, the judgment is vacated in part as to the $45,000 monetary award. The judgment is otherwise affirmed.

*Facts*[1]

Herrera-Edwards was married to Bernard Edwards, who co-founded Chic with Herrera-Edwards' cousin, Nile Rodgers. Edwards and Rodgers authored and performed many popular songs, including *We Are Family* and *Le Freak*. After Edwards died, Herrera-Edwards settled tort claims against his estate in exchange for a 37.5% interest in Edwards' copyrights.

In 2010, after comparing her royalty payments to those of her cousin, Herrera-Edwards came to suspect that she had been underpaid for years. Rodgers arranged for Herrera-Edwards to consult with Richard Leher, a highly-regarded entertainment attorney in Los Angeles, and Michael Ostin, a music executive. They concluded that Herrera-Edwards did not seem to be receiving "record," "artist," or "producer" royalties. Instead of hiring Leher, who commanded a premium billing rate, Herrera-Edwards hired Morgan & Morgan, P.A. The firm prepared a draft complaint to recover the unpaid royalties.

In the meantime, Herrera-Edwards was experiencing financial difficulties. Her investment advisor introduced her to Chuck Biddle, who had a connection to a lender, Music Royalty Consulting, Inc. ("MRCI"). In June 2011, Herrera-Edwards executed an agreement with MRCI to obtain a $1.8 million loan, which was to be secured by a lien on her royalty income. Herrera-Edwards also executed an assignment of her rights, but Jess S. Morgan & Co. ("JSM") and Bernard Edwards Co., LLC ("BEC"), as administrator and co-beneficiary of the copyrights, respectively, refused to consent to the assignment.

As a result, MRCI never made the loan. Instead, MRCI sued JSM and BEC in California state court. The claims were initially dismissed, but MRCI repleaded one claim and added Herrera-

---

[1] The following facts are taken from the findings of fact contained in the bankruptcy court's January 29, 2015 memorandum opinion. (Dkt. 9-85).

Edwards as a defendant. In response to the lawsuit, ASCAP began escrowing Herrera-Edwards' royalty payments. By June 2012, the escrowed royalties had grown to about $265,000.

On June 24, 2012, the attorney representing Herrera-Edwards in the MRCI transaction, Kendall Minter, told Herrera-Edwards that Biddle was claiming that he and Moore had found new money for her to collect. Moore had made a similar claim to Minter in January 2012, stating that he had discovered over $500,000 and could recover the money in seven to fourteen days. On July 11, 2012, Herrera-Edwards signed a "Consulting Agreement" with Moore. Among other terms, the Agreement entitled Moore to a 17% commission on "funds . . . recovered as a direct result" of his services.

Prior to executing the Agreement, Moore did not disclose that he had been convicted of grand larceny in 1999 for taking investor money under the false pretense that the funds would be invested in promoting a Prince concert. Moore also did not disclose that he had an oral agreement with MRCI to receive 50% of any royalty payments that he was able to recover for MRCI through its lawsuit against JSM and BEC.[2]

Herrera-Edwards retained Leher to represent her in the MRCI lawsuit. Leher succeeded in getting the action dismissed and was engaged to obtain the release of the royalty payments escrowed by ASCAP. However, Moore also commenced a series of phone calls and emails to Leher, ASCAP's counsel, and others regarding the escrowed royalty payments. According to Moore, the "sticking point" to releasing the funds was a UCC lien recorded by MRCI, which he could get removed.

---

[2] On appeal, Moore argues that he did disclose his interest on August 4, 2012, after the Consulting Agreement was executed. (Dkt. 18 at 24). This dispute is not material to resolution of the issues on appeal.

3

The escrowed royalties were ultimately released to Leher in August 2012. Pursuant to the Consulting Agreement, Moore demanded payment of 17% of the released funds. Herrera-Edwards paid Moore $44,953.53 based on the advice of her bankruptcy counsel that the payment could be reviewed and challenged in the bankruptcy court.

### *Procedural History*

On October 17, 2012, Herrera-Edwards filed for Chapter 11 bankruptcy protection (Bankr. Case No. 8:12-bk-15725-KRM). On April 22, 2013, the bankruptcy court approved Herrera-Edwards' rejection of the Consulting Agreement. (Dkt. 24-1). The rejection created a statutory breach, giving Moore a claim for damages subject to the claims procedures in 11 U.S.C. § 502. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007); 11 U.S.C. §§ 365(g), 502(g). On February 28, 2014, Moore filed a proof of claim, which sought $10,131,219 for services rendered under the Consulting Agreement and for administrative expenses under 11 U.S.C. § 503(b)(3)(D) and (4). (Dkt. 9-9).

Herrera-Edwards filed objections to the claim and her own claims for relief, triggering an adversary proceeding (Adv. No. 14-ap-247-KRM). Fed. R. Bankr. P. 3007(b). Herrera-Edwards alleged that Moore was not entitled to pre-petition or rejection damages because any recovery of back-due royalties was not "a direct result" of Moore's services under the Agreement. (Dkt. 9-35 at ¶¶ 101, 110). Herrera-Edwards objected to the claim for administrative expenses because Moore had not provided a substantial contribution to the bankruptcy case and was not an attorney or accountant entitled to compensation. (*Id.* at ¶¶ 108, 111). Herrera-Edwards asserted a claim for fraudulent inducement based on Moore's failure to disclose his prior felony conviction (Count I), a claim for unjust enrichment seeking the return of the $45,000 payment that she made under the

4

Consulting Agreement (Count II), and an alternative claim for equitable disallowance (Count III).

Moore moved to dismiss Counts I, II, and III. (Dkt. 9-45). In relevant part, he argued that Herrera-Edwards failed to state a claim for fraudulent inducement because he had no duty to disclose his felony conviction, which was public record. He maintained that Herrera-Edwards could not recover on an unjust-enrichment theory because she had an adequate remedy at law. The bankruptcy court reserved jurisdiction on Moore's motion to dismiss pending trial. (Dkt. 9-86 at 1). Moore also filed a "countersuit" against Herrera-Edwards for breach of contract, unjust enrichment, bad faith, and civil theft. (Dkt. 9-68).

The bankruptcy court tried the case over six days between May 22, 2014 and July 28, 2014. (Dkt. 9-24– Dkt. 9-30). On January 8, 2015, the bankruptcy court orally announced findings of fact and conclusions of law. (Dkt. 9-69 at 17). On January 29, 2015, the bankruptcy court issued a memorandum opinion memorializing the rulings. (Dkt. 9-85). First, the bankruptcy court held that the Consulting Agreement was void and unenforceable because it was induced by fraud. (*Id.* at 13–14). Specifically, the court found that Moore falsely represented that he could recover $500,000 very quickly. That fraud was compounded by Moore's failure to disclose his interest in the MRCI lawsuit that was causing Herrera-Edwards' royalties to be withheld.

Second, the bankruptcy court held that, even if the Agreement were valid, Moore provided no compensable services under the Agreement's terms. (*Id.* at 14–20). In particular, the bankruptcy court determined that Leher and Morgan & Morgan identified the possible royalty short-falls before Moore became involved, that Leher was responsible for having the $265,000 in escrowed payments released from ASCAP, and that although Moore "persuaded" MRCI to terminate its lien, he contributed nothing of value because there was no legal basis for the lien. (*Id.* at 14–16).

5

The bankruptcy court denied Moore's administrative expense claim because his employment was never approved and he provided no benefit to the bankruptcy estate. (*Id.* at 20–24). With respect to Herrera-Edwards' unjust-enrichment claim, the bankruptcy court found that, because the Agreement was fraudulently-induced and because Moore provided no compensable services under the Agreement, it would be inequitable for Moore to retain the $45,000 payment. (*Id.* at 25–26).

The same day that the bankruptcy court entered its memorandum opinion, the court denied Moore's motion to dismiss, briefly stating that the denial was "[c]onsistent with and to implement" the oral rulings and memorandum opinion. (Dkt. 9-86).

On January 29, 2015, the bankruptcy court entered a final judgment: (1) sustaining Herrera-Edwards' objections to Moore's claims and disallowing the claims in their entirety, (2) denying Moore's request for administrative expenses, (3) entering judgment on Herrera-Edwards' claims for fraudulent inducement and unjust enrichment (Counts I and II) in the principal sum of $44,953.93 plus pre-judgment and post-judgment interest, (4) denying as moot Herrera-Edwards' claim for equitable disallowance (Count III), and (5) entering judgment in Herrera-Edwards' favor on Moore's counterclaims. (Dkt. 1-2).

### Standard

Moore appeals from the final judgment (Dkt. 1), which "implicates all non-final orders preceding it." *Barfield v. Brierton*, 883 F.2d 923, 930 (11th Cir. 1989). The exercise of jurisdiction is proper pursuant to 28 U.S.C. § 158(a)(1).[3] *In re Donovan*, 532 F.3d 1134, 1136 (11th Cir. 2008).

The bankruptcy court's legal conclusions are reviewed *de novo* and factual findings are

---

[3] Moore filed a separate notice of appeal in the Chapter 11 case, which was docketed as Case No. 8:15-cv-447. Because the instant appeal was taken from a final judgment resolving all matters between Moore and Herrera-Edwards, the exercise of jurisdiction is proper notwithstanding the second notice of appeal.

reviewed for clear error. *In re JLJ, Inc.*, 988 F.2d 1112, 1113 (11th Cir.1993). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Crawford v. Western Elec. Co., Inc.*, 745 F.2d 1373, 1378 (11th Cir. 1984) (internal quotation marks omitted).

### *Discussion*

### 1. *Fraudulent inducement*

The adversary complaint alleged that Moore fraudulently-induced Herrera-Edwards to sign the Consulting Agreement because Moore failed to disclose his 1999 felony conviction. (Dkt. 9-35 at ¶¶ 115-119). Moore moved to dismiss the claim, arguing that he had no duty to disclose his felony conviction because it was public record. (Dkt. 9-45 at 2). The bankruptcy court did not resolve this issue. (Dkt. 9-85 at 14 n.16). Instead, the bankruptcy court determined that Moore induced Herrera-Edwards to execute the Consulting Agreement by two other fraudulent means: Moore made a false statement that he could recover $500,000 very quickly, and Moore failed to disclose his interest in the MRCI lawsuit.

The bankruptcy court's reliance on those two facts—which were not pleaded in the adversary complaint—is the subject of Moore's third issue on appeal. Moore maintains that the bankruptcy court erred by relying on unpleaded allegations of fraud, rendering the judgment void. Moore also argues, in his first and fifth issues on appeal, that the failure to disclose his felony conviction did not state an actionable fraud claim.

In response, Herrera-Edwards asserts that federal pleading standards do not require a plaintiff to provide notice of every fact or legal theory supporting a claim. Herrera-Edwards also argues that Moore waived his challenge by failing to file a proper post-judgment motion. Herrera-Edwards

7

further maintains that her fraud claim was viable as pleaded.

Rule 9(b) applies in adversary proceedings and requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Bankr. P. 7009; Fed. R. Civ. P. 9(b). A judgment based on unpleaded allegations of fraud may constitute reversible error. *Alna Capital Assocs. v. Wagner*, 758 F.2d 562, 566 (11th Cir. 1985) (holding that the trial court did not err in considering fraudulent conduct not alleged in the pleadings, where the evidence was admitted only to show the defendant's mental state and "[n]othing in the record suggests that the court counted the unpleaded omissions among those upon which it based its judgment of fraud or its damages award.").

Pursuant to Rule 15(b), which also applies in adversary proceedings, an issue not raised by the pleadings may be tried by the parties' express or implied consent. Fed. R. Bankr. P. 7015; Fed. R. Civ. P. 15(b). If an issue is tried by the parties' express or implied consent, the issue "must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b). However, "[a] party cannot be said to have implicitly consented to the trial of an issue not presented by the pleadings unless that party should have recognized that the issue had entered the case at trial." *Gilmere v. City of Atlanta*, 864 F.2d 734, 737 (11th Cir. 1989) (internal quotation marks omitted).

Herrera-Edwards fails to address the requirements of Rule 9(b) and Rule 15(b). Herrera-Edwards points to no place in the record where Moore would have had notice that the basis of her fraud claim had changed. In fact, Herrera-Edwards' post-trial brief continued to base the fraudulent-inducement claim exclusively on Moore's failure to disclose his felony conviction. (Dkt. 9-83 at 23–24).

Accordingly, the new allegations of fraud were not tried by Moore's express or implied

8

consent. *See Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487 (11th Cir. 1987) (holding that a defendant's failure to object to evidence at trial did not demonstrate implied consent where the facts were arguably relevant to other issues and where counsel failed to mention issue in his summary at the close of evidence); *Cioffe v. Morris*, 676 F.2d 539, 542 (11th Cir. 1982) (rejecting an argument that Rule 54(c) permits the award of relief on unpleaded issues). Herrera-Edwards' argument that Moore waived this issue by failing to file a Rule 52 or Rule 59 motion is similarly unavailing. *See Rand v. Nat'l Fin. Ins. Co.*, 304 F.3d 1049, 1052 (11th Cir. 2002) (holding that an appellant is not required to make a Rule 59 motion as a prerequisite to an appeal); *Gilbert v. Sterrett*, 509 F.2d 1389, 1393 (5th Cir. 1975) (holding that the appellants were not required to file a Rule 52 motion).

The bankruptcy court erred by basing its judgment on allegations of fraud that were neither pleaded nor tried with Moore's express or implied consent, and by failing to address the merits of Moore's arguments relating to the viability of the fraud claim as it was pleaded. Nonetheless, the disallowance of Moore's claims was based on an alternative holding that, even if the Consulting Agreement were valid, Moore provided no compensable services under the Agreement. For the reasons set forth below, the bankruptcy court's judgment disallowing Moore's claims can be affirmed on this alternate ground. *In re Monetary Group*, 2 F.3d 1098, 1103 (11th Cir. 1993).

**2.    *Compensable services***

The Consulting Agreement provides as follows:

COMPENSATION: Consultant shall be paid seventeen (17.0%) percent of funds or tangible property recovered as a direct result of the Consultant's services hereunder. In the event Consultant's efforts should result in Client receiving tangible assets such as copyrights as part of a recovery, then the parties shall secure an independent appraisal which values the asset and Consultant's fees shall be based upon the fair market value of the asset. Client [*sic*] is due a fee for any recovery to client including

but not limited to reduction or removal of fees, liens, etc.

(Dkt. 25, Pl. Exh. 38). Another section of the Consulting Agreement specifies: "Consultant agrees to assist client's legal counsel with the litigation and provide information providing the firm is willing to compensate him at an hourly rate to be agreed upon and percentage of recovery." (*Id.*) Based on this language, the bankruptcy court correctly determined that the Consulting Agreement provided Moore with three types of compensation: (1) a 17% commission on funds or tangible liquid property "recovered as a direct result" of Moore' services, (2) an unspecified fee for "any recovery to client including but not limited to reduction or removal or fees, liens, etc.," and (3) an agreed-upon hourly rate and a percentage of recovery for assisting legal counsel. (Dkt. 9-85 at 8).

With respect to the first type of compensation, the bankruptcy court orally ruled as follows:

> [I]t's been a a subject of great debate and inherent ambiguity, it seems to me, as to whether that's 17 percent of the new stuff that would be discovered or whether it's 17 percent of the entire royalty stream[.] . . . .

> I'm going to make the finding that there were no assets recovered by Mr. Moore either pursuant to the consulting agreement or otherwise. The $265,000 was not found money; it was always Ms. Edwards' money. It was just escrowed. And it was principally the efforts of her attorneys to have the MRCI lawsuit dismissed, and the MRCI loan then had no validity. There was no loan ever made.

> The MRCI UCC financing statement was to secure a loan that was never made. And Mr. Leher was perfectly capable of achieving the release of those funds, which were released to him. And the fact that Mr. Moore engaged in a campaign of telephone conversations, emails with Mr. Rymer or somebody at MRCI had no direct bearing on the recovery of that $265,000.

> It would have been recovered by Mr. Leher all by himself. And I find that there was no direct recovery from the efforts of Mr. Moore. There's no proof that his emails and phone calls did anything that Leher wasn't doing. The MRCI loan was voidable anyway because the loan was never closed. There has been no other recovery, as identified in the consulting agreement.

(Dkt. 9-69 at 11-12).

The memorandum opinion included similar findings. With respect to the $265,000 in escrowed royalties, the bankruptcy court held that Leher was responsible for having the MRCI lawsuit dismissed in state court, that Leher negotiated the release of the escrowed royalties from ASCAP, and that the funds were ultimately released to Leher. (Dkt. 9-85 at 15). Even though Moore inserted himself into the process, there was no proof that his efforts contributed anything to what Leher was already doing to obtain the funds. The bankruptcy court additionally stated: "Further, these funds were historical royalties that Herrera-Edwards would have received in the ordinary course if MRCI had not sued her payors. They were not from any new sources that Moore discovered[.]" (*Id.*).

In his fourth issue on appeal, Moore argues that, by referencing "historical royalties," the bankruptcy court violated the parol evidence rule by adding terms to the Consulting Agreement. As Herrera-Edwards responds, however, the consideration of parol evidence is appropriate when a document "is ambiguous and in need of interpretation." *King v. Bray*, 867 So. 2d 1224, 1226 (Fla. 5th DCA 2004).[4] The question of whether a document is ambiguous is a question of law reviewed *de novo*. *Reynolds v. Roberts*, 202 F.3d 1303, 1313 (11th Cir. 2000). If a contract is ambiguous and requires consideration of extrinsic evidence to determine the parties' intent, findings of fact regarding the parties' intent are reviewed for clear error. *Id.*

The bankruptcy court determined that there was an ambiguity in the Agreement because it was not clear whether Moore was entitled to a 17% commission only on newly-discovered copyrights or royalties, or whether he was entitled to a 17% commission on the entire royalty stream, including royalties that Herrera-Edwards had always received. (Dkt. 9-69 at 11). Even under a

---

[4] Although the Consulting Agreement contains a New York choice-of-law provision, both parties apply Florida law.

liberal construction, Moore's initial brief does not challenge the bankruptcy court's legal conclusion that an ambiguity existed. Nor does Moore challenge the bankruptcy court's factual finding that the Agreement did not cover historical royalties.

Moreover, the bankruptcy court determined that Moore did not secure a recovery under the Consulting Agreement, or otherwise, because nothing was obtained "as a direct result" of his services. (Dkt. 9-69 at 11). Again, Moore does not specifically challenge this finding. (Dkt. 18 at 17). Moore does, however, devote a substantial portion of his initial brief to recounting evidence introduced at trial, which he maintains shows that he negotiated the release of the $265,000 in escrowed royalties and that he was responsible for terminating MRCI's UCC lien. (Dkt. 18 at 7-13, 15, 29).

Assuming the issue is properly presented, Moore demonstrates no error in the bankruptcy court's finding that the $265,000 in escrowed royalties were not released as a direct result of Moore's services. *Backar v. W. States Producing Co.*, 547 F.2d 876, 884 (5th Cir. 1977) (noting that whether the defendant's services met contractual requirements was typically a mixed question reviewed *de novo*, "but the predominance of factual questions and credibility choices" supported application of a clearly-error standard). Moore's evidence indicates, at best, that he participated in unspecified ways in Leher's negotiations.[5] Yet, as the bankruptcy court correctly concluded, even though Moore inserted himself into the process, there was no proof that his efforts contributed anything beyond what Leher was already doing to obtain the funds. (Dkt. 9-85 at 15). Moore thus fails to show that

---

[5] For instance, Moore cites Leher's testimony that Leher spent more than 20 hours dealing with Moore on the MRCI matter, as well as an email from Leher referring to himself and Moore as a "great team" and relating that they had been "thorough and aggressive." (Dkt. 9-24 at 211–12, 216-18). A letter from Herrera-Edwards' bankruptcy counsel simply recounts Moore's unverified report that he was finalizing release language with MRCI. (Dkt. 25, Pl. Exhs. 13, 96). The remaining evidence suggests no greater or more specific involvement on Moore's part. Although Moore repeatedly cites to Plaintiff's Exhibit 84, this exhibit was withdrawn and not included in the parties' supplemental record on appeal. (*See* Dkt. 25; Dkt. 22 at 27 n.11).

the escrowed funds were recovered "as a direct result" of his efforts.

With respect to the termination of MRCI's UCC lien, the bankruptcy court accepted Moore's testimony that he "persuaded" MRCI to terminate the lien. (*Id.* at 16). The bankruptcy court also found, however, that there was no legal basis for continuation of the lien and that Moore therefore contributed nothing of value. (*Id.*). Moore assigns no error to that finding.

Based on the foregoing, the bankruptcy court's alternative determination that Moore provided no compensable services under the agreement is due to be affirmed.[6] Because Moore's failure to provide any compensable services under the Agreement was the basis for the bankruptcy court's disallowance of Moore's damages claims and counterclaims (Dkt. 9-85 at 20, 24), the judgment is affirmed with respect to Moore's damages claims and counterclaims.

### 3.    *Unjust enrichment*

The remaining issue is whether the bankruptcy court erred in entering judgment in Herrera-Edwards' favor on her unjust-enrichment claim. On appeal, Moore argues that the unjust-enrichment claim was barred because the parties had an express contract governing the same subject matter. Herrera-Edwards maintains that Moore waived this issue. Alternatively, she contends that the unjust enrichment claim does not concern the same subject matter as the Consulting Agreement.

Moore argued in his motion to dismiss that Herrera-Edwards could not prevail on her unjust-enrichment claim because she had an adequate legal remedy. (Dkt. 9-45 at 5). Moore's argument on appeal is a more specific statement of that general principle. *See Solutec Corp. v. Young & Lawrence Assocs., Inc.*, 243 So. 2d 605, 606 (Fla. 4th DCA 1971). As a result, Moore did not waive

---

[6] Moore does not challenge the bankruptcy court's remaining findings on this issue. (Dkt. 9-85 at 15-20). Moore also does not challenge the bankruptcy court's denial of his administrative-expense claim or his counterclaim for *quantum meruit.* (*Id.* at 20–24).

13

this issue.

The bankruptcy court entered the $45,000 monetary judgment on both the fraudulent-inducement claim and the unjust-enrichment claim. (Dkt. 1-2 at ¶ 6). For the reasons stated above, the bankruptcy court erred in entering judgment on the fraudulent-inducement claim. The bankruptcy court also failed to address Moore's argument that the unjust enrichment claim was barred because Herrera-Edwards had an adequate legal remedy. Accordingly, the monetary judgment is vacated and this matter is remanded for further consideration, including a determination of the bankruptcy court's authority to finally adjudicate the state-law claims in light of *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (2011).

Accordingly, it is **ORDERED**:

(1)     The final judgment of the bankruptcy court is **VACATED IN PART**, as to the bankruptcy court's entry of judgment in the debtor's favor on the debtor's claims for fraudulent inducement and unjust enrichment. The final judgment is otherwise **AFFIRMED**. The case is **REMANDED** to the bankruptcy court for further proceedings consistent with this order.

(2)     Moore's motion for oral argument (Dkt. 21) is **DENIED**.

(3)     The Clerk is direct to **CLOSE** this case.

**DONE AND ORDERED** this /7 day of March, 2016.

JAMES D. WHITTEMORE
United States District Judge

Copies to:  Counsel of Record

14

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

IN RE:                                        **Case No. 8:12-bk-15725-KRM**

**BAMBI A. HERRERA-EDWARDS**               **Chapter 11**
              **Debtor,**

_____/

**BAMBI A. HERRERA-EDWARDS**
              **Plaintiff,**               **Adv. No. 8:14-ap-00247-KRM**
**vs.**
**ERIC LYNDELL MOORE,**

              **Defendant.**

_____/

## MOTION FOR RECONSIDERATION OF PLAINTIFF'S MOTION TO DISMISS

Defendant, ERIC MOORE, hereby files his motion for reconsideration pursuant to rule 59(e) or 60 of his Motion to Dismiss and in support thereof states as follows:

### BACKGROUND

1.    Plaintiff Herrerea-Edwards plead that Defendant Moore defrauded her in order to induce her to enter into the Consulting agreement dated July 11, 2012 after a bench trial[1] the court ruled that Mr. Moore was liable to Ms. Edwards for fraud in the inducement and unjust enrichment.

2.    Mr. Moore appealed the Judgment to the District Court and on March 17, 2016 the honorable Judge Whittemore Vacated the Judgment as to unjust enrichment and fraud in the inducement, the third count in the complaint (Equitable disallowance) was denied as Moot.

3.    The effect of the reversal of the only two counts in the complaint leave the defendant with no cause of action, it is reasonable to believe that had this motion been heard prior to trial the court would have dismissed counts one and two before trial.[2]

---

1    The parties stipulated at trial that the issues raised in the defendants motion to dismiss would be addressed at trial (See Transcript 5/22/2014 pg. 8) the plaintiff did not establish the elements of Fraud by omission or unjust enrichment

2    District Court Judge Whitemore reversed count one and two for the same reasons Moore brought up in the Motion to dimsiss, the defendant does not reference any law or case showing that failing too disclose a prior criminal charge is

## THE DEFENDANTS PLEADINGS FOR UNJUST ENRICHMENT AND FRAUD ARE IN

## FATAL CONFLICT AND THEREFORE CREATED AN INCONSISTENT VERDICT

4.      An inconsistent verdict is when two findings of fact are mutually exclusive. <u>Smith v. Florida</u> <u>Healthy Kids Corp.</u>, 27 So. 3D 692. 695 (Fla. 4Th DCA 2010) <u>citing Crawford V Dimicco</u>, 216 So. 2D 769, 771 (Fla. 4th DCA 1968), an inconsistent verdict is defined as:

*"Where the findings of a jury's verdict in two or more respects are findings with respect to a definite fact material to the judgment such that both cannot stand at the same time, they are in fatal conflict. In such circumstances, contradictory findings mutually destroy each other and result in a no valid verdict, and a trial court's judgment based thereupon is erroneous."* <u>Crawford</u>, *216 So. 2D at 771.*

5.      This Court awarded Herrera-Edwards with Final Judgment on **Count I Fraud in the** **Inducement** *and* **Count II Unjust Enrichment.** The first count cannot exist without a contract and the second count requires that no contract exists, furthermore pleading damages for Fraud in the Inducement ratified the agreement[3]

6.      It is also <u>*very*</u> clear in all the claims filed by Mr. Moore that he never sought *"historical royalties"* from the Appellee. This is stipulated in writing in the pre-petition claim, admin claim and all other claims filed by the Appellant, and literally 15 or more emails to the plaintiff.

## I. The Bankruptcy court did not have Constitutional Authority to enter Final judgment on Herrera-Edwards Fraud and Unjust Enrichment claims

7.      The bankruptcy court did not have constitutional authority to enter final judgment on the fraud and unjust enrichment claims because it is not an Article III court, and pursuant to *Stern V Marshall* the counterclaim[4] filed by Herrerea-Edwards did not arise from bankruptcy, nor would it have been resolved in the claims approval process, these pre-petition allegations clearly were unrelated to bankruptcy and were for a payment made in September 2012.

---

fraud as a matter of law, or how this alleged failure to disclose damaged Ms. Edwards.

3   See in re Mazzoni Farms (4th DCA) 761 So. 2D  at 313
4   It is not in dispute that the $45,000 dollar payment made to Mr. Moore was in September 2012 before the bankruptcy pettion was filed, the alleged fraud by omission allegedly occcured in January 2012 or prior to October 17, 2012

## II . The Court Committed clear error in denying the Motion to Dismiss

8.      The court committed clear error in denying the motion to dismiss for several reasons, the *first* is that the fraud and unjust enrichment claims did not arise out of the bankruptcy and therefore had no constitutional authority[5] to render final judgment, and the public rights exception did not apply to the state law claim which is a common law contract dispute, the *second* reason is that the plaintiffs complaint did not satisfy rule 9(b) the *third* reason is that failing to disclose a prior criminal charge is not fraud by omission as a matter of law, the *fourth* is that the defendant had an adequate remedy at law[6]

### III. Standard for a Motion for Reconsideration

There are three grounds for reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. *Burger King Corp. v. Ashland Equities, Inc.* 181 F. Supp. 2d 1366,1369 (S.D. Fla. 2002). Defendant Moore asserts that the Court committed clear error. In order to demonstrate clear error, a plaintiff must do more than simply restate previous arguments. *Bautista v. Cruise Ships Catering & Service Intern 'I, N. V,* 350 F. Supp. 2d 987, 992 (S.D. Fla. 2003).

It is an improper use of the motion to reconsider to ask the Court to rethink what the Court ... already thought through-rightly or wrongly.... The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties[7], or has made an error not of reasoning but of apprehension.

*Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (citations omitted and brackets omitted). Thus, a "motion for reconsideration cannot be used to re-litigate old matters, raise argument or present evidence that could have been raised prior to the entry of the [challenged order]. This prohibition includes new arguments that were previously available, but not pressed." *Wilchombe v. Teevee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (internal citations omitted).

---

5  The exception to Article III is that the case must fall within "public rights" but this was clearly a private matter
6  See the Defendants Motion to dismiss (Doc 21)
7  The court added allegations of fraud that were unpled and the remaining allegation of not disclosing a prior criminal charge is not fraud as a matter of law, the District Court vacated the judgment as to the unpled allegations.

For the reasons stated above, Mr. Moore respectfully requests that this court reconsider the defendants

**Motion to Dismiss Counts I, II, and II (Doc 21)**

Respectfully submitted,

ERIC LYNDELL MOORE
elmoore75@aol.com
202 Island Avenue San Diego, CA 92101

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day of July 5, 2016 a true and correct copy of this MOTION

FOR RECONSIDERATION was provided by E-mail and/or US mail to the following:

**David S Jennis**
Jennis & Bowen PL
400 North Ashley Drive
Suite 2540
Tampa, FL 33602
(813) 229-1700
Fax : (813) 229-1707
Email: ecf@jennisbowen.com

**Jeffrey W. Warren**
Bush Ross, P.A.
Post Office Box 3913
Tampa, FL 33601-3913
813-224-9255
Fax : 813-223-9620
Email:jwarren@bushross.com

**Kathleen L DiSanto**
Jennis & Bowen
400 North Ashley Drive
Suite 2540
Tampa, FL 33602
(813) 229-1700
Fax : 813-229-1707
Email:ecf@jennisbowen.com

**Bryan D. Hull**
Bush Ross P.A.
Post Office Box 3913
Tampa, FL 33601-3913
813-224-9255
Fax : 813-223-9620
Email:bhull@bushross.com

ERIC LYNDELL MOORE
elmoore75@aol.com
202 Island Avenue San Diego, CA 92101

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JUL 21 2016

IN RE:                                    **Case No. 8:12-bk-15725-KRM**

**BAMBI A. HERRERA-EDWARDS**              **Chapter 11**
**Debtor,**

_____/

**BAMBI A. HERRERA-EDWARDS**
                **Plaintiff,**             **Adv. No. 8:14-ap-00247-KRM**
vs.
**ERIC LYNDELL MOORE,**

        **Defendant.**

_____/

### AMENDED MOTION FOR RECONSIDERATION OF MOORE'S MOTION TO DISMISS

Defendant, ERIC MOORE, hereby files his motion for reconsideration pursuant to rule 59(e) or 60 of his Motion to Dismiss and in support thereof states as follows:

### BACKGROUND

1.    Plaintiff Herrerea-Edwards plead that Defendant Moore defrauded her in order to induce her to enter into the Consulting agreement dated July 11, 2012 after a bench trial[1] the court ruled that Mr. Moore was liable to Ms. Edwards for fraud in the inducement and unjust enrichment.

2.    Mr. Moore appealed the Judgment to the District Court and on March 17, 2016 the honorable Judge Whittemore Vacated the Judgment as to unjust enrichment and fraud in the inducement, the third count in the complaint (Equitable disallowance) was denied as Moot.

3.    The effect of the reversal of the only two counts in the complaint leave the defendant with no cause of action, it is reasonable to believe that had this motion been heard prior to trial the court would have dismissed counts one and two before trial.[2]

---

[1]    The parties stipulated at trial that the issues raised in the defendants motion to dismiss would be addressed at trial (See Transcript 5/22/2014 pg. 8) the plaintiff did not establish the elements of Fraud by omission or unjust enrichment.

[2]    District Court Judge Whitemore reversed count one and two for the same reasons Moore brought up in the Motion to dimsiss, the defendant does not reference any law or case showing that failing too disclose a prior criminal charge is fraud as a matter of law, or how this alleged failure to disclose damaged Ms. Edwards.

## THE DEFENDANTS PLEADINGS FOR UNJUST ENRICHMENT AND FRAUD ARE IN FATAL CONFLICT AND THEREFORE CREATED AN INCONSISTENT VERDICT

4.     An inconsistent verdict is when two findings of fact are mutually exclusive. Smith v. Florida Healthy Kids Corp., 27 So. 3D 692. 695 (Fla. 4Th DCA 2010) citing Crawford V Dimicco, 216 So. 2D 769, 771 (Fla. 4th DCA 1968), an inconsistent verdict is defined as:

*"Where the findings of a jury's verdict in two or more respects are findings with respect to a definite fact material to the judgment such that both cannot stand at the same time, they are in fatal conflict. In such circumstances, contradictory findings mutually destroy each other and result in a no valid verdict, and a trial court's judgment based thereupon is erroneous." Crawford, 216 So. 2D at 771.*

5.     This Court awarded Herrera-Edwards with Final Judgment on **Count I Fraud in the Inducement _and_ Count II Unjust Enrichment.** The first count cannot exist without a contract and the second count requires that no contract exists, furthermore pleading damages for Fraud in the Inducement ratified the agreement[3]

6.     It is also _very_ clear in all the claims filed by Mr. Moore that he never sought *"historical royalties"* from the Appellee. This is stipulated in writing in the pre-petition claim, admin claim and all other claims filed by the Appellant, and literally 15 or more emails to the plaintiff.

### I. The Bankruptcy court did not have Constitutional Authority to enter Final judgment on Herrera-Edwards Fraud and Unjust Enrichment claims

7.     The bankruptcy court did not have constitutional authority to enter final judgment on the fraud and unjust enrichment claims because it is not an Article III court, and pursuant to *Stern V Marshall* the counterclaim[4] filed by Herrerea-Edwards did not arise from bankruptcy, nor would it have been resolved in the claims approval process, these pre-petition allegations clearly were unrelated to bankruptcy and were for a payment made in September 2012.

---

3        See in re Mazzoni Farms (4th DCA) 761 So. 2D  at 313
4        It is not in dispute that the $45,000 dollar payment made to Mr. Moore was in September 2012 before the bankruptcy pettion was filed, the alleged fraud by omission allegedly occcured in January 2012 or prior to October 17, 2012

## II . The Court Committed clear error in denying the Motion to Dismiss

8.      The court committed clear error in denying the motion to dismiss for several reasons, the *first* is that the fraud and unjust enrichment claims did not arise out of the bankruptcy and therefore had no constitutional authority[5] to render final judgment, and the public rights exception did not apply to the state law claim which is a common law contract dispute, the *second* reason is that the plaintiffs complaint did not satisfy rule 9(b) the *third* reason is that failing to disclose a prior criminal charge is not fraud by omission as a matter of law, the *fourth* is that the defendant had an adequate remedy at law[6]

## III. The District Court Vacated the Judgment for the same reasons listed in the motion to dismiss

9.      On March 17, 2016 The honorable Judge Whittemore in his ruling (Doc 31) on pg 7, 13-14 said:

**(Regarding the Fraud count)**

" *The Adversary complaint alleged that Moore fraudulently-induced Herrea-edwards to sign the consulting agreement because Moore failed to disclose his 1999 felony conviction (Dkt.9-35 at 115-119) Moore moved to dismiss the claim, arguing that he had no duty to disclose his felony conviction because it was public record/ Dkt. 9-45 at 2)* __The bankruptcy court did not resolve this issue__ *(Dkt. 9-85 at 14 n.16)*

**(Regarding the unjust-enrichment count)**

" *Moore argued in his motion to dismiss that Herrea-edwards could not prevail on her unjust enrichment claim because she had an adequate legal remedy. (Dkt. 9-45 at 5) Moore's argument on appeal is a more specific statement of that general principle. See Solutec Corp v Young & Lawrence Assocs., Inc., 243 So. 2D 605,606 (Fla. 4Th DCA 1971) as a result Moore did not waive this issue. The bankruptcy court entered the $45,000 monetary judgment on both the fraudulent inducement claim and unjust-enrichment claim. (Dkt. 1-2 at 6) for the reasons stated above, the bankruptcy court erred in entering judgment on the fraudulent inducement claim.* __The bankruptcy court also failed to address Moore's argument that the unjust-enrichment claim was barred because Herrea-edwards had an adequate legal remedy." Accordingly, the monetary judgment is vacated and this matter is remanded for futher consideration.....__

---

5       The exception to Article III is that the case must fall within "public rights" but this was clearly a private matter
6       See the Defendants Motion to dismiss (Doc 21)

## IV. Standard for a Motion for Reconsideration

There are three grounds for reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. *Burger King Corp. v. Ashland Equities, Inc.* 181 F. Supp. 2d 1366,1369 (S.D. Fla. 2002). Defendant Moore asserts that the Court committed clear error. In order to demonstrate clear error, a plaintiff must do more than simply restate previous arguments. *Bautista v. Cruise Ships Catering & Service Intern 'I, N. V,* 350 F. Supp. 2d 987, 992 (S.D. Fla. 2003).

It is an improper use of the motion to reconsider to ask the Court to rethink what the Court ... already thought through-rightly or wrongly.... The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties[7], or has made an error not of reasoning but of apprehension.

*Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (citations omitted and brackets omitted). Thus, a "motion for reconsideration cannot be used to re-litigate old matters, raise argument or present evidence that could have been raised prior to the entry of the [challenged order]. This prohibition includes new arguments that were previously available, but not pressed." *Wilchombe v. Teevee Toons, Inc.,* 555 F.3d 949, 957 (11th Cir. 2009) (internal citations omitted).

For the reasons stated above, Mr. Moore respectfully requests that this court reconsider the defendants **Motion to Dismiss Counts I, II, and II (Doc 21)**

Respectfully submitted,

ERIC LYNDELL MOORE
elmoore75@aol.com
202 Island Avenue San Diego, CA 92101

---

7   The court added allegations of fraud and allegations of Moore not providing compensable services, none of which were pled by the plaintiff and the remaining allegation of not disclosing a prior criminal charge is not fraud as a matter of law, the District Court vacated the judgment as to the unpled allegations of fraud.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day of July 19, 2016 a true and correct copy of this MOTION

FOR RECONSIDERATION was provided by E-mail and/or US mail to the following:

**David S Jennis**
Jennis & Bowen PL
400 North Ashley Drive
Suite 2540
Tampa, FL 33602
(813) 229-1700
Fax : (813) 229-1707
Email: ecf@jennisbowen.com

**Jeffrey W. Warren**
Bush Ross, P.A.
Post Office Box 3913
Tampa, FL 33601-3913
813-224-9255
Fax : 813-223-9620
Email:jwarren@bushross.com

**Kathleen L DiSanto**
Jennis & Bowen
400 North Ashley Drive
Suite 2540
Tampa, FL 33602
(813) 229-1700
Fax : 813-229-1707
Email:ecf@jennisbowen.com

**Bryan D. Hull**
Bush Ross P.A.
Post Office Box 3913
Tampa, FL 33601-3913
813-224-9255
Fax : 813-223-9620
Email:bhull@bushross.com

ERIC LYNDELL MOORE
elmoore75@aol.com
202 Island Avenue San Diego, CA 92101

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re: BAMBI HERRERA-EDWARDS,                          Case No.: 8:12-bk-15725-KRM

        Debtor.

_____/

BAMBI HERRERA-EDWARDS,

        Plaintiff,

v.                                                    Adv. Pro. No.: 8:14-ap-247-KRM

ERIC L. MOORE,

        Defendant.

_____/

## PLAINTIFF'S COMBINED MOTION FOR FINAL JUDGMENT AND RESPONSES IN OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION OF MOTION TO DISMISS AND MOTION FOR RECONSIDERATION OF COUNTERCLAIM

Plaintiff, Bambi Herrera-Edwards ("**Herrera-Edwards**"), respectfully requests that final judgment be entered in her favor following remand, and that Defendant Eric L. Moore's ("**Moore**") *pro se* motion for reconsideration of motion to dismiss (Dkt. 118), as amended (Dkt. 124), and motion for reconsideration of Defendant's counterclaim (Dkt. 127) be denied.

### Preliminary statement

On January 29, 2015, the Court entered a final judgment against Moore which disallowed all of Moore's claims in their entirety and granted judgment in favor of Herrera-Edwards on Count I for Fraud in the Inducement and Count II for Unjust Enrichment and awarded $44,953.93 in damages. (Dkt. 78). Moore appealed. The district court affirmed the disallowance

of Moore's claims and counterclaims but vacated the final judgment on Counts I and II in part[1] and remanded with instructions to consider three issues (Dkt. 116), which are discussed in detail below.

Following remand, Moore filed procedurally improper "motions for reconsideration," which request that the Court reconsider the merits of his motion to dismiss and counterclaim in light of the district court's order. Moore's *pro se* motions appear to have been intended to request a ruling on the matters on remand, and should be construed as such, rather than motions for reconsideration under Rules 59(e) and 60. For the reasons stated below, Moore's arguments with respect to his counterclaim should not be considered, and final judgment should be entered in favor of Herrera-Edwards on Counts I and II.

### Argument

#### A. Moore's Counterclaim

In the middle of trial, on July 8, 2014, Moore filed a counterclaim that raised essentially the same issues as his proof of claim. (Dkt. 48). After trial concluded, this Court entered final judgment against Moore on the counterclaim because, among other things, Moore did not provide any services that were compensable under the Consulting Agreement. (Dkt. 76, p. 20). The district court affirmed the final judgment on Moore's counterclaim:

> Because Moore's failure to provide any compensable services under the Agreement was the basis for the bankruptcy court's disallowance of Moore's damages claims and counterclaims (Dkt. 9-85 at 20, 24), the judgment is affirmed with respect to Moore's damages claims and counterclaims.

---

[1] Moore suggests that the district court vacated the final judgment because the Court added "allegations of Moore not providing compensable services." (Dkt. 124, n. 7). But the district court actually affirmed the disallowance of Moore's claims including the finding that Moore did not provide any compensable services. (Dkt. 116, p. 13).

2

(Dkt. 116, p. 13). The district court's affirmance of the final judgment on Moore's counterclaim is law of the case and is not subject to "reconsideration" by this Court. *This That and the Other Gift and Tobacco, Inc. v. Cobb County, Ga.*, 439 F.3d 1275, 1283 (11th Cir. 2006) ("Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal."). Moore's attempt to revisit his counterclaim should be rejected.

## B. **The Issues on Remand**

The district court remanded with instructions to consider three narrow issues before entering a monetary judgment in Herrera-Edwards' favor. Specifically, the district court directed further consideration (1) "to address the merits of Moore's arguments relating to the viability of the fraud claim as it was pleaded," that is, Moore's "argu[ment] that he had no duty to disclose his felony conviction because it was public record"; (2) "to address Moore's argument that the unjust enrichment claim was barred because Herrera-Edwards had an adequate legal remedy"; and (3) for "a determination of the bankruptcy court's authority to finally adjudicate the state-law claims in light of *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (2011)." (Dkt. 116, pp. 7, 9, 14).

The issues on remand do not require this Court to receive additional evidence. Each issue presents a purely legal question which can be resolved based on the parties' written arguments.

1. **Moore's arguments relating to the viability of the fraud claim as pleaded, including the argument that he had no duty to disclose his felony conviction because it was public record**

A claim for fraud requires:

(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.

2232722.2

*Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). "Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003). Likewise, a duty to disclose arises when one party has information that the other has a right to know because they are in a relationship of "trust or confidence." *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003).

Moore admitted that he was convicted in the fraudulent promotion of a Prince concert, and that he did not disclose the conviction until well after Herrera-Edwards signed the Consulting Agreement. (7/15/14 Tr. p. 43; Doc. 15, Answer ¶ 74, n.1, Ex. B (attaching articles describing the crime)). Such facts were highly material because she was required to entrust Moore with her confidential information. (Answer ¶ 53). The relationship was one of trust and confidence, and Moore had a duty to disclose the grand larceny conviction. A duty of disclosure likewise arose because Moore made extensive representations of his experience representing high profile entertainment clients in the recovery of assets but failed to provide full disclosure of the conviction. (7/15/14 Tr. p. 42). Moore knew that such disclosure would prevent her from signing the Consulting Agreement and intentionally did not inform her. As a result of the fraudulent inducement, Herrera-Edwards suffered damages consisting of the $44,953.53 that Moore demanded and she ultimately paid.

The only defense Moore raised is that the facts and circumstances underlying his conviction were publicly available information which could have been discovered by Herrera-Edwards. (Answer ¶ 74). However, because Moore had an affirmative duty to disclose the information, Herrera-Edwards was not required to perform any due diligence. Moore's defense goes to the question of "whether the recipient of the misrepresentation is 'justified in relying

4

2232722.2

upon its truth.'" *M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 94 (Fla. 2002) (quotation omitted). As the Florida Supreme Court has made clear, "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation." *Butler*, 44 So.3d at 105. This reinforces the policy of "prohibit[ing] one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing." *Id.* (quoting *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So.2d 334, 336-37 (Fla. 1997)). Moore has consistently relied on *Pressman v. Wolf*, 732 So. 2d 356 (Fla. 3d DCA 1999) to support his argument that failure to disclose publicly available information cannot constitute fraud. But the Florida Supreme Court expressly disapproved of *Pressman* in *M/I Schottenstein Homes*.

As the Florida Supreme Court has explained, in an action for fraud, plaintiffs "do not need to allege that they had investigated the truth of the misrepresentations because for this claim, 'a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him.'" *Butler*, 44 So.3d at 105. There is no evidence that Moore's conviction was "obvious" to Herrera-Edwards at the time she signed the Consulting Agreement. Therefore, Moore's argument that he did not have to disclose the conviction and underlying facts because Herrera-Edwards could have discovered that information through publicly available news sources is not a defense.

In addition to his 'publicly available' argument, Moore argued the fraud claim was not viable because Herrera-Edwards did not plead fraud with particularity. Fed. R. Civ. P. 9(b) requires pleading "the who, what, when, where, and how of the allegedly false statements and then alleg[ing] generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Herrera-Edwards sufficiently pled:

- "who" – Eric Moore (Compl. ¶¶ 15, 16, 17, 78, 116),

- "what" – failure to disclose a criminal conviction for stealing money from individuals under the false pretense that the funds would be invested in his promotion of a Prince concert (Compl. ¶¶ 15, 16, 17, 78, 116),

- "when" – in December 2010, January 2011, and July 2012 (Compl. ¶¶ 15, 16, 17, 78, 116),

- "where" – never disclosed in conversations with the Debtor (Compl. ¶¶ 15, 16, 17, 78, 116), and

- "how" – never disclosed in conversations with the Debtor (Compl. ¶¶ 15, 16, 17, 78, 116).

And she alleged the requisite intent. (Compl. ¶¶ 118). Accordingly, the complaint satisfied Rule 9(b). Moore is not entitled to dismissal of Count I, and Herrera-Edwards is entitled to final judgment in her favor on Count I.

### 2. Moore's argument that the unjust enrichment claim was barred because Herrera-Edwards had an adequate legal remedy

A claim for unjust enrichment requires proof that: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (quoting *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).

This Court concluded that Herrera-Edwards' payment of $44,953.93 unjustly enriched Moore because he was not entitled to compensation under the Consulting Agreement, and it would be unjust for him to retain the payment. The district court vacated the judgment and remanded for the Court "to address Moore's argument that the unjust enrichment claim was barred because Herrera-Edwards had an adequate legal remedy." (Dkt. 116, p. 14).

6

The only "legal remedy" Moore relies upon is the existence of an express contract, the Consulting Agreement.[2] But a claim for unjust enrichment will only be barred "if an express contract exists concerning the same subject matter." *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008). The Consulting Agreement did not concern the same subject matter as the payment Moore improperly retained, for three reasons.

*First*, the Consulting Agreement was invalid on account of Moore's fraudulent inducement, and therefore, no valid, enforceable contract existed.

*Second*, the Consulting Agreement only addressed payment for items recovered "as a direct result of the Consultant's services hereunder." (Pl.'s Ex. 38). The Consulting Agreement did not address items recovered from *someone else's* efforts. (Dkt. 76, p. 25, "the funds were released as a direct result of Attorney Leher's efforts, not Moore's.").

*Third*, the Consulting Agreement did not concern the same subject matter as the payment Moore wrongly demanded because this Court found the Consulting Agreement did not apply to "historical royalties," a finding that the district court upheld. (Dkt. 76, pp. 7, 15, 25, 26; Dkt. 116, pp. 11-13). Indeed, Moore admits in his motion for reconsideration that he is not entitled to historical royalties. (Dkt. 118 ¶ 6, Dkt. 124 ¶ 6). Because this Court found the $44,953.93 payment related to "historical royalties," Moore was not entitled to receive the payment under the terms of the Consulting Agreement. (Dkt. 76, p. 25).

---

[2] Further, Florida courts have held that the only remedy at law that would bar an unjust enrichment claim is one based on an express contract. *Williams v. Bear Stearns & Co.*, 725 So.2d 397, 400 (Fla. 5th DCA 1998) ("Although Appellees argue that Appellant has adequate legal remedies and therefore no equitable relief can be granted, this notion does not apply to unjust enrichment claims."); *Mobil Oil Corp. v. Dade County Esoil Mgmt. Co., Inc.*, 982 F. Supp. 873, 880 (S.D. Fla.1997) ("There is no dispute that under Florida law, the general rule is that if the complaint on its face shows that adequate legal remedies exist, equitable remedies are not available. [citation omitted] However, this doctrine does not apply to claims for unjust enrichment."). It is only when the parties have an express contract concerning the same subject matter that a claim for unjust enrichment will be barred. *Id.*

7

In sum, there was no valid express contract "concerning the same subject matter" as the payment Moore wrongfully retained. *Diamond "S" Dev.*, 989 So. 2d at 697. The Consulting Agreement was invalid as a result of Moore's fraud, it did not apply to items recovered from the efforts of others, and it did not cover historical royalties. Moore is not entitled to dismissal of Count II, and final judgment should be entered in favor of Herrera-Edwards on Count II.

### 3. The bankruptcy court's authority to finally adjudicate the state-law claims in light of *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (2011)

*Stern v. Marshall*, 131 S.Ct. 2594 (2011) does not affect this Court's authority to enter a final judgment awarding damages to Herrera-Edwards in this adversary proceeding. Supreme Court and Eleventh Circuit controlling precedent establishes that a bankruptcy court may constitutionally enter final judgments with respect to counterclaims by the bankruptcy estate that are necessarily resolved as part of the allowance or disallowance of proofs of claim asserted by the counter-defendant against the bankruptcy estate.

In *Stern*, the Supreme Court reemphasized that the allowance and disallowance of claims against the debtor are within the statutory *and constitutional* "core" jurisdiction of the bankruptcy courts. Specifically, the Supreme Court held in *Stern* that "[t]he Bankruptcy Court below lacked constitutional authority to enter a final judgment on a state law counterclaim that is not resolved *in the process of ruling on a creditor's proof of claim.*" *Id.* at 2620 (emphasis added). Thus, in *Stern*, the Supreme Court acknowledged its longstanding precedent that the process of ruling on a creditor's proof of claim is at the "core" of the bankruptcy court's constitutional jurisdiction. *See also Lagenkamp v. Kulp*, 498 U.S. 42, 44 (1990) (holding that "by filing a claim against the bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable jurisdiction"); *In re Sundale, Ltd.*, 499 F. App'x 887, 892-93 (11th Cir. 2012) ("[A] bankruptcy

court would have jurisdiction to enter final judgment on state law counterclaims that are necessarily resolved in the process of ruling on a creditor's proof of claim."); *In re Salander O'Reilly Galleries*, 453 B.R. 106, 115-16 (Bankr. S.D.N.Y. 2011) ("Nowhere in . . . *Stern* does the Supreme Court rule that the bankruptcy court may not rule with respect to state law when determining a proof of claim in the bankruptcy . . . .").

In this case, Herrera-Edwards' claims against Moore were necessarily resolved in the process of ruling on Moore's proof of claim against her bankruptcy estate. In ruling on Moore's proof of claim and Herrera-Edwards' complaint, this Court construed the Consulting Agreement and held that the parties did not intend for Moore to receive a commission on any "historical royalties." (Dkt. 76, pp. 7, 15, 25, 26; Dkt. 116, pp. 11-13). Accordingly, Moore was neither entitled to the $44,953.93 payment for historical royalties, which she sought to recover through her claim, or for any other amounts representing a recovery of historical royalties, which she raised in her objection to Moore's proof of claim.

Because the adjudication of Herrera-Edwards' claims against Moore were necessarily resolved by the allowance or disallowance of Moore's claims against Herrera-Edwards' bankruptcy estate, the resolution of Herrera-Edwards' claims was within the core jurisdiction of the bankruptcy court. Moore's assertion that *Stern v. Marshall* limited the bankruptcy court's jurisdiction to adjudicate his claims against the Debtor is not supported by controlling precedent. Notwithstanding, Herrera-Edwards submits that the final judgment entered in this case should provide that to the extent the district court subsequently finds core jurisdiction lacking, the final judgment should be deemed as a report and recommendation to the district court.

2232722.2

## C. Moore's new arguments

In his motions for reconsideration, Moore argues that final judgment against him for fraud and unjust enrichment creates an "inconsistent verdict." The Florida Supreme Court has held that fraud in the inducement can result in either invalidation of the contract or damages:

> It is axiomatic that fraudulent inducement renders a contract voidable, not void. *See Columbus Hotel Corp. v. Hotel Management Co.*, 116 Fla. 464, 477, 156 So. 893, 898 (1934). Consistent with the majority view, Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract.

*Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.*, 761 So.2d 306, 313 (Fla. 2000).[3]

Contrary to Moore's argument, there is nothing inconsistent about entering a final judgment against him on both counts. For the reasons discussed above, Herrera-Edwards is entitled to final judgment on Count I for fraud in the inducement and on Count II for unjust enrichment. Moore's fraud in the inducement requires invalidation of the Consulting Agreement, or alternatively, an award of damages in the amount of $44,953.93. Pursuant to *Mazzoni Farms*, upon finding that she is entitled to final judgment on Count I, Herrera-Edwards elects that she be awarded $44,953.93 for Moore's fraud in the inducement. Herrera-Edwards is also entitled to a monetary judgment in the same amount on Count II for unjust enrichment, because as discussed above, the Consulting Agreement did not concern the same subject matter as the payment Moore received, as it did not apply to items recovered from the efforts of others, and it did not cover historical royalties.

---

[3] While the Florida Supreme Court noted that *status quo* must be restored in order for the contract to be invalidated, at trial, Moore did not submit argument or evidence that anything was required to be done to restore the *status quo*.

2232722.2

## Conclusion

Moore's attempt to resurrect his counterclaim (Dkt. 127) should not even be considered, as it is barred by the law of the case. Moore's request for the dismissal of Counts I and II (Dkts. 118, 124) should be denied. Final judgment should be entered in favor of Herrera-Edwards on Counts I and II in accordance with the election set forth above, and should further provide that to the extent the district court may subsequently find core jurisdiction lacking, the final judgment should be deemed a report and recommendation to the district court.

Respectfully submitted,

Dated: July 26, 2016

/s/ Bryan D. Hull
Jeffrey W. Warren
Florida Bar No. 150024
Bryan D. Hull
Florida Bar No. 20969
Bush Ross, P.A.
Post Office Box 3913
Tampa, Florida 33601-3913
Telephone: (813) 224-9255
Facsimile: (813) 223-9260
jwarren@bushross.com
bhull@bushross.com
*Counsel to the Plaintiff/Debtor*

11

2232722.2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 26, 2016, I electronically filed a true and correct copy of the foregoing with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system which will send a notice of electronic filing to all counsel of record, and I furnished a copy of the foregoing document(s) to the following parties in the manner of service indicated below:

_____
/s/ Bryan D. Hull
ATTORNEY

**Via U.S. Mail, postage prepaid and Electronic Mail to:**

Eric Moore
202 Island Avenue, #118
San Diego, California 92101
*Elmoore75@Aol.com*

**FILED VIA MAIL**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AUG 12 2016

CLERK, US BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:                                    Case No. 8:12-bk-15725-KRM

**BAMBI A. HERRERA-EDWARDS**            Chapter 11
                    **Debtor,**

_____/

**BAMBI A. HERRERA-EDWARDS**
                    **Plaintiff,**      Adv. No. 8:14-ap-00247-KRM
vs.
**ERIC LYNDELL MOORE,**

                    **Defendant.**

_____/

## RESPONSE TO DEBTORS MOTION FOR FINAL JUDGMENT

Defendant, ERIC MOORE, hereby files his response to his motion for reconsideration pursuant to rule 59(e) or 60 of his Motion to Dismiss and in support thereof states as follows:

### BACKGROUND

1.     Plaintiff Herrera-Edwards plead that Defendant Moore defrauded her in order to induce her to enter into the Consulting agreement dated July 11, 2012, after a bench trial[1] the court ruled that Mr. Moore was liable to Ms. Edwards for fraud in the inducement and unjust enrichment and rendered final judgment on Mr. Moore of $45,000 dollars plus interest.

2.     Mr. Moore appealed the Judgment to the District Court and on March 17, 2016. The honorable Judge Whittemore Vacated the Judgment as to unjust enrichment and fraud in the inducement, and determined that the issues raised in the motion to dismiss had not been adjudicated, the court abused it's discretion and committed clear error in not hearing the motion to dismiss before trial or during trial.

---
1   The parties stipulated at trial that the issues raised in the defendants motion to dismiss would be addressed at trial (See Transcript 5/22/2014 pg. 8) per the district court none of these issues were addressed

## I. THE FINAL JUDGMENT IS BASED ENTIRELY ON UNPLED[2] ALLEGATIONS

3.    The court ruled that Ms. Edwards had been fraudulently induced by Two unpled allegations of

fraud which the District Court reversed, this court also ruled on other unpled allegations such as

a)  The allegation that Mr. Moore provided no compensable services under the Consulting agreement.

b)  The allegation he sought "historical royalties from the debtor"

4.    If the court heard the Motion to dismiss in advance of trial the plaintiff would be left with only

the allegations that were pled, which were (a) Failing to disclose a prior criminal charge (b) Unjust-

enrichment (the return of a $45,000 dollar "Historical royalty" pre-petition payment[3])

## II. THE COMPLAINT FAILED TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED PURSUANT TO FLORIDA LAW IN *PRESSMAN V WOLF*

5.    Whether a complaint states a cause of action is an issue of law, reviewed de novo. Kreizinger v.

Schlesinger, 925 So. 2d 431, 432 (Fla. 4th DCA 2006). "On motion and upon such terms as are just, the

court may relieve a party or a party's legal representative from a final judgment, decree, order, or

proceeding for the following reasons: . . . (4) that the judgment -2-or decree is void . . . ." Fla. R. Civ. P.

1.540(b). "Under Florida law, in order to sustain a claim for fraudulent misrepresentation sufficient to

void a contract *ab initio*, an aggrieved party is generally required to prove: (1) a misrepresentation of a

material fact; (2) which the maker knew to be false; (3) made with the intent of inducing another person

to rely upon it; (4) that the person relied on the misrepresentation to his detriment; and (5) that said

reliance caused damages. Samuels v. King Motor Co. of Fort Lauderdale, 782 So.2d 489, 497 (Fla. 4th

DCA 2001); W.R. Townsend Contracting, Inc. v. Jensen Civil Const., Inc., 728 So.2d 297, 304 (Fla. 1st

DCA 1999). Additionally, in the case of fraudulent concealment, the aggrieved party must also prove

---

2    A judgment based on unpled allegations is void Fine v Fine 400 So. 2D 1254, 1255 (Fla. 5Th DCA 1981)
3    This is the only allegation of Mr. Moore receiving "Historical Royalties" Mr. Cinque stipulated in writing post-
     bankruptcy that Mr. Moore was not seeking historical royalties (Def Exhibits 122,129,136,142) see exhibits

the added element of a duty to disclose on the part of the defendant. <u>Gutter v. Wunker</u>, 631 So.2d 1117,

1118 (Fla. 1994). Herrera-Edwards plead that she was fraudulently induced by Mr. Moore's failure to

disclose his prior criminal charge (Compl. Paragraph 15,16,17,78,116)  The Appellee plead *again* in the

<u>*Plaintiffs Opposition to Motion to Dismiss*</u> (Doc 29) that she was fraudulently induced by Mr. Moore's

failure to disclose his prior criminal charge. Page three reads in part:

**"What"**-*Failure to disclose a criminal conviction for stealing money from individuals under the false*

*pretense that the funds would be invested in his promotion of a prince concert* (Compl. Paragraphs

15,16,17,78,116)

> <u>**Mr. Moore had no duty to disclose his prior criminal charge as a matter of a law.**</u>

6.      A failure to disclose is actionable as fraud only if the speaker owes a duty to disclose the matter

in question. *Liberty Surplus Ins. Corp., Inc. v. First Indem. Ins. Servs., Inc.*, 31 So. 3d 852, 857-58 (Fla.

4th DCA 2010) (citing § 551(1) of Restatement (Second) of Torts); *see also Friedman v. Am. Guardian*

*Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003). Under Florida law, a duty to

disclose arises in two circumstances: 1) "when one party has information which the other party has a

right to know because there is a fiduciary or other relation of trust and confidence between the two

parties" and 2) when a party in an arm's-length transaction undertakes to disclose information, that

party must disclose all material facts. *See Friedman*, 837 So. 2d at 1166; *Philip Morris USA, Inc. v.*

*Naugle*, 103 So. 3d 944, 946-47 (Fla. 4th DCA 2012). <u>There was no evidence presented at trial that Mr.</u>

<u>Moore  had a legal duty to disclose his prior criminal charge</u> which occurred over sixteen years ago and

therefore the Appellee's complaint does not state a cause for relief.

> <u>**Mr. Moore was not In a fiduciary or other relationship of trust with the Plaintiff**</u>

7.      The review of publicly available Probate records, Estate Tax records and royalty statements

does not create a fiduciary relationship as alleged by the Appellee (Compl.117)

8.    The confidential information Moore uncovered was his own work-product and no evidence was presented at trial that Moore had a fiduciary relationship of trust, in fact the contract says the opposite , it reads in part under **Independent contractor**

" *The relationship by and among the parties shall be that of an independent contractor. The parties agree that the consultant shall not have the authority to commit, bind or obligate the client to any contractual or financial agreements or undertakings and the client reserves the right to execute such documents as may be required in order to secure payment to her of the funds that are subject to the agreement*"

9.    Nothing in the motion for final judgment points to any case law, record evidence or testimony that proved Mr. Moore had a duty to disclose, or fiduciary duty the contract clearly says otherwise.

**Pressman v Wolf: Statements concerning public record can not form the basis for actionable fraud**

10.    In *Pressman v Wolf* the court ruled that issues of public record can not form the basis for actionable fraud, *Therefore failing to disclose a prior criminal charge which is public record can not form the basis for actionable fraud. Pressman v Wolf 732 So.2D 356,361(Fla 3D DCA 1999)* for the proposition that "statements concerning public record cannot form the basis for a claim for actionable fraud"

11.    Furthermore, the debtor did not allege or prove damages from the alleged false statement and the judgment should be vacated. see *Ellish v. Richard*, 622 So. 2D 1154, 1155 (Fla. 4th DCA 1993) (court vacated a judgment for failure to allege damages resulting from defendant's false statements because plaintiff did not make sufficient damages allegations.). For the reasons stated above the Appellee's complaint does not state a cause of action upon which relief can be granted, the District court ruling was not ambiguous, the issues in the motion to dismiss were not heard.

## III. THE UNJUST-ENRICHMENT CLAIM DID NOT ARISE OUT OF THE BANKRUPTCY

12.     The unjust enrichment claim did not arise out of the bankruptcy it is clear in the complaint that

the funds the debtor sought to be returned were for a pre-petition payment and therefore the court had

no jurisdiction or constitutional authority[4] to hear the unjust-enrichment claim.

13.     As confirmed by the District court the other issue in the Motion dismiss was that the unjust-

enrichment claim was barred because Ms. Edwards had an adequate remedy at law. The bankruptcy

court did not have constitutional authority to enter final judgment on the fraud and unjust enrichment

claims because it is not an Article III court, and pursuant to *Stern V Marshall* the counterclaim[5] filed by

Herrera-Edwards did not arise from bankruptcy, nor would it have been resolved in the claims approval

process, these pre-petition allegations clearly were unrelated to bankruptcy.

## IV. The District Court ruled that the issues in the Motion to Dismiss had not been resolved

14.     On March 17, 2016 The honorable Judge Whittemore in his ruling (Doc 31) on pg 7, 13-14 said:

### (Regarding the Fraud count)

" *The Adversary complaint alleged that Moore fraudulently-induced Herrera-Edwards to sign the*
*consulting agreement because Moore failed to disclose his 1999 felony conviction (Dkt.9-35 at 115-*
*119) Moore moved to dismiss the claim, arguing that he had no duty to disclose his felony conviction*
*because it was public record/ Dkt. 9-45 at 2)* **The bankruptcy court did not resolve this issue** *(Dkt. 9-*
*85 at 14 n.16)*

15.     It is clear that the main and only issues pled was not determined by the bankruptcy court, only

unpled allegations and determinations were made, creating a situation in which Mr. Moore's

constitutional rights have been trampled upon, due to hardball tactics of counsel of the debtor.

---

4     See Stern V Marshall
5     It is not in dispute that the $45,000 dollar payment made to Mr. Moore was in September 2012 before the bankruptcy
      petition was filed.

**(Regarding the unjust-enrichment count)**

" Moore argued in his motion to dismiss that Herrera-Edwards could not prevail on her unjust enrichment claim because she had an adequate legal remedy. (Dkt. 9-45 at 5) Moore's argument on appeal is a more specific statement of that general principle. See Solutec Corp v Young & Lawrence Assocs., Inc., 243 So. 2D 605,606 (Fla. 4Th DCA 1971) as a result Moore did not waive this issue. The bankruptcy court entered the $45,000 monetary judgment on both the fraudulent inducement claim and unjust-enrichment claim. (Dkt. 1-2 at 6) for the reasons stated above, the bankruptcy court erred in entering judgment on the fraudulent inducement claim. _The bankruptcy court also failed to address Moore's argument that the unjust-enrichment claim was barred because Herrea-edwards had an adequate legal remedy." Accordingly, the monetary judgment is vacated and this matter is remanded for further consideration....._

## V.    The District Court remanded the case for a determination of the bankruptcy's court authority to finally adjudicate state-law claims in light of Stern v Marshall, 131 S. Ct. 2594,2620 (2011)

16.    The court has yet to render a determination that the  $45,000 in "historical royalties" Ms. Edwards wanted returned was within the jurisdiction of the bankruptcy court, a pre-petition claim is clearly not something that "arose out of the bankruptcy[6]" (see Compl. 90-Doc 1)

For the reasons stated above, Mr. Moore respectfully requests that this court reconsider the defendants **Motion to Dismiss Counts I, II and Dismiss the complaint with prejudice (Doc 21)**

Respectfully submitted,

ERIC LYNDELL MOORE
elmoore75@aol.com
202 Island Avenue San Diego, CA 92101

---

6    See Northern Pipeline Const. Co. v Marathon Pipe Line Co.,458 U.S. 458 U.S. 50, 53(1982)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day of August 9, 2016 a true and correct copy of this

MOTION FOR RECONSIDERATION was provided by E-mail and/or US mail to the following:

**David S Jennis**
Jennis & Bowen PL
400 North Ashley Drive
Suite 2540
Tampa, FL 33602
(813) 229-1700
Fax : (813) 229-1707
Email: ecf@jennisbowen.com

**Kathleen L DiSanto**
Jennis & Bowen
400 North Ashley Drive
Suite 2540
Tampa, FL 33602
(813) 229-1700
Fax : 813-229-1707
Email:ecf@jennisbowen.com

**Bryan D. Hull**
Bush Ross P.A.
Post Office Box 3913
Tampa, FL 33601-3913
813-224-9255
Fax : 813-223-9620
Email:bhull@bushross.com

**Jeffrey W. Warren**
Bush Ross, P.A.
Post Office Box 3913
Tampa, FL 33601-3913
813-224-9255
Fax : 813-223-9620
Email:jwarren@bushross.com

ERIC LYNDELL MOORE
elmoore75@aol.com
202 Island Avenue San Diego, CA 92101

Refiled copy Per court order —

ORDERED.

Dated: **November 02, 2016**

K. Rodney May
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov**

In re

**BAMBI A. HERRERA-EDWARDS,**

     **Debtor.**

_____/

**Case No. 8:12-bk-15725-KRM
Chapter 11**

**BAMBI A. HERRERA-EDWARDS,**

     **Plaintiff,**

vs.

**BERNARD EDWARDS COMPANY,
LLC, and JESS S. MORGAN & CO., INC.,**

     **Defendants.**

_____/

**Adv. Proc. No. 8:13-ap-641-KRM**

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT

On April 4, 2014, Bambi Herrera-Edwards, the debtor ("Debtor") in the above-captioned

Chapter 11 case (the "Main Case"), filed a motion to reject executory portions of a 1997 Co-

Publishing Agreement ("Motion to Reject"), seeking to establish her ownership of the

administration rights over her share of the music copyrights that were owned by her late husband, Bernard Edwards.[1]

On July 29, 2013, Debtor (or "Plaintiff") filed the above-captioned adversary proceeding ("AP 641") against the Bernard Edwards Company, LLC ("BEC"), and Jess S. Morgan & Co., Inc. ("JSM") (collectively, the "Defendants"), including a later-filed Amended Complaint.[2] Plaintiff seeks adjudication of whether (1) JSM is entitled to collect 5% of gross revenues before she receives her 37½% of the music copyright income and (2) she is entitled to receive, in addition to income from the copyrights, 37½% of the artist and producer royalties from Bernard Edwards' music career. Plaintiff alleges that her share of the artist and producer royalties has been improperly withheld from her since the closing of Edwards' probate estate on December 31, 1999.

The Motion to Reject and AP 641 were tried together.[3] At the close of Plaintiff's case-in-chief, Defendants made an *ore tenus* Motion for Judgment on Partial Findings pursuant to Fed. R. Civ. P. 52(c) (the "Motion"). Plaintiff filed a written Response to the Motion ("Response") (Doc. No. 254); Defendants filed a Reply thereto (the "Reply") (Doc. No. 255).

Defendants' Motion is due to be granted. On September 9, 2016, the Court's ruling was

---

[1] Main Case, Doc. No. 370. With administration rights, a person has control over the exploitation of a copyright, including the receipt of income therefrom.

[2] AP 641, Doc. No. 52. BEC is a limited liability company whose members include the six children of Bernard Edwards – Michael Edwards, Mark Edwards, Bernard Edwards, Jr., Portia Vrtiak, Leah Edwards, and David Edwards. *See* Trial Tr., March 4, 2016, Pg. 189 (Vrtiak).

Citations to testimony from the record from Trial will be cited as "Trial Tr., date, Pg. __, Lns. __ (Witness Last Name)."

[3] On February 24, 2016, in the Main Case, Defendants filed a Motion for Summary Judgment as to Debtor's Motion to Reject Executory Portions of Co-Publishing Agreement and Incorporated Memorandum of Law (the "Motion for Summary Judgment"). Main Case, Doc. No. 709. On March 1, 2016, Plaintiff filed her Response to the Motion for Summary Judgment. Main Case, Doc. No. 726. The Court heard oral argument on March 1, 2016, but deferred ruling on the Motion for Summary Judgment until the conclusion of trial.

announced on the record in open court. This written decision clarifies that oral ruling and provides additional citations to the trial record.[4] This memorandum opinion constitutes the Court's findings of fact and conclusions of law, in accordance with Fed. R. Bankr. P. 7052. The findings of fact shall, where necessary or appropriate, be deemed to be conclusions of law and, where necessary or appropriate, conclusions of law shall be deemed findings of fact.

## Findings of Fact

1. Bernard Edwards was a well-known guitarist, songwriter, and producer whose work included such compositions as *"Dance, Dance, Dance," "Everybody Dance," "Le Freak,"* and *"We Are Family."*[5] He was a founding member of the popular funk/disco band *Chic*.[6] Prior to his death, Bernard Edwards employed Wallace Franson ("Franson") and JSM to manage his business and financial affairs.[7] As part of this arrangement, he and Franson had orally agreed that JSM would take a perpetual fee of 5% of his gross income.[8]

2. Bernard Edwards died on April 18, 1996.[9] At that time, he had six children: Michael Edwards, David Edwards, Portia Edwards Vrtiak, Leah Edwards, Bernard Edwards, Jr.,

---

[4] Determining whether an executory contract may be rejected is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A). The parties consented to the trial of these matters in this Court. Therefore, the Court may enter a final judgment.

[5] *See* Doc. No. 52, ¶ 8.

[6] *Id.* Defendants did not dispute these basic facts regarding Bernard Edwards and his career as a singer, songwriter, and producer.

[7] *See* Trial Tr., April 22, 2016, Pgs. 66-67 (Franson).

[8] *See id.* at Pg. 68, Lns. 4-14.

[9] *See* Doc. No. 52, ¶ 12.

and Mark Edwards.[10]  At the time of his death, Alexis Edwards (now deceased) was his former spouse.  Debtor was his surviving spouse.[11]

## I.   The Probate Case.

3.       Mr. Edwards' financial affairs and assets were submitted to the Court of Probate in Westport, Connecticut (the "Probate Case").  Mr. Franson was appointed Executor.[12]

4.       Debtor was represented in the Probate Case by Paul Johnson and Charles McCaghey of the law firm of Ryan, Ryan, Johnson, McCaghey & Deluca, LLP ("RRD").[13] Debtor executed a Fee Retainer Agreement with RRD on October 22, 1996.[14]  That Agreement outlined certain disputed claims that Debtor asserted in the Probate Case, for which RRD would represent her.[15]  In the RRD Agreement, Debtor agreed to pay RRD a perpetual 10% fee per annum for all amounts exceeding $1.2M in the event of a settlement.[16]

5.       In the Probate Case, Debtor asserted a $10M tort claim, a claim for her spousal share of the Probate Estate, and a claim to ownership of a home in Westport, Connecticut (collectively, "Debtor's Probate Claims").[17]  The Probate Court rejected Debtor's spousal share claim and her claim to ownership of the home.[18]  RRD pursued an appeal of those rulings.[19]

---

[10] *See* Def. Ex. 1, Pg. 1.

[11] *See id.*

[12] *See id.* at 2; *see also* Trial Tr., April 22, 2016, Pg. 70, Lns. 3-14 (Franson).  Richard Pober ("Pober") was legal counsel for the Probate Estate. *See* Trial Tr., April 22, 2016, Pg. 75, Lns. 2-3 (Franson).

[13] *See* Def. Ex. 7; Trial Tr., March 3, 2016, Pg. 283, Lns. 17-23 (Herrera-Edwards).

[14] *See* Def. Ex. 6.

[15] *See id.*

[16] *See id.* at ¶ 1(b).

[17] *See id.* at 1; *see also* Trial Tr., April 21, 2016, Pg. 54 (Pober).

[18] *See* Trial Tr., March 3, 2016, Pgs. 194-195 (Herrera-Edwards).

6.      The Probate Court's rulings were on appeal when Debtor, Franson (as Executor), and some of the Edwards children attended a court-ordered mediation (the "Mediation") on July 9, 1997.[20]  Alexis Edwards did not attend the Mediation, nor did Mark Edwards, Michael Edwards, or Bernard Edwards, Jr.[21]  At the conclusion of the Mediation, the attending parties signed a handwritten Stipulation (the "July 9th Stipulation").[22]

7.      The July 9th Stipulation stated that "Bambi Edwards shall be assigned full and complete ownership and interest in 37½% of all royalties and other payments received from the copyrights *and other such interests* owned by Bernard Edwards at the time of his death. . . ."[23] There was no mention of "Administration Rights" or "Artist and Producer Royalties."[24] Paragraph 9 of the July 9th Stipulation also provided that the parties would "execute such documents, contracts and agreements as are necessary to effectuate the terms and conditions of this Stipulation."[25]

8.      Thereafter, and through July 30, 1997, the lawyers for Debtor and Franson exchanged correspondence and drafts of a settlement agreement.[26]

---

[19] *See* Trial Tr., March 3, 2016, Pg. 195 (Herrera-Edwards).

[20] *See* Trial Tr., April 21, 2016, Pg. 54, Ln. 11 – Pg. 55, Ln. 3 (Pober).

[21] Trial Tr., March 4, 2016, Pg. 50, Ln. 6 – Pg. 51, Ln. 2 (Herrera-Edwards).

[22] The July 9th Stipulation was executed by the Executor and his Attorney, Mr. Pober, James Cousins (counsel for Alexis Edwards), Attorney McCaghey, Anthony Ahern (Guardian Ad Litem for Lead Edwards), Portia Vrtiak, David Edwards, and Debtor. *See* Def. Ex. 12 (handwritten version); Def. Ex. 13 (typed version).  At trial, the Parties stipulated that Def. Ex. 13 was an exact typed version of Def. Ex. 12, the handwritten stipulation dated July 9, 1997, except for signatures, which did not appear on Def. Ex. 13.

[23] *See* Def. Ex. 13, ¶ 1 (emphasis added).

[24] *See generally id.*

[25] *Id.* at ¶ 9.

[26] *See* Def. Exs. 14, 15, 18, 20, 21 and 22.

9.    A draft "settlement agreement," identified in the record at trial as Def. Ex. 16, was circulated on July 16, 1997.  That same day, the Executor's lawyers submitted to the Probate Court an Application for Approval of Compromise of Claim.[27]  The Application to the court stated that there was a "proposed compromise settlement" of Herrera-Edwards' Probate Claims.[28]  The Application stated that "Bambi Edwards shall receive a participation in the income stream of the copyrights to be received by the estate in the percentage of 37½ percent, net after all expenses."[29]  The Application further stated that: the parties would enter into a co-publishing agreement; Franson will act as publisher of the copyrights; Franson will have full and complete administration rights; and Herrera-Edwards will have no administration rights whatsoever regarding the copyrights.[30]

10.    At that time, Debtor was also represented by an intellectual property attorney, Ronald St. Onge ("St. Onge"), who billed time to Debtor's file on July 29 and 30, 1997.[31]

## II.    The Settlement Agreement, the General Release and the Co-Publishing Agreement.

11.    On July 30, 1997, Debtor, Franson and other interested parties executed a document titled "Settlement Agreement" (the "Settlement Agreement").[32]  The Settlement

---

[27] *See* Def. Ex. 17.  The Executor's lawyer, Mr. Pober, sent the Application to Debtor's attorney, Mr. Johnson (Def. Ex. 15).  There is no evidence in the record of any objection to the Application, or its submission to the Probate Court.

[28] *See id.* at ¶ 3.

[29] *Id.* at ¶ 4.

[30] *Id.*

[31] *See* Def. Ex. 38; Trial Tr., March 3, 2016, Pg. 185, Lns. 4-23 (Johnson).

[32] *See* Def. Ex. 26.

Agreement arose from the same transaction as the settlement of Debtor's Probate Claims at the Mediation.

12.    The Settlement Agreement provided, among other things:

"Bambi Edwards agrees to accept and the estate agrees to take any and all steps necessary to *assign a 37½ percent participation in the income stream from the copyrights* owned by Bernard Edwards Estate on the date of Bernard Edward's death after payment of all costs, expenses and debt related to the copyrights. The participation share of in the income stream would be on a net basis after all estate, income and other taxes and administrative expenses of the estate have been paid. The six surviving children of Bernard Edwards agree to accept the residual of the estate in trust as per the Last Will and Testament of Bernard Edwards."[33]

13.    The Settlement Agreement also provided that Bambi Edwards and Alexis Edwards would receive monthly statements while the Probate Estate was open and quarterly statements thereafter, with payments "for their respective shares of the income from the copyrights."[34] It further provided that the [q]uarterly payments shall begin when all estate debts and expenses have been paid."[35] The Settlement Agreement also stated that the parties would enter into a co-publishing agreement, which would provide that "the executor of the estate will act as publisher of the copyrights and will have full administration rights therein" and that "Bambi Edwards and Alexis Edwards will be co-publishers, and will have no administrative rights whatsoever regarding the copyrights."[36] Paragraph 6 of the Settlement Agreement included Debtor's acknowledgement "that she has no administration rights in the copyrights and that any third party would be subject to all terms and conditions as set forth in this agreement."[37]

---

[33] *See* Def. Ex. 26, ¶ 2(c) (emphasis added).

[34] *See id.* at ¶ 4.

[35] *See id.*

[36] *See id.* at ¶ 5.

[37] *See id.* at ¶ 6.

Finally, the Settlement Agreement provided that all "parties agree and approve the claim by *Jess S. Morgan & Co.* for a 5% fee on all deferred income and other income received by the estate of Bernard Edwards from copyrights as a debt of the decedent."[38] The Settlement Agreement was signed by Debtor, Franson, Alexis Edwards, each of Mr. Edwards' adult children, and the guardian for the one minor child.[39]

 14. The parties also executed mutual General Releases as to any and all actions based on any matter that pre-dated the General Releases, July 30, 1997.[40] The General Release executed by Debtor stated that she released JSM and the children of Bernard Edwards from "any, and all manner of action and actions . . . contracts . . . which they have or ever had against them . . . from the beginning of the world to the day of the date of this release, EXCEPT FOR THE TERMS, CONDITIONS AND CONSIDERATION CONTAINED IN THE STIPULATION OF SETTLEMENT DATED JULY 30, 1997, WHICH REMAINS IN FULL FORCE AND EFFECT."[41] The General Release was notarized for Plaintiff by her attorney, Mr. Johnson.[42] The Court finds that the reference in the General Release to the "*Stipulation* of Settlement dated July 30, 1997" refers to the Settlement Agreement.[43]

---

[38] *See* Def. Ex. 26, ¶ 13.

[39] *See generally id.*

[40] *See* Def. Ex. 25.

[41] *See id.* The General Release was executed by Plaintiff and witnessed by her lawyers, McCaghey and Johnson. *See id.; see also*, Trial Tr., March 4, 2016, Pg. 47, Lns. 1-12 (Edwards).

[42] *See* Def. Ex. 25.

[43] *See id.* (emphasis added).

15.     On August 21, 1997, Debtor, Alexis Edwards, and the Probate Estate executed a Co-Publishing Agreement.[44]   Paragraph 2 of the Co-Publishing Agreement states, in pertinent part:

> "Grant of Rights.
>
>       (a)  In consideration of all of the terms and conditions set forth herein and in the Settlement Agreement, Publisher hereby sells, assigns and transfers to Bambi Edwards thirty-seven and one-half percent (37.5%), and to Alexis Edwards twelve and one-half percent (12.5%) in and to all of Publisher's right, title and interest in the Compositions including, without limitation, all copyrights in the Compositions.  To such effect, Publisher shall execute and deliver assignments of copyright and other documentation which may be reasonably requested to establish and record such ownership rights.
>
>       (b) Bambi and Alexis acknowledge that they shall have no administration rights in and to the Compositions, and that they each grant to Publisher the sole and exclusive right to administer, control, use, exploit, receive income from, and otherwise deal in and for the compositions, throughout the Territory, in perpetuity."[45]

The Co-Publishing Agreement also provided that the "powers granted to Publisher under this agreement are coupled with an interest and are irrevocable for any cause whatsoever."[46]  The Co-Publishing Agreement also provided that "Bambi and Alexis each acknowledge that their execution of the Settlement Agreement is a material inducement for The Estate to enter into this Co-Publishing Agreement with them."[47]

16.     On September 4, 1997, the Probate Court entered an order which stated:

> "The Court has reviewed and approved the Settlement Agreement entered into by the Estate, Bambi Edwards as surviving spouse and Alexis Edwards as former spouse of the decedent.  Disputed claims have been made against the estate by

---

[44] *See* Def. Ex. 34.

[45] *See id.* at ¶ 2.

[46] *See id.* at ¶ 2(c).

[47] *See id.* at ¶ 4.

> Bambi Edwards and Alexis Edwards and the Settlement Agreement resolves all claims that can be made by Bambi Edwards and Alexis Edwards against the estate. The children of Bernard Edwards have agreed to all terms of the Settlement Agreement and the Court believes the Agreement is fair and equitable for the children."[48]

There is no evidence in the record herein that Plaintiff contested the entry of this order (the "Order Approving Settlement Agreement").

17.     Based on the documents in evidence and the testimony in Plaintiff's case-in-chief, the Court finds that the Order Approving the Settlement Agreement was meant to, and did, approve the Settlement Agreement, dated July 30, 1997, which had been executed by all of the affected parties.[49]  There is no evidence that the Probate Court ever separately considered or approved the July 9th Stipulation.[50]

18.     The Court finds that the intent of the parties to the Settlement Agreement and Co-Publishing Agreement was that the Plaintiff would never hold ownership of the music copyrights; instead, Plaintiff would be entitled to receive payments from BEC equal to 37½% of the income stream from the music copyrights, after payment of all costs, expenses and debt related thereto.  Plaintiff never acquired any Administration Rights and never acquired any right to payment of any Artist and Producer Royalties.

**III.     The Copyright Assignments.**

19.     Once the Probate Case was closed, Franson and Plaintiff executed an Assignment of Copyright, dated January 1, 2000 (the "Herrera-Edwards Assignment"), wherein Franson assigned Plaintiff a 37½% interest in the musical compositions, "reserving, however, the

---

[48] *See* Def. Ex. 40.

[49] *See* Def. Ex. 39.

[50] *See id.*

exclusive right to administer, control, use, exploit, receive income from, and otherwise deal in and for said Compositions . . . throughout the world in perpetuity . . . ."[51] The Herrera-Edwards Assignment also stated that Plaintiff's share of the income stream from the music copyrights was "subject to a lien to secure the payment to Jess S. Morgan & Company, Inc. of 5% of the gross receipts from exploitation of such assigned rights in perpetuity."[52]

20.     Franson also executed Assignments of Copyright to six trusts for each of the children of Bernard Edwards (the "Trust Assignments"), assigning to each trust 8.333% of the "Copyright Ownership" and 16.667% of the Administration Rights.[53]  Franson, as trustee for each of the six trusts, then executed another Assignment of Copyright (the "BEC Assignment") in favor of BEC, the entity collectively owned by Edwards' children, conveying to it 50% of the "Copyright Ownership" and 100% of the Administration Rights.[54]   BEC has held the Administration Rights continuously since January 1, 2000.

21.     The Court finds that the Herrera-Edwards Assignment was executed with the intent of implementing the Settlement Agreement and Co-Publishing Agreement.  The Herrera-Edwards Assignment did not grant Plaintiff more than what the parties had agreed to in the Settlement Agreement and Co-Publishing Agreement: payment of 37½% of the income stream from the music copyrights, after payment of all costs, expenses and debt related thereto.[55]

---

[51] *See* Def. Ex. 60, Pg. 3.

[52] *See id.*

[53] *See* Def. Ex. 61.

[54] *See* Def. Ex. 59.

[55] *See* Def. Exs. 26, 34 & 60.

22.     Plaintiff was represented by counsel (including Mr. Johnson, Mr. McCaghey, and Mr. St. Onge) at all times in connection with the execution of the Settlement Agreement, the General Release, the Co-Publishing Agreement, and the Herrera-Edwards Assignment. There is no evidence in the record to support the theory that Franson, JSM, or BEC did anything to mislead, conceal information from, or trick Plaintiff in any way into executing the Settlement Agreement, the General Release, the Co-Publishing Agreement, or the Herrera-Edwards Assignment. The Court finds no proof of fraud or concealment by the Defendants in connection with any of these agreements.

## IV.     After the Closing of the Probate Estate.

23.     Since January 1, 2000, BEC, through JSM as its manager, remitted quarterly payments to Plaintiff, either directly or through Plaintiff's accountants or lawyers. It provided Plaintiff with quarterly statements (the "Quarterly Statements") showing the sources of the payments to her and the costs deducted by either BEC or JSM from that income.[56] Payment from BEC was remitted to Plaintiff with each Quarterly Statement.[57] In each of the Quarterly Statements, BEC identified that Plaintiff receives income from "Writer/Publisher Income." Every Quarterly Statement shows the 5% reduction, as payment to JSM.[58] The Quarterly Statements also identify other costs or expenses that are deducted from the total payment made to Plaintiff.[59]

---

[56] *See* Def. Ex. 139 (a composite of every statement provided by BEC to Plaintiff from March 2000 – December 2015).

[57] *See e.g.*, Def. Exs. 82-84.

[58] *See* Def. Ex. 139.

[59] *See id.*

24.     In 2005, Plaintiff, through Bert Padell and Joseph Richichi, her CPA and lawyer, respectively, sent a letter to JSM protesting the 5% fee that was being taken by JSM.[60]  JSM responded by providing Plaintiff's professionals with a copy of the Herrera-Edwards Assignment.  Mr. Padell then sent the attorneys at RRD a fax, attaching a copy of the Herrera-Edwards Assignment with the hand-written query "*why!!*" next to the 5% lien language.[61]

25.     Plaintiff did not then pursue any claim against JSM regarding the 5% fee. Instead, Plaintiff, through Padell, renegotiated Plaintiff's fee arrangement with RRD to include a sunset provision of RRD's perpetual 10% legal fee.[62]

## Conclusions of Law

1.     The Court concludes that the Settlement Agreement, dated July 30, 1997, is the binding, operative and controlling document regarding the resolution of Debtor's Probate Claims.

a.     The Settlement Agreement is the only document that was executed by all of the parties affected by the resolution of Debtor's Probate Claims.[63]  The July 9th Stipulation was not signed by Alexis Edwards; nor, was it signed by beneficiaries Michael Edwards, Mark Edwards and Bernard Edwards, Jr.[64]  Mark Edwards testified credibly that he had never seen the July 9th Stipulation before his deposition in this proceeding.[65]

---

[60] *See* Def. Ex. 76.

[61] *See* Def. Ex. 77.

[62] *See* Def. Ex. 78.

[63] *See* Def. Ex. 26.

[64] *See* Def. Exs. 12 and 13.

[65] *See* Trial Tr., March 4, 2016, Pg. 236, Lns. 21-25 (Mark Edwards).

b. The Settlement Agreement resolved disputed claims affecting the interests of Leah Edwards, then a minor, and the value of the assets exceeded $10,000. Thus, Probate Court approval of the resolution of Debtor's Probate Claims was necessary under Connecticut law.[66]

c. The Settlement Agreement was the only agreement that was approved by the Probate Court. As that court stated in 1997, in the Order Approving Settlement Agreement:

> "The Court has reviewed and approved the Settlement Agreement entered into by the Estate, Bambi Edwards as surviving spouse and Alexis Edwards as former spouse of the decedent. Disputed claims have been made against the estate by Bambi Edwards and Alexis Edwards and the Settlement Agreement resolves all claims that can be made by Bambi Edwards and Alexis Edwards against the estate. The children of Bernard Edwards have agreed to all terms of the Settlement Agreement and the Court believes the Agreement is fair and equitable for the children."[67]

The July 9th Stipulation was not executed by Alexis Edwards and it did not provide for resolution of her claims.[68] It stated only that Alexis Edwards would receive an unidentified percentage of royalties from the Probate Estate.[69] But, the Settlement Agreement, which Alexis Edwards signed, provided for her to receive a 12½% participation in the income stream from the music copyrights to resolve her claims against the Probate Estate.[70] Three of Mr. Edwards' adult children did not execute the July 9th Stipulation; but, all of the adult children and Leah Edwards'

---

[66] "[W]hen a party is under eighteen years of age, settlement agreements valued at greater than $10,000 must be approved by the Probate Court." *Roe v. Gunnery, Inc.* 2013 WL 1849284, *4 (Ct. Sup. Ct., April 10, 2013); *see also Kowalyshyn v. Leconche*, 2015 WL 7421826 (Ct. Sup. Ct., Nov. 2, 2015) (finding that there was no final settlement agreement because the settlement was subject to approval by the Probate Court, but that the Court's approval was not obtained). Johnson and McCaghey both testified that because there was a minor child (Leah Edwards) involved, the Probate Court had to approve any settlement between the parties to the Probate Estate. *See* Trial Tr., March 3, 2016, Pg. 25, Lns. 17-25 (McCaghey); Trial Tr., March 3, 2016, Pg. 111, Lns. 14-22 (Johnson).

[67] *See* Def. Ex. 40.

[68] *See* Def. Ex. 12.

[69] *See id.*

[70] *See* Def. Ex. 26.

Guardian Ad Litem signed the Settlement Agreement.[71] For these reasons, the Court concludes that it was the Settlement Agreement, not the July 9th Stipulation, that was considered and approved by the Probate Court.

d.   The Settlement Agreement was the result of post-mediation negotiations and drafting by attorneys for Plaintiff and the other parties.   Plaintiff was represented by counsel, including Messrs. Johnson, McCaghey and St. Onge, during the process leading to the execution of the Settlement Agreement, the General Release and the Co-Publishing Agreement.[72] Plaintiff's own counsel repeatedly cited the Settlement Agreement as the operative agreement resolving Debtor's Probate Claims.[73]

e.   The General Release, executed by Plaintiff on July 30, 1997, caused the terms and obligations of the July 9th Stipulation to be released and superseded by the terms and obligations of the Settlement Agreement, which was expressly excepted from the General Release.   The July 9th Stipulation is not, therefore, the final, binding agreement that resolved Plaintiff's Probate Claims.[74]   Accordingly, the Court rejects Plaintiff's contention that the July 9th Stipulation is controlling.

---

[71] *See* Def. Ex. 26.

[72] *See* Def. Exs. 14, 15, 18, 20, 21, and 22.

[73] *See* Def. Exs. 29 (Letter from McCaghey to Pober citing to the Settlement Agreement), 44 (Request for Approval of Further Advances filed with the Probate Court citing to the Settlement Agreement), 47 (same), 99 (Letter from Minter to Pober citing to the Settlement Agreement and failing to reference the July 9th Stipulation).

[74] Moreover, under applicable Connecticut law, evidence offered to vary or contradict the terms of a fully executed contract is barred by the parol evidence rule. *See Heyman Assoc. No. 1 v. Ins. Co. of State of Pa.*, 653 A.2d 122, 135 (Conn. 1995). Here, because Edwards executed the Settlement Agreement, which was intended to contain the whole agreement, after the July 9th Stipulation, the parol evidence rule bars the use of extrinsic evidence, such as the July 9th Stipulation, to vary or contradict the terms of the Settlement Agreement. *Id.*

## I.   Copyright Administration Rights.

2.     The Settlement Agreement is the binding, controlling agreement among the parties now before the Court.  It provides that Plaintiff will not have any Administration Rights.[75]  The Court concludes that under this controlling document, Plaintiff did not receive Administration Rights to the music copyrights of her late husband.  Therefore, Plaintiff is not entitled to reject the executory portions of the related Co-Publishing Agreement in an effort to acquire or re-acquire the Administration Rights for the music copyrights.

a.  This Court may not rewrite the terms of the Settlement Agreement.[76]  Applicable case law does not allow a court to approve rejection of executory provisions of an agreement and simultaneously rewrite or invalidate portions of a related and otherwise binding agreement.[77]  Moreover, rejection does not allow a debtor to avoid a right that has already vested in the counter-party to the agreement or obligations that are fully executed.[78]  Rejection relieves a debtor of only its future performance under the contract.[79]

b.  The Court rejects Plaintiff's contention that she became the absolute owner of a 37½% portion of the music copyrights by reason of paragraph 2(a) of the Co-Publishing Agreement, which she simultaneously granted back to the Probate Estate/Publisher in paragraph 2(b).

---

[75] *See* Def. Ex. 26, ¶¶ 5 & 6.  The July 9th Stipulation does not reference Administration Rights.  *See* Def. Ex. 12.

[76] *See In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010).

[77] *See e.g. Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007) (discussing limited effect of rejection on contract subject to rejection); *In re The Ground Round, Inc.*, 335 B.R. 254, 261 (1st Cir. BAP 2005) (discussing limited scope of rejection and finding that rejection does not modify rights and obligations of the parties even in the rejected contract).

[78] *Thompkins*, 476 F.3d at 1307,1308.

[79] *Id.* at 1306.

c. The Co-Publishing Agreement recites that it is made subject to and in furtherance of the Settlement Agreement.[80] It provides that "Bambi and Alexis acknowledge that they shall have no administration rights in and to the Compositions . . . ."[81] The Court finds that the Co-Publishing Agreement was an artifice, or mechanism by which Plaintiff and Alexis Edwards were granted ownership of their respective shares of the income from the music copyrights, without the Administration Rights. This reading of paragraphs 2(a) and (b) of the Co-Publishing Agreement is consistent with the language of both the Settlement Agreement and the July 9th Stipulation, which speak in terms of rights to a portion of the income derived from the copyrights, not ownership of the underlying copyrights themselves. At times, even Plaintiff has acknowledged that she has no Administration Rights.[82]

3. BEC holds the Administration Rights to Edwards' copyrights.

a. Immediately upon the close of the Probate Case, Franson, on behalf of the Probate Estate, executed multiple "assignments of copyright," including the Trust Assignments.[83] Ultimately, Franson transferred to BEC 50% of the "Copyright Ownership" and 100% of the Administration Rights.[84]

---

[80] *See* Def. Ex. 34, ¶ 2(a) (stating that the Grant of Rights is made in "consideration of all the terms and conditions set forth herein and in the Settlement Agreement....").

[81] *See id.* at ¶ 2(b).

[82] *See* Def. Ex. 17, ¶ 4 and Def. Ex, 26, ¶ 6. While not dispositive, the Court also notes that Plaintiff's own former lawyer, Kendall Minter, who was retained to negotiate a loan agreement on behalf of Plaintiff, acknowledged in a letter to Messrs. Parviz and Omidvar, that Plaintiff had no Administration Rights. *See* Def Ex. 94.

[83] *See* Def. Ex. 61.

[84] *See* Def. Ex. 59.

b. The execution of the Trust Assignments and the BEC Assignment was meant to satisfy the writing requirement under the Copyright Act.[85] They identify the copyright interests that Franson, on behalf of the Probate Estate, transferred to BEC. Pursuant to the Herrera-Edwards Assignment, Plaintiff received a 37½% interest in the income from the copyrights.[86] Taken together, these Assignments are consistent with the language of the Settlement Agreement, which stated that the Probate Estate would "take any and all steps necessary to *assign a 37½ percent participation in the income stream from the copyrights* owned by Bernard Edwards' Estate on the date of Bernard Edward's death after payment of all costs, expenses and debt related to the copyrights."[87] The Court concludes that since January 1, 2000, BEC has held and owned the Administration Rights regarding Ms. Edwards' music copyrights.

## II.   Artist and Producer Royalties.

4.   The Court concludes that Plaintiff is not entitled to Artist and Producer Royalties, either retroactively or prospectively.

a. No Artist and Producer Royalties were granted to Plaintiff by the Settlement Agreement. In the Settlement Agreement, Plaintiff agreed to receive only the stated portion of 37½% of the income stream from the copyrights.[88] "Copyright" is a well-understood term and

---

[85] 17 U.S.C.A. §204(a) provides "a transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."

[86] *See* Def. Ex. 60 (reserving the Administration Rights and imposing the 5% lien on the income stream).

[87] *See* Def. Ex. 26, ¶ 2(c).

[88] *See id.*

does not, as argued by Plaintiff, include income from sources other than the compositions themselves.[89]

b.  The July 9th Stipulation did not expressly state that Plaintiff would be granted any portion of Artist and Producer Royalties.[90]  The terms of the Settlement Agreement, specifying the compromise of Debtor's Probate Claims in exchange for 37½% of the income from the copyrights, after expenses, is neither inherently unfair, nor in conflict with the July 9th Stipulation.

c.  Plaintiff argues that the Probate Estate's tax returns, filed on July 17, 1997 (the "Tax Returns"), eight days after the Mediation, establish that Plaintiff was entitled to Artist and Producer Royalties, because these royalties were being received by the estate during the Probate Case and certain tax schedules indicated that Plaintiff received "37.5% of the net estate" pursuant to a "Settlement of Claim dated 7/9/97."[91]  Plaintiff also asserts that because these Tax Returns identify a higher marital deduction because of the inclusion of the additional non-copyright income, this indicates that the Probate Estate had agreed, on July 9, 1997, to provide her with more than just the stated percentage of income from the copyrights only.   This contention is not persuasive, however, because the Tax Returns also included an exhibit that stated that the "final documentation" for the settlement was not available at the time of filing and

---

[89] According to the testimony of Marc Stollman, an expert witness for Defendants, a "copyright in a composition generally refers to the words and music" and there are four primary royalties paid in connection with a composition, including 1) mechanical reproduction, 2) public performance, 3) sheet music or books, and 4) synchronization. *See* Trial Tr., April 21, 2016, Pg. 203, Lns. 1-23 (Stollman). Stollman also explained that artist royalties and producer royalties are generally royalties paid for performing or producing a song, but confirmed that the artist or producer is not typically the owner of the copyright in the words or music of a song. *See* Trial Tr., April 21, 2016, Pg. 204, Lns. 14-25 (Stollman).  These explanations were corroborated by the testimony of Richard Leher, Plaintiff's expert. *See* Trial Tr., March 2, 2016, Pgs. 64-65, Pg. 92, Ln. 3 – Pg. 93, Ln. 12 (Leher).

[90] *See* Def. Ex. 12.

[91] *See* Def. Ex. 141.

that upon "future request, the estate will provide a copy of the final settlement agreement approved by the Court."[92] The Executor, Franson, testified in this proceeding. His explanation – that at the time of filing, the Tax Returns represented his best efforts to put the IRS on notice of what the marital deduction might be, in the face of the filing deadline – is entirely credible. Further, there is nothing in the record to indicate Plaintiff ever relied on the Tax Returns.

5. Even if there was a question regarding the amounts and sources of income that Plaintiff was to receive as a result of the Settlement Agreement, her claims are barred by any applicable statute of limitations.[93] There is no proof in the record of fraud or concealment by any of the Defendants that might arguably extend any such limitation periods.

a. Both during and after the Probate Case, Plaintiff was provided with statements identifying the source of her income and the amounts that she would receive. In the initial inventory of the Probate Case, prepared by JSM and Franson, the Probate Estate identified two sources of income – money from "Music Copyrights" and "Deferred Compensation."[94] All of the statements generated during the Probate Case were provided to Plaintiff, through her counsel at RRD.[95]

b. After the Probate Case was closed, the Quarterly Statements were also initially provided to Plaintiff, her lawyers at RRD and to her accountant, Maggie Turner.[96] These

---

[92] See Def. Ex. 141, Pg. 93.

[93] See Conn. Gen. Stat. §§ 52-576, 52-577 and 52-576(a) (establishing 3 year statute of limitations for conversion; 6 years for breach of contract or money had or received); Fla. Stat. § 95.11(2)-(3) (establishing 5 year statute of limitations for breach of contract; 4 years for conversion or money had or received); Cal. Code Civ. Proc. § 337, 338(c), 339(1) (establishing 4 year statute of limitations for breach of contract; 3 years for conversion; 2 years for money had and received).

[94] See Def. Ex. 8, Pg. 1.

[95] See e.g., Def. Exs. 49 and 50.

[96] See Def. Exs. 63-65.

statements disclosed that BEC was receiving professional income from "Copyrights" plus the "Deferred Compensation," but that Plaintiff was receiving income only from the copyrights.[97] Turner had worked for JSM prior to working for Plaintiff.[98] She was uniquely qualified to understand the JSM statements.[99] While she worked at JSM, Turner would have known about Bernard Edwards' income; she had the experience to understand the statements provided by JSM to Plaintiff. There is no evidence in the record that Turner was not working for Plaintiff in good faith. There is no evidence in the record that supports any claim that JSM or BEC made any effort to conceal the sources or amount of income from Plaintiff. Thus, as long ago as the first quarterly payment in March of 2000, Plaintiff had reason to know that BEC and JSM were remitting to her the agreed percentage of income only from the music copyrights. There is no evidence in the record that Plaintiff asserted any claim for unpaid Artist and Producer Royalties prior to the filing of AP 641 in 2013. Thus, Plaintiff's claims, if they were otherwise meritorious, could have been raised 19 years ago. They are now time barred.

     c. The Court concludes that the Quarterly Statements (Def. Ex. 139) and the manner in which JSM has paid Plaintiff since the close of the Probate Case (December 31, 1999) are consistent with the terms of the Settlement Agreement, which provided that the "[q]uarterly payments shall begin when all estate debts and expenses have been paid."[100] Prior to December 31, 1999, JSM worked with the Internal Revenue Service and Connecticut Department of

---

[97] Def. Exs. 63, Pg. 3 and 64, Pg. 3.

[98] *See* Trial Tr., April 20, 2016, Pg. 60, Ln. 20 – Pg. 62, Ln. 2 (testimony of Mandel regarding Turner's employment at JSM and her job responsibilities on the account of Bernard Edwards).

[99] *See id.*

[100] *See* Def. Ex. 26, ¶ 4.

Revenue regarding audits of the tax returns for the Probate Estate.[101] The debts of the Probate

Estate were not fully resolved until the tax audits were completed. The pleadings filed in the

Probate Case indicate that the payments under the Settlement Agreement were deferred until the

closing of the Probate Case.[102] The Court finds the testimony of Messrs. Franson, Pober, Mandel

and Stahl to be plausible and credible as to there not being a workable method to allocate

expenses to sources of income during the Probate Case, so that income from all sources was

placed into a single account, all of the expenses were paid therefrom, and the interested parties

received the remainder based upon the percentages agreed upon in the Settlement Agreement.

Their testimony plausibly explains, therefore, why the payments (advances) to Plaintiff during

the Probate Case differed from those made after the Probate Case was closed.

## III.    The 5% Lien.

6.    Plaintiff cannot now rescind or reject the 5% lien because it is barred, by her

previous agreements and by applicable statutes of limitations.

a. The Settlement Agreement, signed by Plaintiff, approved JSM's claim "for a 5%

fee on all deferred income and other income received by the estate of Bernard Edwards from

copyrights as a debt of the decedent."[103] The Herrera-Edwards' Assignment granted JSM a 5%

lien on "the gross receipts" received from the music copyrights.[104] Plaintiff thus agreed in

January 2000 to JSM's 5% lien on all income received from the music copyrights. Plaintiff has

---

[101] Trial Tr., April 20, 2016, Pg. 86, Lns. 15-21 (Mandel).

[102] For example, during the Probate Case, Plaintiff requested advances against her stream of income. In order to obtain such advances, the parties filed pleadings with the Probate Court wherein they acknowledged that there was a Settlement Agreement entered into on July 30, 1997, and as "the estate is still in administration, payments for the income stream have not as yet begun." *See* Def. Exs. 44 and 47.

[103] *See* Def. Ex. 26, ¶ 13.

[104] *See* Def. Ex. 60. The Herrera-Edwards Assignment was provided to Plaintiff's lawyers before she signed it. Def.
(continue)

not presented any evidence or case law establishing that the 5% lien is invalid or was not properly perfected.

b. Even if Plaintiff had any basis to extinguish JSM's 5% fee, the statute of limitations bars her from asserting it in this proceeding. Plaintiff was aware of the 5% lien as of the date of the Herrera-Edwards Assignment, January 1, 2000.[105] Plaintiff was either aware, or should have been aware, that JSM was capturing 5% of all income from the music copyrights at the time she received the first Quarterly Statement in March 2000.[106] In 2005, Plaintiff, through her lawyers, raised the issue of the 5% deduction by sending a protest letter.[107] But, Plaintiff did not then pursue any claim against JSM regarding the 5% fee. Instead, Plaintiff, renegotiated her fee arrangement with RRD to include a sunset provision of RRD's perpetual 10% fee.[108] Based on the foregoing, the Court concludes that the statute of limitations to revoke or challenge the 5% lien would have started to run no later than 2005 and, thus, has long since expired.

c. Under any applicable statute of limitations, all claims asserted in the Amended Complaint relating to the 5% lien or the Artist and Producer Royalties are time-barred.

7. Given that Plaintiff cannot reject the Co-Publishing Agreement, as it relates to the Administration Rights, and Plaintiff is unable to rescind or otherwise avoid the 5% fee to JSM, the Court concludes that there is no benefit to the bankruptcy estate to allow rejection of the Co-Publishing Agreement.

---

(continued)
Exs. 51, 54 and 56.

[105] See Def. Ex. 60.

[106] See Def. Ex. 139, Pg. 66.

[107] See Def. Ex. 76.

[108] See Def. Ex. 78.

8.      Having considered the documentary evidence, the testimony of witnesses, arguments of counsel, the Motion, the Response and the Reply, and relevant authority, and otherwise being fully advised in the premises, it is hereby

**ORDERED AND ADJUDGED AS FOLLOWS:**

1.      The *ore tenus* Motion for Judgment on Partial Findings by Defendants Bernard Edwards Company, LLC and Jess S. Morgan & Co., Inc., is **GRANTED.**

2.      The Motion by Debtor to Reject Executory Portions of the Co-Publishing Agreement filed in the Main Case (Doc. No. 370) is **DENIED.**

3.      BEC is the proper and lawful holder of the administration rights relating to the music copyrights owned by Bernard Edwards at the time of his death.

4.      Final judgment is entered in favor of Defendants, Bernard Edwards Company, LLC and Jess S. Morgan & Co., Inc., as to all counts of the Amended Complaint (Doc. No. 52) filed in the above captioned adversary proceeding.

      a.      As to Count I of the Amended Complaint, which seeks declaratory relief regarding Plaintiff's interests in the various streams of income, the Court declares that, per the binding agreements of the parties, Plaintiff is entitled to a 37½% interest in the income stream from the music copyrights owned by Bernard Edwards at the time of his death, which does not include any income from Artist and Producer Royalties;

      b.      As to Count II of the Amended Complaint, which seeks declaratory relief regarding whether JSM is entitled to deduct a 5% fee from income stream from the music copyrights paid to Plaintiff, the Court declares that Defendant, Jess S. Morgan & Co., Inc., holds a valid and proper lien for 5% of the gross receipts on all income received from the music copyrights owned by Bernard Edwards at the time of his death and that

Plaintiff, or any successor in interest to Plaintiff's rights, is bound by the controlling agreements and documents to a compromise which allows JSM to continue to deduct this 5% fee from the gross income stream from the music copyrights;

      c.     As to Count VII, the Court declares that JSM's 5% lien is not void for a lack of consideration; and

      d.     As to all other claims alleged in the Amended Complaint, final judgment is entered in favor of Defendants, Bernard Edwards Company, LLC and Jess S. Morgan & Co., Inc.

5.     Plaintiff, Bambi A. Herrera-Edwards, shall take nothing in this Adversary Proceeding and shall go hence without day.

6.     The Court reserves the right to enter all other orders as may be necessary and proper, including but not limited to an order for reasonable attorneys' fees and costs in favor of Defendants.

Case No.: 96-000083

IN RE:

THE ESTATE OF BERNARD EDWARDS    :    STATE OF CONNECTICUT

ERIC MOORE                       :    WESTPORT PROBATE COURT
                                      PD-50
VS.

THE ESTATE OF BERNARD EDWARDS    :    January 24, 2017

## NOTICE OF ENTRY OF ORDER FOR RELIEF AND OF AUTOMATIC STAY

PLEASE TAKE NOTICE that BAMBI HERRERA-EDWARDS (the "Debtor") filed a voluntary petition for relief under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, on October 17, 2012, Chapter 11 Case No. 8:12-bk-15725-KRM.  Pursuant to Section 301 of the Bankruptcy Code, the filing of the petition constitutes an order for relief.

PLEASE TAKE FURTHER NOTICE that Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay of -

      (1)    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

      (2)    the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

      (3)    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

      (4)    any act to create, perfect, or enforce any lien against property of the estate;

(5)     any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6)     any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7)     the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8)     the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

PLEASE TAKE FURTHER NOTICE that, as a result of the automatic stay set forth in Section 362(a) of the Bankruptcy Code, the continued prosecution of the above-styled action is stayed as to the Debtor.

PLEASE TAKE FURTHER NOTICE that, as a result of Mr. Moore's continuous and intentional prosecution of this matter despite be given notice of the automatic stay, Ms. Herrera-Edwards has filed an emergency motion in the Bankruptcy Court for an order awarding sanctions and holding Mr. Moore in contempt of court (see motion attached without exhibits).

BAMBI HERRERA-EDWARDS, as surviving spouse of the decedent

By: _____

Eric H. Rothauser, Esq.
BoneeWeintraub LLC
29 South Main Street, Suite 330
West Hartford, CT 06107
860-561-1555
860-561-0390 (fax)
ERothauser@bw-law.com

2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed this 24th day of January, 2017 to the following:

By electronic mail only:

Jimmy Parish, Esq.
jparish@bakerlaw.com
Wendy Townsend, Esq.
wtownsend@bakerlaw.com
Baker & Hostetler, LLP
200 South Orange Ave.
Suntrust Center, Suite 2300
Orlando, FL 32801-3432
Attorneys for: Bernard Edwards, Jr., David Edwards, Leah Edwards, Mark Edwards, Michael Edwards,
Portia Vrtiak, Bernard Edwards Company, LLC, Wallace D. Franson, Jess S. Morgan & Company, Inc.

Bryan D. Hull, Esq.
Bush Ross P.A.
P.O. Box 3913
Tampa, FL 33601-3913
Attorneys for Bambi Herrera-Edwards

By electronic mail and U.S. Mail:

Eric Lyndell Moore
elmoore75@aol.com
202 Island Ave #118
San Diego, CA 92101

By U.S. Mail only:

Kelly A. Green
Mcintyre, Panzarella,
Thanasides, Bringgold
& Todd
6943 E. Fowler Avenue
Temple Terrace, FL 33617

Christina I. Belanger
200 South Orange Ave.

3

45 Rockefeller Plaza
New York, New York 10111

Richard Pober, Esq.
c/o Pullman & Comley
850 Main Street
Bridgeport, CT 06601-7006

Charles M. McCaghey, Esq.
Ryan, Ryan, Johnson,
McCaghey & Deluca LLP
80 Fourth Street
Stamford, CT 06905

Nancy E. Blair, Esq.
Blair & Potts
P.O. Box 1214
Stamford, CT 06904-1214

Anthony E. Ahern, Esq.
Cramer & Ahern
38 Post Road
Westport, Ct 06880

Richard H. Saxl
265 Post Road West
Westport, CT 06880

_____
Eric H. Rothauser
Commissioner of the Superior Court

4

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                            Case No. 8:12-bk-15725-KRM
                                                  Chapter 11
BAMBI A. HERRERA-EDWARDS,

           Debtor.
_____/

## DEBTOR'S EMERGENCY MOTION
## FOR AN ORDER (A) AWARDING SANCTIONS FOR INTENTIONAL
## AND WILLFUL VIOLATION OF THE AUTOMATIC STAY AND
## (B) HOLDING ERIC L. MOORE IN CONTEMPT OF COURT

Bambi A. Herrera-Edwards. (the "**Debtor**"), by and through undersigned counsel, and pursuant to the provisions of Sections 105(a) and 362 of Title 11 of the United States Code (the "**Bankruptcy Code**"), respectfully requests that the Court enter an order (a) awarding sanctions for intentional and willful violation of the automatic stay, and (b) holding Eric L. Moore ("**Moore**") in contempt of court (the "**Motion for Sanctions**"). In support of the Motion for Sanctions, the Debtor respectfully represents as follows:

### Preliminary Statement and Background

1.       This Court has presided over (a) the Debtor's Chapter 11 case filed in 2012 resulting in a confirmed Chapter 11 plan of reorganization, (b) the various disputed administrative and unsecured prepetition claims against the Debtor pursued by Moore resulting in the disallowance of all such claims and the affirmance on appeal of such disallowance, (c) the pending claim by the Debtor against Moore to recover the sum of $45,000 that Moore improperly received from the Debtor prior to her Chapter 11 case, and (d) the various pending disputes between the Debtor and Bernard Edwards Company, LLC ("**BEC**") and Jess S. Morgan & Co. ("**JSM**").

2.      In one way or another, each of these matters revolved around property rights of the Debtor related to the Debtor's claims against BEC and JSM arising from the settlement of the Debtor's claims against the Estate of her deceased husband Bernard Edwards (the "**Edwards Estate**") and the consideration she obtained as part of that settlement.

3.      Moore has persistently and improperly sought to share in the Debtor's recovery of these property rights that are derived from the Edwards Estate including the musical compositions written by Bernard Edwards, his artist and producer royalties, certain administration rights and other property interests more particularly described in the pleadings and evidence before this Court.

4.      Notwithstanding the final and nonappealable orders disallowing any claim of Moore against the Debtor, Moore has continued to pursue a deliberate agenda of interference in the affairs and property rights of the Debtor.

5.      Despite repeated requests to cease his interference, Moore has only increased his activities and interference. The only purpose of these activities is an extortion directed to the Debtor to pay him to leave her alone.

6.      Although the Debtor has tried to ignore Moore, he recently filed with the Westport, Connecticut Probate Court (the "**Probate Court**") pleadings that are in violation of the automatic stay that continues in effect in the Chapter 11 bankruptcy case of the Debtor.

7.      In particular, on December 27, 2016, Moore filed a Limited Motion to Open Estate for Declaration that the Probate Court Order(s) Approving the July 9, 1997 Stipulated Agreement; the July 16, 1997 Compromise of Claim Did Not Approve the Co-Publishing Document Nor the Document Dates July 20, 1997 Entitled "Settlement Agreement," a Motion to Open Estate (Fraud) dated December 9, 2016, and a Memorandum of Law (collectively, the

"**Motions to Reopen**"). True and correct copies of the Motions to Reopen are attached as Composite Exhibit "A."

8.      The filing of the Motions to Reopen are in direct violation of sections 362(a)(1) and (3) of the title 11 of the United States Code.

9.      In response to the Motions to Reopen, BEC filed in the Probate Court Bernard Edwards Company, LLC's Response to Petitioner, Eric Moore's, Motion to Open Estate (the "**BEC Response**"). Instead of just responding that Moore has no standing to file the Motions to Reopen, BEC advanced in the BEC Response its defenses to the Debtor's claims that are disputed by the Debtor and remain unresolved in the Debtor's bankruptcy case. However, counsel for BEC has assured the Debtor's counsel that the BEC Response was simply defensive and that if the Motions to Reopen are withdrawn, BEC will seek no relief in the Probate Court.

10.     The Probate Court has now scheduled hearings for February 6, 2017 to consider the Motions to Reopen and BEC's Response. A true and correct copy of the Notice of Hearing scheduled by the Probate Court is attached as Exhibit "B."

11.     On January 22, 2017, counsel for the Debtor provided a demand to Moore to immediately withdraw the Motions to Reopen and take all necessary actions to cancel the February 6, 2017 hearing before the Probate Court and that failing to take such actions would result in the filing of a motion for sanctions (the "**Demand**"). A true and correct copy of the Demand is attached as Exhibit "C."

12.     Moore responded to the Demand and invited the filing of this Motion for Sanctions. (the "**Moore Response**") A copy of the Moore Response is attached as Exhibit "D."

13.     For the reasons set forth herein, the Motions to Reopen and the Moore Response constitute acts to exercise control over property of the Debtor's estate in violation of Section 362(a)(3) of the Bankruptcy Code.

14.     The Debtor is an individual injured by the intentional and willful violations of the automatic stay. To the extent that Moore persists in contending that he has an interest in the Debtor's property and her affairs, the Debtor seeks an order of this Court enforcing the automatic stay by finding any such actions to be void *ab initio*.

15.     The Motions to Reopen and the Moore Response constitute intentional and willful violations of the automatic stay that entitle the Debtor to recover actual damages, costs and attorneys' fees, and punitive damages as sanctions for such violations pursuant to Section 362(k) of the Bankruptcy Code and the inherent contempt powers of this Court.

## Argument and Relief Requested

16.     Pursuant to Section 541(a)(1) of the Bankruptcy Code, the estate of the Debtor is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."

17.     A debtor's interests in its pre-petition contracts become property of the debtor's estate upon the filing of a bankruptcy petition. *Grant v. Lathan Construction Corp. (In re Construction Contractors of Ocala, Inc.)*, 196 B.R. 188, 194 (Bankr. M.D. Fla. 1996); *see also Hutchins v. Fordyce Bank and Trust Co. (in re Hutchins)*, 216 B.R. 1, 7 (Bankr. E.D. Ark. 1997) ("a debtor's interest in a contract, even if it is nonassumable, constitutes property of the estate.") (citing *Bell v. Alden Owners, Inc.*, 199 B.R. 451, 462 (S.D.N.Y.) 1996)).

18.     Because a debtor's contracts are property of the estate, Section 362(a)(3) of the Bankruptcy Code acts as a stay of any act to "exercise control" over the debtor's pre-petition contracts. *See In re Hutchins*, 216 B.R. at 7 ("upon the filing of the petition in bankruptcy, the

4

automatic stay prohibited any action against both the debtor and estate property, including the rights associated with the contracts in which the debtor had an interest.")

19.    To the extent Moore maintains that he can assert rights and remedies of the Debtor and does in fact seek to assert such rights, such contention is an act to exercise control over the interest of the Debtor in such property. Attempting to intimidate and mislead the Debtor into thinking that she must allow Moore to pursue her rights and/or must pay Moore or lose property of the Debtor, also violates Section 362(a)(3) of the Bankruptcy Code.

20.    A willful stay violation occurs when "an entity 'engages in a deliberate act that is done in violation of the automatic stay with knowledge that the debtor has filed a bankruptcy petition.'" *In re Craine*, 206 B.R. 594, 597 (Bankr. M.D. Fla. 1997) (quoting *In re Washington*, 172 B.R. 415, 419 (Bankr. S.D. Ga. 1994)). In this regard, the Eleventh Circuit Court of Appeals has applied the "general definition of 'willful violation. . . . " *See In re Craine*, 206 B.R. at 597, citing *In re Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1555 (11th Cir. 1996).

21.    In *In re Jove Engineering, Inc.*, the Eleventh Circuit reiterated that "[a]lthough the definition varies somewhat from context to context, willfulness generally connotes intentional action taken with at least callous indifference for the consequences." *Id.* (quoting *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529,1535 (11th Cir. 1986)). Thus, the Eleventh Circuit applied the rule that automatic stay violations are willful "if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *In re Jove Engineering, Inc.*, 92 F3d at 1555 (collecting cases from other circuits).

22.    In the instant case, Moore knew of the existence of the stay in the Debtor's case. Nevertheless, Moore deliberately filed the Motions to Reopen and sent the Moore Response.

23.     In the Eleventh Circuit, actions "taken in violation of the automatic stay are void and without effect." *Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982) (citing *Kalb v. Feuerstein*, 308 U.S. 433 (1940); *accord U.S. v. White*, 466 F.3d 1241, 1244 (11th Cir. 2006) (same); *In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir. 1984) ("It is true that acts taken in violation of the automatic stay are generally deemed void and without effect.")

24.     Therefore, because the Motions to Reopen constitute a violation of Section 362(a)(3) of the Bankruptcy Code, any such action is void *ab initio*, and no further action may be taken thereon.

25.     Generally, a federal court has inherent power to control the matters, parties and attorneys appearing before it. In *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the Supreme Court addressed the nature and scope of a federal court's inherent power to control the proceedings and the conduct of the parties involved. The Court acknowledged that "'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Id.* at 43 (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (other citation omitted)). These powers are necessarily vested in courts to manage their affairs to "achieve the orderly and expeditious disposition of cases." Id. These inherent powers, which are incidental to a federal court, include the power to control and discipline attorneys and pro se litigants appearing before it. *Id.*

26.     The Debtor has been damaged as a result of Moore's willful violation of the automatic stay, including, without limitation, the attorneys' fees, actual damages and costs associated with the prosecution of this Motion for Sanctions. Moreover, under the circumstances, punitive damages are warranted based upon the maliciousness and bad faith associated with the stay violation which Moore attempted to use as a means to intimidate the Debtor into paying him.

6

27.     Accordingly, and for the reasons set forth above, the Court should hold Moore in contempt for willfully violating the automatic stay, and impose sanctions in the form of actual damages, attorneys' fees, costs and punitive damages and any other relief deemed appropriate.

WHEREFORE, the Debtor respectfully requests the entry of an Order (a) awarding sanctions for intentional and willful violation of the automatic stay, (b) holding Moore in contempt of court, and (c) granting such other and further relief as s just and proper.

Dated: Tampa, Florida
       January 23, 2017

BUSH ROSS, P.A.
Post Office Box 3913
Tampa, Florida 33601-3913
(813) 224-9255 (telephone)
(813) 223-9620 (telecopy)
Attorneys for the Objectors

By:  ___/s/ Jeffrey W. Warren_____
        Jeffrey W. Warren
        Florida Bar No. 150024
        *jwarren@bushross.com*



1801 North Highland Avenue
Tampa, Florida 33602
(813) 224-9255 [Phone]
(813) 223-9620 [Fax]
www.bushross.com

Mailing Address:
Post Office Box 3913
Tampa, Florida 33601-3913

**JEFFREY W. WARREN**
jwarren@bushross.com
(813) 204-6423 [Direct Line]

January 22, 2017

**VIA EMAIL AND OVERNIGHT DELIVERY**

Mr. Eric Lyndell Moore
202 Island Avenue
San Diego, CA 92101
elmoore75@aol.com

      Re:    Notice of Violation of the Automatic Stay Under 11 U.S.C. § 362(a)

Dear Mr. Moore:

      As you are aware, the undersigned represents Ms. Bambi Alicia Herrera-Edwards (the **"Debtor"**) in connection with her Chapter 11 bankruptcy case pending before the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the **"Bankruptcy Court"**).

      Please be advised that your recent filings with the Westport, Connecticut Probate Court are in violation of the automatic stay that continues in effect in the Chapter 11 bankruptcy case of the Debtor. In particular, the Limited Motion to Open Estate for Declaration that the Probate Court Order(s) Approving the July 9, 1997 Stipulated Agreement; the July 16, 1997 Compromise of Claim Did Not Approve the Co-Publishing Document Nor the Document Dates July 20, 1997 Entitled "Settlement Agreement" filed on December 27, 2016 as well as the Motion to Open Estate (Fraud) dated December 9, 2016 and the Memorandum of Law submitted therewith (collectively, **"Motions to Reopen"**) are in direct violation of sections 362(a)(1) and (3) of the title 11 of the United States Code. In addition, any attempts by you to go forward with the scheduled February 6, 2017 hearing on the Motions to Reopen in the Probate Court will be a further violation of the automatic stay.

      Accordingly, Ms. Herrera-Edwards demands that the Motions to Reopen be immediately withdrawn by you and that you take all necessary actions to cancel the scheduled February 6, 2017 hearing before the Probate Court. Your failure to withdraw your pleadings and cancel the February 6 hearing, will result in Ms. Herrera-Edwards taking immediate actions to enforce the automatic stay in her bankruptcy case and seek appropriate compensatory and punitive damages as a result of your actions. *As such, by no later than January 25, 2017 at 5:00 p.m. (Eastern Prevailing Time), please provide the undersigned with proof in writing that your Motions to Reopen have been withdrawn and that the February 6 hearing has been cancelled.*

      Sincerely,

Jeffrey W. Warren

cc:    Ms. Bambi Alicia Herrera-Edwards (via email only)
       Bernard Edwards Corporation c/o Jimmy Parrish, Esq. and Richard Saxl, Esq. (via email only).

STATE OF CONNECTICUT

| | |
|---|---|
| ) | PROBATE COURT |
| IN THE MATTER OF THE ) | |
| ESTATE OF: ) | WESTPORT |
| ) | |
| BERNARD EDWARDS ) | |
| ) | District 50 |
| Deceased ) | |

## LIMITED MOTION TO OPEN ESTATE FOR DECLARATION THAT THE PROBATE COURT ORDER(S) APPROVING THE JULY 9, 1997 STIPULATED AGREEMENT; THE JULY 16, 1997 COMPROMISE OF CLAIM DID NOT APPROVE THE CO-PUBLISHING DOCUMENT NOR THE DOCUMENT DATED JULY 30, 1997 ENTITLED "SETTLEMENT AGREEMENT"

Now comes the Petitioner, Eric Moore, a creditor in the bankruptcy of Bambi Edwards in Tampa, Florida seeking a motion to Open and to clarify in the above captioned matter for the purpose of providing a declaration that various documents[1] do not contain the date stamp and/or official seal and approval of the Westport Probate Court

## STATEMENT OF THE FACTS

This matter comes before this Court due to the misapplication of the Court's original 1997 Orders.  This confusion was intentionally created by several agreements improperly entered into the so-called "sealed file" in an attempt to commit a fraud upon the Court and subvert the true intention of the Orders as issued. These same documents have been presented as "Court Approved" in the bankruptcy court by the lawyers for

---

1   The documents are entitled (1) Co-publishing agreement allegedly dated August 21, 1997 (2) "Settlement Agreement" allegedly dated July 30, 1997 these documents are in the sealed file

Wallace D. Franson, former executor of the Estate, and without a declaration from this court, the bankruptcy court and U.S. District Court will continue to be deceived.

1.   On April 25, 2014  The Asst. Clerk of the court confirmed in writing via a letter that;

   a. The Document entitled: Co-publishing agreement dated August 21, 1997 did not contain the date stamp of the Westport Probate Court

   b. The Document entitled Settlement Agreement dated July 30, 1997 does have an authentic date stamp[2] but did not contain a raised seal[3] which is placed on all documents signed by the Judge and official court staff.

2.   The Bankruptcy court will not accept the findings in this letter without a declaration because it is considered hearsay.

3.   The Bankruptcy court and United States District Court have been lead to believe that the date stamp[4] on the co-publishing document is authentic date stamp of the Westport Probate Court.

4.   The Bankruptcy court and United States District Court have been lead to believe that the document entitled " Settlement Agreement" dated July 30, 1997 and the document entitled Co-publishing agreement were approved by the Westport Probate Court, The Bankruptcy court order reads in Part:

---

2   The Authentic date stamp reads August 28, 1997 making it impossible that this agreement was presented to the court on July 30, 1997. The April 25, 2014  Letter is enclosed in the Appendix

3   Without a declaration the Executor can use their couterfeit raised seal and continue to present this document as authentic

4   Upon information and belief, Wallace D. Franson made counterfeit Westport Probate Court date stamps and/or court Seals, and copies of Judge Capauno's signature in order to place them on these documents in order to transfer millions of dollars from Ms. Edwards to themselves since 1996 to date.

*" Through the July 9, 1997 settlement agreement, the July 30, 1997 settlement agreement and the co-publishing agreement, all executed as part of a single transaction."*

5.   On or about November 29, 2012 The Asst. Clerk of this court provided Certified Documents of the July 9, 1997 Stipulated Agreement with the court order approving it attached. This agreement and order are **attached as Exhibit A.**

6.   On or about September 12, 2016 the Asst. Clerk of this court provided Certified Documents of the July 16, 1997 order approving the compromise of claim and order approving the claim of the first wife Alexis Edwards. This agreement and order is **attached as Exhibit B**

7.   The lawyers for the Former Executor of the Estate continue to assert that the co-publishing document and July 30, 1997 document were approved by *one* of the above mentioned orders.

Therefore Petitioner Eric Moore respectfully this court to issue an order and/or declaration that the documents entitled Co-publishing agreement and "Settlement Agreement" dated July 30, 1997 were not approved by the above mentioned orders or any other orders of the Westport Probate Court.

Respectfully submitted,

ERIC LYNDELL MOORE
202 Island Avenue San Diego, CA 92101
**elmoore75@aol.com**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day of DECEMBER 27, 2016 a true and correct copy

of this LIMITED MOTION TO REOPEN was provided by E-mail and/or US mail or

process server to the following:

David S Jennis
The Jennis Firm
00 North Ashley Drive Suite 2540
Tampa, FL 33602
813) 229-1700
Fax : (813) 229-1707
Email:djennis@jennislaw.com

Richard J. Pober, Esq
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006
Email:rpober@pullcom.com

*Former Attorney of the Estate of Bernard Edwards*

Bryan D. Hull
Bush Ross P.A.
Post Office Box 3913 Tampa, FL
33601-3913 813-224-9255
Fax : 813-223-9620
Email:bhull@bushross.com

*Attorney for Debtor Bambi Edwards*

*Richard Saxl*
*Attorney at Law*
*P.O. Box 5042*
*Westport, CT 06881 Email:Dick@richardhsaxl.com*

Baker & Hostetler LLP/Jimmy Parrish
200 S. Orange Avenue
Suntrust Center, Suite 2300
P.O. Box 112 (32802-0112)
Orlando, Florida 32801-3432 Email:jparrish@bakerlaw.com and
wtownsend@bakerlaw.com

*Attorney for Wallace D. Franson, Richard Pober, The Bernard Edwards Company, LLC, Jess S. Morgan & Co the Children of Bernard Edwards*



```
-------------------------------------X
                                     :
ESTATE OF BERNARD EDWARDS            :
                                     :
                Deceased.            :    JULY 9, 1997
                                     :
-------------------------------------X
```

IT IS HEREBY STIPULATED AND AGREED THAT:

1.   Bambi Edwards shall be assigned full and complete ownership and interest in 37-1/2% of all royalties and other payments received from the copyrights and other such interests owned by Bernard Edwards at the time of his death, and shall be paid such royalties within 30 days after receipt by Jess S. Morgan & Company of such sums.

2.   Bambi Edwards shall receive the $250,000.00 insurance policy from the Estate or insurance company within 30 days of the execution of this Stipulation or when received.

3.   The Estate shall forgive, waive and release all sums advanced by the Estate for mortgage payments, home expenses, widow's allowances and similar sums advanced to Bambi Edwards by the Estate.

4.   The Estate shall withdraw its claims to 3 Sturges Hollow and therefore Bambi Edwards shall have full title to the house at 3 Sturges Hollow, Westport, CT.

5.   The Estate shall convey to Bambi Edwards title and ownership of the Ferrari.

6.   Bambi Edwards, Alexis Edwards, Bernard Edwards, Jr., Portia Vrtiak, David Edwards, Mark Edwards and Leah Edwards hereby release each other of any and all claims which they may have now or ever had against each other from the beginning of time to the date of this Stipulation.

7.   Bambi Edwards and Alexis Edwards hereby release the Estate of any claims which they may have or ever had against each other from the beginning of time to the date of this Stipulation.

8.   Bambi Edwards and Alexis Edwards agree to cooperate regarding the filing of Federal and State tax returns.

9.   The Estate by its Executor Wallace Franson, Bambi Edwards, Alexis Edwards and Bernard Edwards' children agree to execute such documents, contracts and agreements as are necessary to effectuate the terms and conditions of this Stipulation.

10.  Bambi Edwards agrees to withdraw, with prejudice, the lawsuit commenced by her against the Estate and pending in the

Federal Court for the Southern District of New York on the terms and conditions contained herein.

11.  The Estate releases any and all claims to the personal property found at 3 Sturges Hollow Road, and in storage in New York City, except any of Bernard Edwards' musical instruments in storage, and shall deliver to her the items identified in Schedule A attached hereto.

12.  Each of the attorneys execute this agreement on behalf of their respective clients, and represent that each has full authority from their clients to agree to these terms.

13.  All parties will withdraw all outstanding lawsuits and claims now pending in Probate Court or Superior Court.

14.  Alexis Edwards shall receive a percentage of the royalties to be agreed upon by the Executor in consideration of releasing her tort claim.

- 3 -

15. Confidentiality - all terms shall be maintained in confidence and shall not disclose same to any outside party.

July 9, 1997

Richard Pober
Attorney for Estate
Wallace Franson, Executor

James Cousins
Attorney for Alexis Edwards

Charles McCaghey
Attorney for Bambi Edwards

Anthony E. Ahern
Guardian Ad Litem

Portia I. Vrtiak

David Edwards

Bambi Edwards

- 4 -

Schedule "A"

Gold guitar necklace w/diamond

Bernard's wedding band (exchanged)

Photo Album (2)

Bambi necklace (diamond)

Bambi jackets (Spike Lee)

Coat Brown Cashmere (Bambi made)

Keys to Ferrari

Radio to Ferrari

- 5 -

STATE OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE ESTATE | : COURT OF PROBATE |
| BERNARD EDWARDS, | : |
| | : DISTRICT OF WESTPORT |
| Deceased. | : |
| | : SEPTEMBER 3, 1997 |

### ORDER

The Court has reviewed and approved the Settlement Agreement entered into by the Estate and Bambi Edwards. The Court entered an Order on Bambi Edward's Request for Statutory Share and the Estate filed an Objection claiming the surviving spouse was not entitled to a statutory share due to abandonment. All parties, including the children as beneficiaries under the Last Will and Testament of the decedent, have entered into a Settlement Agreement addressing all issues including the appeal filed by the Estate. The Court hereby vacates its Memorandum of Decision concerning the statutory share and issues of abandonment and all orders contained therein shall be vacated in view of the Stipulated Agreement.

BY THE COURT.

THE HONORABLE EARL F. CAPUANO

DATED AT WESTPORT, CT, THIS 4th DAY OF SEPTEMBER, 1997.

CERTIFIED COPY
OF RECORD
PC-186   REV. 7/01

COURT OF PROBATE

| | | |
|---|---|---|
| COURT OF PROBATE, | WESTPORT | DISTRICT NO.  50 |

ESTATE OF/IN THE MATTER OF      BERNARD  EDWARDS

I,  Karen M. Uccellini      ☐ Judge  ☐ Clerk  ☒ Ass't Clerk of the court of probate,      Westport

district and authorized keeper of the records and seal thereof, hereby certify that I have compared the appended copy of [*specify documents*]
the Stipulated Agreement dated July 9, 1997 and the order, dated September 3, 1997 signed by
the Honorable Earl F. Capuano in the estate of Bernard Edwards, late of Westport, in said
District deceased.

with the official record thereof kept on file in this office and have found the same to be a true and complete copy of the document(s)
maintained on file, as aforesaid.

IN TESTIMONY WHEREOF, I have hereunto affixed the
seal of said court and subscribed my name on:

*Date:* November 29, 2012.

COURT
SEAL

.......................*Karen M. Uccellini*.......................
☐ Judge  ☐ Clerk  ☒ Ass't Clerk

CERTIFIED COPY OF RECORD
PC-186



CERTIFIED COPY
OF RECORD
PC-186  REV.  7/01

STATE OF CONNECTICUT

COURT OF PROBATE

**COURT OF PROBATE,**   WESTPORT

**DISTRICT NO. 50**

ESTATE OF XXXXXXXXXXXXXXXXX

BERNARD EDWARDS

I, Karen M. Uccellini   ☐ Judge  ☐ Clerk  ☒ Ass't Clerk of the court of probate,   Westport

district and authorized keeper of the records and seal thereof, hereby certify that I have compared the appended copy of [*specify documents*]
the Application for Approval of Compromise of Claim, dated July 16, 1997 and the
Order Approving the Compromise of Claim, dated September 4, 1997 of Bernard Edwards,
late of Westport, in said District deceased.

with the official record thereof kept on file in this office and have found the same to be a true and complete copy of the document(s)
maintained on file, as aforesaid.

IN TESTIMONY WHEREOF, I have hereunto affixed the

seal of said court and subscribed my name on:

**COURT**
**SEAL**

*Date:*  September 12, 2016..

......................................... Karen M. Uccellini ................................

☐ Judge  ☐ Clerk  ☒ Ass't Clerk

CERTIFIED COPY OF RECORD
PC-186



**APPLICATION FOR APPROVAL
OF COMPROMISE OF CLAIM**

TO THE PROBATE COURT FOR THE DISTRICT OF WESTPORT

IN RE: ESTATE OF BERNARD EDWARDS

The Petitioner represents that:

1.  He is the attorney for the estate of Bernard Edwards.

2.  Alexis Edwards is the former spouse of Bernard Edwards and has filed claims against the estate.

3.  Said claim resulted in a disputed claim between Alexis Edwards and Bernard Edwards and a proposed compromise settlement of said claim against the estate by Alexis Edwards was arrived at by counsel for both parties.

4.  The estate agrees that Alexis Edwards shall receive a participation in the income stream of the copyrights to be received by the estate in the percentage of 12 ½ percent, net after all expenses. The expenses to be deducted shall be the same as the deduction to the other parties receiving participation in the income stream. All parties will enter into a standard co-publishing agreement, with the copyrights owned in the same percentages as the income from the copyrights is allocated pursuant to this settlement agreement.  The co-publishing agreement will provide that (a) the executor of the estate will act as publisher of the copyrights and will have full and complete administration rights therein; (b) the executor will have the absolute right and ability to assign such administration rights to any person or entity, including but not limited to the trust for the children of Bernard Edwards; (c) Bambi Edwards and Alexis Edwards will be co-publishers, and will have no administrative rights whatsoever regarding the copyrights; and (d) all costs of administering the copyrights will be deducted "off-the-top" in determining revenue earned by the copyrights.

5.  It is the opinion of the undersign that such settlement is a fair and equitable compromise of the claims of said Alexis Edwards and will be for the benefit of said estate.

WHEREFORE, your subscriber prays that the Court authorize the executor to compromise said claims for the above-referenced amount and give a valid release to the estate from Alexis Edwards for said amount.

Dated at Westport, Connecticut this _16_ day of _July_, 1997

RICHARD POBER
Attorney for the Estate of Bernard Edwards

DISTRICT of WESTPORT
RECEIVED

SEP   8 2016

PROBATE COURT

Eric L. Moore
202 Island Avenue
San Diego, CA 92101
(336) 671-2193
(619) 923-1020 Fax

September 6, 1997

**ESTATE OF BERNARD EDWARDS**

**Attn: Karen Uccellini**

by Fax (203) 341-1102 and US Mail

Dear Mrs. Uccellini,

Hello. Hope all is well. We are in receipt of certified copies of the July 9, 1997 stipulated agreement that you sent us dated November 29, 2012. To support a motion to the bankruptcy court and United States District Court

Please send a certified copy of:

pg 257

a) The application for compromise of claim (Vol645pg 268) filed on July 16, 1997 and the order approving the compromise of claim (Vol 645pg 265)

b) Also please attach copy of any other agreements that were approved by the order approving the application for compromise of claim.

Eric L. Moore

VOL 645 PG 265

STATE OF CONNECTICUT

IN THE MATTER OF THE ESTATE
BERNARD EDWARDS,

Deceased.

COURT OF PROBATE

DISTRICT OF WESTPORT

SEPTEMBER 3, 1997

<u>ORDER</u>

The Court has reviewed and approved the Settlement Agreement entered into by the Estate, Bambi Edwards as surviving spouse and Alexis Edwards as former spouse of the decedent. Disputed claims have been made against the estate by Bambi Edwards and Alexis Edwards and the Settlement Agreement resolves all claims that can be made by Bambi Edwards and Alexis Edwards against the estate. The children of Bernard Edwards are the sole beneficiaries under his will. The children of Bernard Edwards have agreed to all terms of the Settlement Agreement and the Court believes the Agreement is fair and equitable for the children.

Upon review of all documents and the Settlement Agreement, the Court hereby finds that the Settlement proposed is fair and equitable compromise of claims of Bambi Edwards and Alexis Edwards and is in the best interests of the estate and is hereby approved by the Court.

BY THE COURT,

THE HONORABLE EARL F. CAPUANO

DATED AT WESTPORT, CT, THIS 4th DAY OF SEPTEMBER, 1997.

# APPENDIX

04/24/2014   22:13   2033411102

PAGE  01/01





# State of Connecticut

## COURT OF PROBATE, DISTRICT OF WESTPORT
### WESTPORT - WESTON

LISA K. WEXLER
Judge

SHIRLEY A. DELUCA
Chief Clerk

AUDREY WILLIAMS
Clerk

KAREN UCCELLINI
Asst. Clerk

TOWN HALL
110 Myrtle Avenue
Westport, CT 06880
Tel: (203) 341-1100
Fax: (203) 341-1102
E-mail: sdeluca@ctprobate.gov

April 25, 2014

Mr. Moore
By: Fax (619) 923-1020

ESTATE OF: BERNARD EDWARDS

Dear Mr. Moore,
The document entitled: Co-Publishing Agreement dated August 21, 1997, which is included in this file, does not have our date stamp on it. The other document entitled:  Settlement Agreement dated July 30, 1997 does have our date stamp.  All materials presented to the court get a date stamp.

Date stamps are not the same as our raised seal, which is placed on all documents signed by the Judge and official court staff.

Very truly yours,

*Karen M. Uccellini*
Asst. Clerk

# PULLMAN

## ATTORNEYS

Richard J. Pober
850 Main Street
P O. Box 7006
Bridgeport, CT  06601-7006
p   203 330 2134
f   203 576 8888
rpober@pullcom.com
www.pullcom.com

September 22, 2011

via email - fmoultrie@moultriecpa.com
Fred S. Moultrie
Moultrie Accountancy Group
100 Corporate Pointe, Suite 300
Culver City, CA 90230-8764

Re:   **Inspection of the books and records of the Estate of Bernard Edwards, Bernard Edwards Company, LLC and Jess S. Morgan and Company, Inc. for the period retroactive from April 19, 1996 through July 31, 2011 on behalf of Bambi Edwards**

Dear Mr. Moultrie:

Please be advised I represent the legal interests of the Estate of Bernard Edwards and Bernard Edwards Company, LLC.   Receipt is acknowledged of your letter dated September 17, 2011 received by my client on September 19, 2011.  Please send any future correspondence directly to me.

As you should be aware, Bambi Edwards signed a very limiting co-publishing agreement which provides very limited audit rights.   Under the terms of the audit rights she may send an individual, at her expense, to examine the past two years.

Per the settlement agreement, Bambi Edwards is not entitled to nor has any interest in the late Bernard Edwards' personal services income, i.e., recording artist and producer, musician, etc. Ms. Edwards has an income and non-administrative copyright ownership interest in the late Bernard Edwards' catalog of compositions, as evidenced by the Co-Publishing Agreement dated August 21, 1997.

Your attention is directed to Paragraph 3c of the Co-Publishing Agreement.  As my client has not received any objection from your client until now, all prior accountings up to 2 years ago are not subject to audit.   You may review the accounting statements and payments rendered by the Bernard Edwards Company, LLC to Bambi Edwards along with the source statements and payments forming the basis of the accounting statements.  For your information, the only sources

# PULLMAN

ATTORNEYS

Page 2

of Publisher copyright income are Warner/Chappell Music, ASCAP and BMI. An auditor is not entitled to review the source agreements with Warner/Chappell Music, ASCAP and BMI.

After you have read this letter, please let me know whether you still intend to proceed with your audit under the terms of this letter and I will coordinate with my client a mutual day and time for you to attend the audit.

Very truly yours,

/s/

Richard J. Pober
RP:ach

　　　Jeremy Stahl
　　　Richard Mandel
　　　Peter Paterno
　　　Howard King

ACTIVE/74751.1/RPOBER/2582536v1

## <u>DECLARATION OF RICHARD MANDEL</u>

I, Richard Mandel, declare as follows:

1.      I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2.      I am the President of Defendant Jess S. Morgan & Co., Inc. ("JSM") (erroneously sued as Jess S. Morgan & Co.) in the above-entitled action.

3.      JSM is in the business, among other things, of providing business management services to musicians, songwriters, and composers, among other types of artists and celebrities.

4.      JSM is the manager of Defendant Bernard Edwards Co., LLC ("BEC") (erroneously sued as Bernard Edwards Companies, LLC). BEC is an entity that publishes and administers certain musical compositions of the deceased composer, Bernard Edwards, and is the successor-in-interest to the Estate of Bernard Edwards ("Estate") with respect to his compositions.

5.      Non-party Bambi Edwards is the surviving spouse of Bernard Edwards. BEC currently pays certain royalty income to Ms. Edwards under the terms of a Co-Publishing Agreement ("Co-Publishing Agreement") dated August 21, 1997 between the Estate, Bambi Edwards, and Alexis Edwards. Alexis Edwards is a former spouse of Bernard Edwards.

6.      A true and correct copy of the Co-Publishing Agreement (as redacted to delete Social Security numbers, birthdates, and home addresses) is attached hereto as **Exhibit A**.

7.      The Co-Publishing Agreement makes reference to and is the result of a confidential and probate court-approved settlement agreement ("Settlement Agreement") dated July 30, 1997, between the Estate, Bambi Edwards, and Alexis Edwards, which settlement resolved all claims against the Estate that had been made by Bambi Edwards and Alexis Edwards.

8.      I am familiar with music publishing and co-publishing agreements from my many years of experience dealing with such agreements in connection with providing business management services to JSM's music industry clients. The Co-Publishing Agreement at issue here did not arise in the typical context of a publishing agreement between a composer and its music publisher and thus has certain negotiated terms and conditions specific to its unique context.

///

9.     Attached hereto as Exhibit B is a true and correct copy of a letter with attachment dated July 18, 2011, that Defendants' outside counsel, Richard J. Pober, Esq., sent by email to Bambi Edwards's lawyer, Kendall A. Minter, Esq., and Parviz Omidvar, the President of Plaintiff Music Royalty Consulting, Inc. ("Plaintiff"), among others, and on which I was copied. The letter is in reference to Ms. Edwards's alleged assignment to Plaintiff of her right to receive royalty income from BBC. Mr. Pober's letter offers to issue royalty checks directly to Plaintiff, rather than to Ms. Edwards, after July 7, 2011, on the terms and conditions set forth in Mr. Pober's letter provided Plaintiff and Ms. Edwards agree to same. Plaintiff and Ms. Edwards did not accept Mr. Pober's offer to provide for direct payment to Plaintiff on the terms set forth in his letter.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed October 20, 2011, at Los Angeles, California.

Richard Mandel

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PROTECTIVE ORDER AND TO QUASH DEPOSITION NOTICES; DECLARATION OF RICHARD MANDEL

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                               Case No. 8:12-bk-15725-KRM
                                                     Chapter 11
BAMBI A. HERRERA-EDWARDS,

      Debtor.

_____/

### DEBTOR'S EMERGENCY MOTION
### FOR AN ORDER (A) AWARDING SANCTIONS FOR INTENTIONAL
### AND WILLFUL VIOLATION OF THE AUTOMATIC STAY AND
### (B) HOLDING ERIC L. MOORE IN CONTEMPT OF COURT

Bambi A. Herrera-Edwards. (the "**Debtor**"), by and through undersigned counsel, and pursuant to the provisions of Sections 105(a) and 362 of Title 11 of the United States Code (the "**Bankruptcy Code**"), respectfully requests that the Court enter an order (a) awarding sanctions for intentional and willful violation of the automatic stay, and (b) holding Eric L. Moore ("**Moore**") in contempt of court (the "**Motion for Sanctions**"). In support of the Motion for Sanctions, the Debtor respectfully represents as follows:

#### Preliminary Statement and Background

1.     This Court has presided over (a) the Debtor's Chapter 11 case filed in 2012 resulting in a confirmed Chapter 11 plan of reorganization, (b) the various disputed administrative and unsecured prepetition claims against the Debtor pursued by Moore resulting in the disallowance of all such claims and the affirmance on appeal of such disallowance, (c) the pending claim by the Debtor against Moore to recover the sum of $45,000 that Moore improperly received from the Debtor prior to her Chapter 11 case, and (d) the various pending disputes between the Debtor and Bernard Edwards Company, LLC ("**BEC**") and Jess S. Morgan & Co. ("**JSM**").

2.      In one way or another, each of these matters revolved around property rights of the Debtor related to the Debtor's claims against BEC and JSM arising from the settlement of the Debtor's claims against the Estate of her deceased husband Bernard Edwards (the "**Edwards Estate**") and the consideration she obtained as part of that settlement.

3.      Moore has persistently and improperly sought to share in the Debtor's recovery of these property rights that are derived from the Edwards Estate including the musical compositions written by Bernard Edwards, his artist and producer royalties, certain administration rights and other property interests more particularly described in the pleadings and evidence before this Court.

4.      Notwithstanding the final and nonappealable orders disallowing any claim of Moore against the Debtor, Moore has continued to pursue a deliberate agenda of interference in the affairs and property rights of the Debtor.

5.      Despite repeated requests to cease his interference, Moore has only increased his activities and interference. The only purpose of these activities is an extortion directed to the Debtor to pay him to leave her alone.

6.      Although the Debtor has tried to ignore Moore, he recently filed with the Westport, Connecticut Probate Court (the "**Probate Court**") pleadings that are in violation of the automatic stay that continues in effect in the Chapter 11 bankruptcy case of the Debtor.

7.      In particular, on December 27, 2016, Moore filed a Limited Motion to Open Estate for Declaration that the Probate Court Order(s) Approving the July 9, 1997 Stipulated Agreement; the July 16, 1997 Compromise of Claim Did Not Approve the Co-Publishing Document Nor the Document Dates July 20, 1997 Entitled "Settlement Agreement," a Motion to Open Estate (Fraud) dated December 9, 2016, and a Memorandum of Law (collectively, the

2

"**Motions to Reopen**"). True and correct copies of the Motions to Reopen are attached as Composite Exhibit "A."

8.      The filing of the Motions to Reopen are in direct violation of sections 362(a)(1) and (3) of the title 11 of the United States Code.

9.      In response to the Motions to Reopen, BEC filed in the Probate Court Bernard Edwards Company, LLC's Response to Petitioner, Eric Moore's, Motion to Open Estate (the "**BEC Response**"). Instead of just responding that Moore has no standing to file the Motions to Reopen, BEC advanced in the BEC Response its defenses to the Debtor's claims that are disputed by the Debtor and remain unresolved in the Debtor's bankruptcy case. However, counsel for BEC has assured the Debtor's counsel that the BEC Response was simply defensive and that if the Motions to Reopen are withdrawn, BEC will seek no relief in the Probate Court.

10.     The Probate Court has now scheduled hearings for February 6, 2017 to consider the Motions to Reopen and BEC's Response. A true and correct copy of the Notice of Hearing scheduled by the Probate Court is attached as Exhibit "B."

11.     On January 22, 2017, counsel for the Debtor provided a demand to Moore to immediately withdraw the Motions to Reopen and take all necessary actions to cancel the February 6, 2017 hearing before the Probate Court and that failing to take such actions would result in the filing of a motion for sanctions (the "**Demand**"). A true and correct copy of the Demand is attached as Exhibit "C."

12.     Moore responded to the Demand and invited the filing of this Motion for Sanctions. (the "**Moore Response**") A copy of the Moore Response is attached as Exhibit "D."

13.     For the reasons set forth herein, the Motions to Reopen and the Moore Response constitute acts to exercise control over property of the Debtor's estate in violation of Section 362(a)(3) of the Bankruptcy Code.

14.     The Debtor is an individual injured by the intentional and willful violations of the automatic stay. To the extent that Moore persists in contending that he has an interest in the Debtor's property and her affairs, the Debtor seeks an order of this Court enforcing the automatic stay by finding any such actions to be void *ab initio*.

15.     The Motions to Reopen and the Moore Response constitute intentional and willful violations of the automatic stay that entitle the Debtor to recover actual damages, costs and attorneys' fees, and punitive damages as sanctions for such violations pursuant to Section 362(k) of the Bankruptcy Code and the inherent contempt powers of this Court.

### Argument and Relief Requested

16.     Pursuant to Section 541(a)(1) of the Bankruptcy Code, the estate of the Debtor is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."

17.     A debtor's interests in its pre-petition contracts become property of the debtor's estate upon the filing of a bankruptcy petition. *Grant v. Lathan Construction Corp. (In re Construction Contrators of Ocala, Inc.)*, 196 B.R. 188, 194 (Bankr. M.D. Fla. 1996); *see also Hutchins v. Fordyce Bank and Trust Co. (in re Hutchins)*, 216 B.R. 1, 7 (Bankr. E.D. Ark. 1997) ("a debtor's interest in a contract, even if it is nonassumable, constitutes property of the estate.") (citing *Bell v. Alden Owners, Inc.*, 199 B.R. 451, 462 (S.D.N.Y.) 1996)).

18.     Because a debtor's contracts are property of the estate, Section 362(a)(3) of the Bankruptcy Code acts as a stay of any act to "exercise control" over the debtor's pre-petition contracts. *See In re Hutchins*, 216 B.R. at 7 ("upon the filing of the petition in bankruptcy, the

4

automatic stay prohibited any action against both the debtor and estate property, including the rights associated with the contracts in which the debtor had an interest.")

19.     To the extent Moore maintains that he can assert rights and remedies of the Debtor and does in fact seek to assert such rights, such contention is an act to exercise control over the interest of the Debtor in such property. Attempting to intimidate and mislead the Debtor into thinking that she must allow Moore to pursue her rights and/or must pay Moore or lose property of the Debtor, also violates Section 362(a)(3) of the Bankruptcy Code.

20.     A willful stay violation occurs when "an entity 'engages in a deliberate act that is done in violation of the automatic stay with knowledge that the debtor has filed a bankruptcy petition.'" *In re Craine*, 206 B.R. 594, 597 (Bankr. M.D. Fla. 1997) (quoting *In re Washington*, 172 B.R. 415, 419 (Bankr. S.D. Ga. 1994)). In this regard, the Eleventh Circuit Court of Appeals has applied the "general definition of 'willful violation. . . . " *See In re Craine*, 206 B.R. at 597, citing *In re Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1555 (11th Cir. 1996).

21.     In *In re Jove Engineering, Inc.*, the Eleventh Circuit reiterated that "[a]lthough the definition varies somewhat from context to context, willfulness generally connotes intentional action taken with at least callous indifference for the consequences." *Id.* (quoting *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529,1535 (11th Cir. 1986)). Thus, the Eleventh Circuit applied the rule that automatic stay violations are willful "if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *In re Jove Engineering, Inc.*, 92 F3d at 1555 (collecting cases from other circuits).

22.     In the instant case, Moore knew of the existence of the stay in the Debtor's case. Nevertheless, Moore deliberately filed the Motions to Reopen and sent the Moore Response.

23.     In the Eleventh Circuit, actions "taken in violation of the automatic stay are void and without effect." *Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982) (citing *Kalb v. Feuerstein*, 308 U.S. 433 (1940); *accord U.S. v. White*, 466 F.3d 1241, 1244 (11th Cir. 2006) (same); *In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir. 1984) ("It is true that acts taken in violation of the automatic stay are generally deemed void and without effect.")

24.     Therefore, because the Motions to Reopen constitute a violation of Section 362(a)(3) of the Bankruptcy Code, any such action is void *ab initio*, and no further action may be taken thereon.

25.     Generally, a federal court has inherent power to control the matters, parties and attorneys appearing before it.  In *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the Supreme Court addressed the nature and scope of a federal court's inherent power to control the proceedings and the conduct of the parties involved. The Court acknowledged that "'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Id.* at 43 (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (other citation omitted)). These powers are necessarily vested in courts to manage their affairs to "achieve the orderly and expeditious disposition of cases." Id. These inherent powers, which are incidental to a federal court, include the power to control and discipline attorneys and pro se litigants appearing before it. *Id.*

26.     The Debtor has been damaged as a result of Moore's willful violation of the automatic stay, including, without limitation, the attorneys' fees, actual damages and costs associated with the prosecution of this Motion for Sanctions. Moreover, under the circumstances, punitive damages are warranted based upon the maliciousness and bad faith associated with the stay violation which Moore attempted to use as a means to intimidate the Debtor into paying him.

27.     Accordingly, and for the reasons set forth above, the Court should hold Moore in contempt for willfully violating the automatic stay, and impose sanctions in the form of actual damages, attorneys' fees, costs and punitive damages and any other relief deemed appropriate.

WHEREFORE, the Debtor respectfully requests the entry of an Order (a) awarding sanctions for intentional and willful violation of the automatic stay, (b) holding Moore in contempt of court, and (c) granting such other and further relief as s just and proper.

Dated: Tampa, Florida
      January 23, 2017

BUSH ROSS, P.A.
Post Office Box 3913
Tampa, Florida  33601-3913
(813) 224-9255 (telephone)
(813) 223-9620 (telecopy)
Attorneys for the Objectors

By: _____/s/ Jeffrey W. Warren_____
      Jeffrey W. Warren
      Florida Bar No. 150024
      *jwarren@bushross.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 23, 2017, I electronically filed a true and correct copy of the foregoing Debtor's Motion for an Order (A) Awarding Sanctions for Intentional and Willful Violation of the Automatic Stay and (B) Holding Eric L. Moore in Contempt of Court with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system and I furnished a copy of the foregoing document(s) to the following parties in the manner of service indicated below:

/s/ Jeffrey W. Warren
ATTORNEY

**Via the CM/ECF system which will send a Notice of Electronic Filing to:**

- Noel R Boeke   noel.boeke@hklaw.com, wendysue.henry@hklaw.com
- Brandon T Crossland   bcrossland@bakerlaw.com, jdorn@bakerlaw.com;orlbakerdocket@bakerlaw.com
- Colleen Murphy Davis   colleen.murphy@usdoj.gov, beverly.lanier@usdoj.gov;renee.beam@usdoj.gov;CaseView.ECF@usdoj.gov
- Kathleen L DiSanto   ecf@jennislaw.com, karon@jennislaw.com;marj@jennislaw.com
- James W Elliott   james@mcintyrefirm.com, meaghan@mcintyrefirm.com;cposs@mcintyrefirm.com;sandy@mcintyrefirm.com
- Jason C Ester   jester@pinellascounty.org
- Bryan D Hull   bhull@bushross.com, lhoman@bushross.com
- David S Jennis   ecf@jennislaw.com, karon@jennislaw.com;marj@jennislaw.com
- Laura B Labbee   llabbee@bushross.com
- Andrew V Layden   alayden@bakerlaw.com, jdriggers@bakerlaw.com;OrlBakerDocket@bakerlaw.com
- Angelina E Lim   angelinal@jpfirm.com, minervag@jpfirm.com;katherines@jpfirm.com;andrenaw@jpfirm.com
- Nicole Mariani Noel   bankruptcynotices@kasslaw.com, nmnoel@ecf.courtdrive.com
- Jimmy D Parrish   jparrish@bakerlaw.com, OrlBakerDocket@bakerlaw.com;jdriggers@bakerlaw.com
- Tiffany D Payne   tpayne@bakerlaw.com, OrlBakerDocket@bakerlaw.com;smccoy@bakerlaw.com;jdriggers@bakerlaw.com;egreen@bakerlaw.com
- Nicole Peair   Nicole.W.Peair@USdoj.gov
- Pinellas County Tax Collector (AB)   abradley@taxcollect.com
- Steven J Solomon   steven.solomon@gray-robinson.com, lauren.rome@gray-robinson.com;Amador.Ruiz-Baliu@gray-robinson.com
- Clay M Townsend   ctownsend@forthepeople.com, jsantos@forthepeople.com
- Wendy Cramer Townsend   wtownsend@bakerlaw.com, jdriggers@bakerlaw.com;egreen@bakerlaw.com;orlbakerdocket@bakerlaw.com;smccoy@bakerlaw.com
- **United States Trustee - TPA**   USTPRegion21.TP.ECF@USDOJ.GOV
- Alison Verges Walters   tbyington@kelleykronenberg.com

**Via U.S. Mail, postage prepaid, and electronic mail to:**

Mr. Eric Lyndell Moore
202 Island Avenue
San Diego, CA 92101
elmoore75@aol.com

8

Case No.: 96-000083

IN RE:

| | | |
|---|---|---|
| THE ESTATE OF BERNARD EDWARDS | : | STATE OF CONNECTICUT |
| ERIC MOORE | : | WESTPORT PROBATE COURT<br>PD-50 |
| VS. | | |
| THE ESTATE OF BERNARD EDWARDS | : | January 24, 2017 |

## NOTICE OF ENTRY OF ORDER FOR RELIEF AND OF AUTOMATIC STAY

PLEASE TAKE NOTICE that BAMBI HERRERA-EDWARDS (the "**Debtor**") filed a voluntary petition for relief under Chapter 11 of title 11, United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, on October 17, 2012, Chapter 11 Case No. 8:12-bk-15725-KRM. Pursuant to Section 301 of the Bankruptcy Code, the filing of the petition constitutes an order for relief.

PLEASE TAKE FURTHER NOTICE that Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay of -

> (1)     the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

> (2)     the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

> (3)     any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

> (4)     any act to create, perfect, or enforce any lien against property of the estate;

(5)     any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6)     any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7)     the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8)     the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

PLEASE TAKE FURTHER NOTICE that, as a result of the automatic stay set forth in Section 362(a) of the Bankruptcy Code, the continued prosecution of the above-styled action is stayed as to the Debtor.

PLEASE TAKE FURTHER NOTICE that, as a result of Mr. Moore's continuous and intentional prosecution of this matter despite be given notice of the automatic stay, Ms. Herrera-Edwards has filed an emergency motion in the Bankruptcy Court for an order awarding sanctions and holding Mr. Moore in contempt of court (see motion attached without exhibits).

BAMBI HERRERA-EDWARDS, as surviving spouse of the decedent

By: _____

Eric H. Rothauser, Esq.
BoneeWeintraub LLC
29 South Main Street, Suite 330
West Hartford, CT 06107
860-561-1555
860-561-0390 (fax)
ERothauser@bw-law.com

2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed this 24<u>th</u> day of January, 2017 to the following:

By electronic mail only:

Jimmy Parish, Esq.
jparish@bakerlaw.com
Wendy Townsend, Esq.
wtownsend@bakerlaw.com
Baker & Hostetler, LLP
200 South Orange Ave.
Suntrust Center, Suite 2300
Orlando, FL 32801-3432
Attorneys for: Bernard Edwards, Jr., David Edwards, Leah Edwards, Mark Edwards, Michael Edwards,
Portia Vrtiak, Bernard Edwards Company, LLC, Wallace D. Franson, Jess S. Morgan & Company, Inc.

Bryan D. Hull, Esq.
Bush Ross P.A.
P.O. Box 3913
Tampa, FL 33601-3913
Attorneys for Bambi Herrera-Edwards

By electronic mail and U.S. Mail:

Eric Lyndell Moore
elmoore75@aol.com
202 Island Ave #118
San Diego, CA 92101

By U.S. Mail only:

Kelly A. Green
Mcintyre, Panzarella,
Thanasides, Bringgold
& Todd
6943 E. Fowler Avenue
Temple Terrace, FL 33617

Christina I. Belanger
200 South Orange Ave.

45 Rockefeller Plaza
New York, New York 10111

Richard Pober, Esq.
c/o Pullman & Comley
850 Main Street
Bridgeport, CT 06601-7006

Charles M. McCaghey, Esq.
Ryan, Ryan, Johnson,
McCaghey & Deluca LLP
80 Fourth Street
Stamford, CT 06905

Nancy E. Blair, Esq.
Blair & Potts
P.O. Box 1214
Stamford, CT 06904-1214

Anthony E. Ahern, Esq.
Cramer & Ahern
38 Post Road
Westport, Ct 06880

Richard H. Saxl
265 Post Road West
Westport, CT 06880

Eric H. Rothauser
Commissioner of the Superior Court

4

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Case No. 8:12-bk-15725-KRM
                                                Chapter 11
BAMBI A. HERRERA-EDWARDS,

        Debtor.
_____/

**DEBTOR'S EMERGENCY MOTION
FOR AN ORDER (A) AWARDING SANCTIONS FOR INTENTIONAL
AND WILLFUL VIOLATION OF THE AUTOMATIC STAY AND
(B) HOLDING ERIC L. MOORE IN CONTEMPT OF COURT**

        Bambi A. Herrera-Edwards. (the "**Debtor**"), by and through undersigned counsel, and

pursuant to the provisions of Sections 105(a) and 362 of Title 11 of the United States Code (the

"**Bankruptcy Code**"), respectfully requests that the Court enter an order (a) awarding sanctions

for intentional and willful violation of the automatic stay, and (b) holding Eric L. Moore

("**Moore**") in contempt of court (the "**Motion for Sanctions**"). In support of the Motion for

Sanctions, the Debtor respectfully represents as follows:

<u>**Preliminary Statement and Background**</u>

        1.      This Court has presided over (a) the Debtor's Chapter 11 case filed in 2012 resulting

in a confirmed Chapter 11 plan of reorganization, (b) the various disputed administrative and

unsecured prepetition claims against the Debtor pursued by Moore resulting in the disallowance of

all such claims and the affirmance on appeal of such disallowance, (c) the pending claim by the

Debtor against Moore to recover the sum of $45,000 that Moore improperly received from the

Debtor prior to her Chapter 11 case, and (d) the various pending disputes between the Debtor and

Bernard Edwards Company, LLC ("**BEC**") and Jess S. Morgan & Co. ("**JSM**").

2.     In one way or another, each of these matters revolved around property rights of the Debtor related to the Debtor's claims against BEC and JSM arising from the settlement of the Debtor's claims against the Estate of her deceased husband Bernard Edwards (the "**Edwards Estate**") and the consideration she obtained as part of that settlement.

3.     Moore has persistently and improperly sought to share in the Debtor's recovery of these property rights that are derived from the Edwards Estate including the musical compositions written by Bernard Edwards, his artist and producer royalties, certain administration rights and other property interests more particularly described in the pleadings and evidence before this Court.

4.     Notwithstanding the final and nonappealable orders disallowing any claim of Moore against the Debtor, Moore has continued to pursue a deliberate agenda of interference in the affairs and property rights of the Debtor.

5.     Despite repeated requests to cease his interference, Moore has only increased his activities and interference. The only purpose of these activities is an extortion directed to the Debtor to pay him to leave her alone.

6.     Although the Debtor has tried to ignore Moore, he recently filed with the Westport, Connecticut Probate Court (the "**Probate Court**") pleadings that are in violation of the automatic stay that continues in effect in the Chapter 11 bankruptcy case of the Debtor.

7.     In particular, on December 27, 2016, Moore filed a Limited Motion to Open Estate for Declaration that the Probate Court Order(s) Approving the July 9, 1997 Stipulated Agreement; the July 16, 1997 Compromise of Claim Did Not Approve the Co-Publishing Document Nor the Document Dates July 20, 1997 Entitled "Settlement Agreement," a Motion to Open Estate (Fraud) dated December 9, 2016, and a Memorandum of Law (collectively, the

2

"**Motions to Reopen**"). True and correct copies of the Motions to Reopen are attached as Composite Exhibit "A."

8.      The filing of the Motions to Reopen are in direct violation of sections 362(a)(1) and (3) of the title 11 of the United States Code.

9.      In response to the Motions to Reopen, BEC filed in the Probate Court Bernard Edwards Company, LLC's Response to Petitioner, Eric Moore's, Motion to Open Estate (the "**BEC Response**"). Instead of just responding that Moore has no standing to file the Motions to Reopen, BEC advanced in the BEC Response its defenses to the Debtor's claims that are disputed by the Debtor and remain unresolved in the Debtor's bankruptcy case. However, counsel for BEC has assured the Debtor's counsel that the BEC Response was simply defensive and that if the Motions to Reopen are withdrawn, BEC will seek no relief in the Probate Court.

10.     The Probate Court has now scheduled hearings for February 6, 2017 to consider the Motions to Reopen and BEC's Response. A true and correct copy of the Notice of Hearing scheduled by the Probate Court is attached as Exhibit "B."

11.     On January 22, 2017, counsel for the Debtor provided a demand to Moore to immediately withdraw the Motions to Reopen and take all necessary actions to cancel the February 6, 2017 hearing before the Probate Court and that failing to take such actions would result in the filing of a motion for sanctions (the "**Demand**"). A true and correct copy of the Demand is attached as Exhibit "C."

12.     Moore responded to the Demand and invited the filing of this Motion for Sanctions. (the "**Moore Response**") A copy of the Moore Response is attached as Exhibit "D."

3

13.    For the reasons set forth herein, the Motions to Reopen and the Moore Response constitute acts to exercise control over property of the Debtor's estate in violation of Section 362(a)(3) of the Bankruptcy Code.

14.    The Debtor is an individual injured by the intentional and willful violations of the automatic stay.  To the extent that Moore persists in contending that he has an interest in the Debtor's property and her affairs, the Debtor seeks an order of this Court enforcing the automatic stay by finding any such actions to be void *ab initio*.

15.    The Motions to Reopen and the Moore Response constitute intentional and willful violations of the automatic stay that entitle the Debtor to recover actual damages, costs and attorneys' fees, and punitive damages as sanctions for such violations pursuant to Section 362(k) of the Bankruptcy Code and the inherent contempt powers of this Court.

### Argument and Relief Requested

16.    Pursuant to Section 541(a)(1) of the Bankruptcy Code, the estate of the Debtor is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."

17.    A debtor's interests in its pre-petition contracts become property of the debtor's estate upon the filing of a bankruptcy petition. *Grant v. Lathan Construction Corp. (In re Construction Contrators of Ocala, Inc.)*, 196 B.R. 188, 194 (Bankr. M.D. Fla. 1996); *see also Hutchins v. Fordyce Bank and Trust Co. (in re Hutchins)*, 216 B.R. 1, 7 (Bankr. E.D. Ark. 1997) ("a debtor's interest in a contract, even if it is nonassumable, constitutes property of the estate.") (citing *Bell v. Alden Owners, Inc.*, 199 B.R. 451, 462 (S.D.N.Y.) 1996)).

18.    Because a debtor's contracts are property of the estate, Section 362(a)(3) of the Bankruptcy Code acts as a stay of any act to "exercise control" over the debtor's pre-petition contracts. *See In re Hutchins*, 216 B.R. at 7 ("upon the filing of the petition in bankruptcy, the

4

automatic stay prohibited any action against both the debtor and estate property, including the rights associated with the contracts in which the debtor had an interest.")

19.     To the extent Moore maintains that he can assert rights and remedies of the Debtor and does in fact seek to assert such rights, such contention is an act to exercise control over the interest of the Debtor in such property. Attempting to intimidate and mislead the Debtor into thinking that she must allow Moore to pursue her rights and/or must pay Moore or lose property of the Debtor, also violates Section 362(a)(3) of the Bankruptcy Code.

20.     A willful stay violation occurs when "an entity 'engages in a deliberate act that is done in violation of the automatic stay with knowledge that the debtor has filed a bankruptcy petition.'" *In re Craine*, 206 B.R. 594, 597 (Bankr. M.D. Fla. 1997) (quoting *In re Washington*, 172 B.R. 415, 419 (Bankr. S.D. Ga. 1994)). In this regard, the Eleventh Circuit Court of Appeals has applied the "general definition of 'willful violation. . . . " *See In re Craine*, 206 B.R. at 597, citing *In re Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1555 (11th Cir. 1996).

21.     In *In re Jove Engineering, Inc.*, the Eleventh Circuit reiterated that "[a]lthough the definition varies somewhat from context to context, willfulness generally connotes intentional action taken with at least callous indifference for the consequences." *Id.* (quoting *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529,1535 (11th Cir. 1986)). Thus, the Eleventh Circuit applied the rule that automatic stay violations are willful "if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *In re Jove Engineering, Inc.*, 92 F3d at 1555 (collecting cases from other circuits).

22.     In the instant case, Moore knew of the existence of the stay in the Debtor's case. Nevertheless, Moore deliberately filed the Motions to Reopen and sent the Moore Response.

23.     In the Eleventh Circuit, actions "taken in violation of the automatic stay are void and without effect." *Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982) (citing *Kalb v. Feuerstein*, 308 U.S. 433 (1940); *accord U.S. v. White*, 466 F.3d 1241, 1244 (11th Cir. 2006) (same); *In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir. 1984) ("It is true that acts taken in violation of the automatic stay are generally deemed void and without effect.")

24.     Therefore, because the Motions to Reopen constitute a violation of Section 362(a)(3) of the Bankruptcy Code, any such action is void *ab initio*, and no further action may be taken thereon.

25.     Generally, a federal court has inherent power to control the matters, parties and attorneys appearing before it. In *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the Supreme Court addressed the nature and scope of a federal court's inherent power to control the proceedings and the conduct of the parties involved. The Court acknowledged that "'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Id.* at 43 (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (other citation omitted)). These powers are necessarily vested in courts to manage their affairs to "achieve the orderly and expeditious disposition of cases." Id. These inherent powers, which are incidental to a federal court, include the power to control and discipline attorneys and pro se litigants appearing before it. *Id.*

26.     The Debtor has been damaged as a result of Moore's willful violation of the automatic stay, including, without limitation, the attorneys' fees, actual damages and costs associated with the prosecution of this Motion for Sanctions. Moreover, under the circumstances, punitive damages are warranted based upon the maliciousness and bad faith associated with the stay violation which Moore attempted to use as a means to intimidate the Debtor into paying him.

6

27.     Accordingly, and for the reasons set forth above, the Court should hold Moore in contempt for willfully violating the automatic stay, and impose sanctions in the form of actual damages, attorneys' fees, costs and punitive damages and any other relief deemed appropriate.

WHEREFORE, the Debtor respectfully requests the entry of an Order (a) awarding sanctions for intentional and willful violation of the automatic stay, (b) holding Moore in contempt of court, and (c) granting such other and further relief as s just and proper.

Dated: Tampa, Florida
      January 23, 2017

BUSH ROSS, P.A.
Post Office Box 3913
Tampa, Florida 33601-3913
(813) 224-9255 (telephone)
(813) 223-9620 (telecopy)
Attorneys for the Objectors

By: _____ /s/ Jeffrey W. Warren _____
      Jeffrey W. Warren
      Florida Bar No. 150024
      *jwarren@bushross.com*

7

**STATE OF CONNECTICUT**

| | |
|---|---|
| IN THE MATTER OF THE )<br>ESTATE OF BERNARD EDWARDS )<br><br>)<br>)<br>Deceased )<br>) | **PROBATE COURT**<br><br>Westport<br><br>District 50 |

## MOTION TO OPEN ESTATE (FRAUD)

Now comes the Petitioner, Eric Moore, and moves this honorable Court to Open the

above captioned matter for the purpose of providing a remedy for a fraud perpetrated

upon the Court and to clarify the terms of the Court's 1997 Order.  In support of this

motion, Petitioner says:

1.      By Order of this Court, Bambi Edwards, widow of the Deceased, Bernard

Edwards, received specific distributions from the Estate as the result of a Stipulated

Agreement dated July 9,1997.(Exhibit A, attached hereto)

2.      This July 9, 1997 Agreement was the result of a Court mediated negotiation that

included the release[1] of collateral claims by both parties to the dispute.

3.      The Assistant Clerk of this Court[2] has indicated that the July 9, 1997 stipulated

Agreement is the only agreement in the file to which the Order[3] of the Court was

attached.

---

1    Both parties dropped their respective lawsuits against each other on July 10, 1997 per this agreement.
2    Ms. Edwards Connecticut Probate Counsel, Bonee & Weintraub confirmed that no court order existed for the alleged
     July 30, 1997 document nor the alleged Co-publishing agreement, her Bankruptcy Counsel David Jennis confirmed this
     in open court
3    Walalce D. Franson, and his corporation, Bernard Edwards Company, LLC, are seeking over $1,200,000 in legal fees
     from Ms. Edwards based on these fraudulent documents, with counterfeit date stamps and/or court seals.

## THE CO-PUBLISHING DOCUMENT AND JULY 30, 1997 DOCUMENT

4.  The file in this matter also includes several documents which purport to terminate the July 9, 1997 Agreement. Various documents have been attached[4] to the authentic courts order approving the Stipulated Agreement, These documents can be shown to be included in the record as frauds on the Court, as shown below.

5.  The blank and unexecuted co-publishing agreement in the sealed file purports to severely limit the rights of Bambi Edwards to property and income of the Estate as granted by the July 9, 1997 agreement.

6.  Mr. Franson testified at trial in Florida that the probate court awarded him the following copyrights of the deceased, (Administration *rights, Publishers Share, Publishers Share of performance, Producer and Artist royalties and a 5% lifetime lien*)

7.  Mr. Franson requested a 5% fee "forever" at the July 9, 1997 mediation but it was denied, despite this denial *six months* after the Estate of Bernard Edwards was closed, he forged Ms. Edwards name and placed a 5% lien on Ms. Edwards copyrights in favor of his company, Jess S. Morgan & Co. In essence he never assigned Ms. Edwards *ownership interest,* <u>he is still listed as executor</u>, the copyright assignment reads in part: *" Among the Assignor, Bambi Edwards and Alexis Edwards and subject to a lien to secure payment to Jess S. Morgan and Company, Inc. of 5% of the gross receipts of such assigned rights <u>in perpetuity</u>.*

---

4   These documents were filed with the copyright office, ASCAP. BMI, Warner Chappell, Motown Records, EMI Records etc. They purport to transfer various copyrights and "lifetime executor fees" to the Executor of the Estate, including 50% of Ms. Edwards 37.5% copyright share, her administration rights (right to collect the income) and producer and artist royalties, these assets are worth over $5,000,000 dollars per the appraisal in 2013.

8.      This co-publishing document allegedly dated August 21, 1997, was not properly

executed, received or considered by the court in the issuance of its Order can be clearly

shown by the following:

9.      The document, despite having a handwritten date of 8/21/1997, shows a date

stamp indicating a receipt by the Court on 9/05/1997, THIS DATE STAMP IS NOT

GENUINE, and is a fraud intended to alter the judgment of the Court in this matter, this

fake date stamp is sometimes whited out to conceal it's inauthenticity (*See*, Exhibit B)

10.     The Co-publishing document also can not be an agreement contemplated by the

Court in the issuance of its Order because of the failure of the receipt of the Agreement

to be properly docketed, furthermore it is unsigned[5] by the Executor and Bambi

Edwards, and allegedly awards copyrights belonging to Ms. Edwards to the Executor.

11.     Interested parties to this matter, Former Executor of the Estate Wallace D. Franson

and his firm Jess S. Morgan, have continued to deprive Bambi Edwards of property and

income by reliance upon the application of this Fraudulent and/or forged co-publishing

document (*See,* copyright assignment [6]attached hereto as Exhibit C)

12.     Petitioner, Eric Moore, is an interested party by virtue of contractual relationships

with Bambi Edwards and has standing as a creditor in the Bankruptcy Estate of Bambi

Edwards. (8:12-BK-15725)  Petitioner and Ms. Bambi Edwards have been damaged by

the fraudulent application of the Order to the Co-publishing document and July 30, 1997

document.[7]

---

5   See the Sealed file of this case, the original copy of this document is blank and unsigned
6   This fraudulent copyright assignment was filed June 2, 2000 some six months after the estate was closed
7   This document could not have been approved at the July 30, 1997 because it did not arrive to the probate court until

## COUNTERFEIT WESTPORT COURT DATE STAMPS AND COURT SEALS

13.    Petitioner requests clarification via an order of the court and/or declaration that these documents were not approved by this Court in its September 4, 1997 Order, the former Executor of the Estate and/or one of the lawyers in the case have created counterfeit Westport Probate Court date stamps and court seals.

14.    These counterfeit date stamps and court seals are placed on various documents allegedly signed by Ms. Edwards, these documents purport to transfer millions of dollars in copyrights and cash from the her to Wallace D. Franson and two entities he controls (Jess S. Morgan & Co., The Bernard Edwards Company, LLC)

15.    Former Executor Wallace D. Franson testified at trial in the bankruptcy court that the co-publishing agreement and July 30, 1997 document was approved by order of the probate court on September 4, 1997.

16.    The fake received date stamp and handwritten 8/21/1997 date is on the co-publishing agreement filed with the copyright office, Warner Chappell, BMI, ASCAP, in order that these funds can be diverted to the executor of the estate.

17.    On April 25, 2014 The Asst. Clerk of the Probate court confirmed in writing that the so called Co-publishing agreement allegedly dated August 21, 1997 did not not contain the date stamp of the Westport Probate court, and the document dated July 30, 1997 did have an official date stamp[8], but did not contain the courts seal.

---

August 28, 1997, the RECEIVED Stamp of this document was erased on copies provided to Ms. Edwards

8    The date stamp on the "Settlement agreement" dated July 30, 1997 is August 28, 1997 which was long after the July 30, 1997 agreement

18.     Without access to the sealed court file, the executor was able to perpetrate this fraud on the probate court, bankruptcy court, the IRS and royalty payers.[9]

19.     The perpetrators white out the authentic received stamp (August 28, 1997) on the July 30, 1997 document, then attach the authentic court order approving the July 9, 1997 agreement and allege it was approved at the hearing on July 30, 1997, or in some cases they place a counterfeit date stamp and/or seal on the document.

20.     The bankruptcy court has been presented with the fraudulent documents, and without an order of this court they are deemed to be authentic, the court has refused to judicially notice the July 9, 1997 stipulated agreement and order without stipulating that the other fraudulent documents *may* have been approved by the same order.

21.     The Document dated July 30, 1997, does not carry the seal of the Probate Court and has no order attached to it that would effectuate its provisions, no one signed the so-called co-publishing agreement, it is blank in the sealed file, it isn't the *"final settlement"*

22.     Furthermore, two of the Edwards children were minors at the time of the death of Mr. Edwards "under Connecticut law it is no question that when a party is under age eighteen years of age, settlement agreement valued at greater than $10,000 must be approved by the probate court" *Roeshyn v Gunnery, Inc.* 2013 WL1849284, *4 (Ct. Sup Ct. April 10, 2013) see also *Kowalyshyn v Leconche*, 2015 WL 7421826 (Ct. Sup November 2, 2015) (Finding that there was no final settlement agreement because the settlement was subject to to the approval by the probate court, but that courts approval was never obtained.

---

9   ASCAP, BMI, Warner Chappell, Motown Records, EMI Records, UMG, Sony and others have these false documents.

## THE JULY 9, 1997 STIPULATED AGREEMENT

23.     On July 9, 1997 the parties to the litigation regarding Ms. Edwards statutory share

attended a mediation,  the same day the parties came to an agreement[10] which was

handwritten and signed, on July 10, 1997 the handwritten agreement was typed up

verbatim[11] and mailed overnight to Richard Pober and Wallace D. Franson.

24.     The terms and conditions of the handwritten stipulated agreement[12] were

contingent upon the parties dropping their lawsuits with prejudice. Paragraph ten of the

agreement reads:

" *Bambi Edwards agreed to withdraw, with prejudice, the lawsuit commenced by her*

*against the Estate and pending in the Federal Court of New York on the terms and*

*conditions contained herein* "

25.     On July 10, 1997 Ms. Bambi Edwards dropped her lawsuit in the Federal Court in

New York, this was confirmed by Wallace Franson at Trial, and a letter between the Ms.

Edwards attorney and Richard Pober. (See Exhibit D)

26.     These letters confirm that the Estate agreed that the Stipulated Agreement dated

July 9, 1997 was the agreement the parties would to be bound by, in further performance

of this agreement the Estate dropped its appeal of Ms. Edward statutory share on July

10, 1997 per paragraph thirteen of the agreement which reads:

---

10  According to trial testimony this agreement was initially handwritten by Attorney Richard Pober and typed up verbatim on July 10, 1997 by Ms. Bambi Edwards attorney Paul Johnson
11  This is important to note because the July 30, 1997 document was alleged to be a " Typed up version of the Handwritten agreement, but it clearly is not.
12  It was confirmed at trial by Ms. Edwards and her lawyers that the Stipulated agreement was dated July 9, 1997

*"All parties will withdraw all outstanding lawsuits and claims now pending in Probate Court or Superior Court"*

27.    The dismissal of this lawsuit is confirmed by the enclosed letter and filed stipulation of discontinuance dated July 10, 1997, note that the letter references the stipulated agreement is dated July 9, 1997 not July 30, 1997 (see Exhibit D)

28.    The Stipulated agreement contained a release of claims provision therefore there was no need to draft another "General Release Document" paragraph six reads:

*" Bambi Edwards, Alexis Edwards, Bernard Edwards Jr., Portia Vtriak, David Edwards, Mark Edwards and Leah Edwards hereby release each other of any and all claims which they may have now or ever against each other from the beginning of time to the date of this stipulation"*

## THE FRAUDULENT GENERAL RELEASE DOCUMENT

29.    One of the other fraudulent documents is entitled *"General Release"* it was back-dated to appear as if it was signed on July 30, 1997 and it purports to change the date of the Stipulated Agreement from July 9, 1997 to the Fraudulent document dated July 30,1997.

30.    To further deceive the court into believing the July 30, 1997 document in the sealed file was the "Real Stipulated agreement" other fraudulent documents had to be drafted and placed under seal in which the stipulated agreement was alleged to be dated July 30, 1997. Please take note of the request for approval of further advances **Vol 001-pg 031-033** and the *"General Release"* attached as **Exhibit E.**

The language in the General Release reads:

*"Except for the terms, conditions and consideration contained in the stipulation of settlement dated July 30, 1997, which remains in full force and effect."*

31.  The release provision of this alleged agreement is crucial to understanding the fraud perpetrated at this court, there clearly was no reason to sign another release of claims, because all parties had signed the waiver on July 9, 1997.

32.  The September 4, 1997 Order clearly references the adoption of the "Stipulated Agreement" made on July 9, 1997 and provided by certified records from the Clerk on November 29, 2012. The order reads in part:

> *" The Court hereby vacates it's Memorandum of Decision concerning the statutory share and issues of abandonment and all orders contained therein shall be vacated in view of the stipulated agreement"*

### THE ALEXIS EDWARDS COMPROMISE OF CLAIM ORDER

33.  Alexis Edwards was the first wife of the deceased Bernard Edwards, she made similar claims against the Estate as Bambi Edwards and she settled her claim for 12.5% of the Copyrights of her deceased husband.

34.  Alexis Edwards is referenced In the July 9, 1997 stipulated agreement as a party that would receive a part of the estate as well, paragraph fourteen reads:

*" Alexis Edwards shall receive a percentage of the royalties to be agreed upon by the Executor in consideration of releasing her tort claim"*

35.    On or about July 16, 1997 an application of compromise of claim was filed

reflecting the 12.5% ownership of the copyrights that Alexis Edwards was to receive and

this motion was approved on September 4, 1997. A Certified copy of the motion and

order[13] are attached **as Exhibit F.**

36.    The court order that approved Alexis Edward's Application for compromise of

claim is sometimes attached to the July 30, 1997 document as the order approving it.

### THE BERNARD EDWARDS ESTATE TAX RECORDS AND CLOSING DOCS

37.    The December 9, 1999 Estate Closing Account (Vol. 704, p. 33-41) improperly

lists a 5% fee/lien to the Executor's firm, Jess S. Morgan & Co. this *"lifetime executor*

*fee"* was not a part of the July 9, 1997 Agreement, this further proves that Mr. Franson

awarded his company 5% of the income of the copyrights "forever". **(See Exhibit G)**

38.    The Executor, Wallace D. Franson evaded state and federal taxes, he took the

widows allowance on the copyright assets[14] and liens that he awarded himself, and/or

Jess S. Morgan & Co., the IRS was informed in writing that the July 9, 1997 agreement

was the governing agreement, page 12 of the estate tax records reads in part:

> *"Settlement of claim dated 7/9/1997 in accordance with agreement negotiated by*
>
> *a mediator which awarded 37.5% of the net estate to the surviving spouse."*

39.    Mr. Franson clearly knew the July 9, 1997 stipulated agreement was governing

but he informed the copyright office, and bankruptcy court that these assets were his

property as of July 1997. (see the Estate tax records attached as **Exhibit H)**

---

13  This order has been attached to the July 30, 1997 document and purported to approve its terms and conditions including
    a 5% lifetime executor lien on Ms. Edwards Copyrights for the benefit of Jess S. Morgan.
14  The copyrights and royalties Mr. Franson took from Ms. Edwards were appraised at over $10,000,000 dollars

## THE BANKRUPTCY CASE OF WIDOW BAMBI EDWARDS

40.    The bankruptcy petition of the widow, Bambi Edwards, is currently pending.

(8:12-BK-15725 ) The bankruptcy court has been deceived and hoodwinked by the

counterfeit date stamps and court seals, on various documents alleged to be approved by

the Westport Probate Court.

41.    On April 25, 2014 The Asst. Clerk of the Probate court confirmed in writing that

the so called Co-publishing agreement allegedly dated August 21, 1997 did not not

contain the date stamp of the Westport Probate court, and the document dated July 30,

1997 contained an official date stamp[15], but it didn't contain a raised seal, which is

placed on all documents signed by the Judge and official court staff. **(See Exhibit I)**

42.    The obligation of this Court to defend itself against frauds attempted to be

exercised against it, as well as the balance of equities in this matter and in the

bankruptcy proceeding, demand that this matter be opened to clarify the September 4,

1997 Order, either pursuant to this motion by Petitioner or, in the alternative, *sua sponte*,

as is the Court's right to ensure the validity and full faith and credit in its judgments.

43.    The actions of Wallace D. Franson and/or Richard Pober are fraud upon the

court,These intentionally false and misleading statements are not only frauds upon this

Court, they are violations of Connecticut criminal code as well (false statements made

while under "penalty of false statement" ) In the Bankruptcy court Mr. Fransons lawyers

are seeking $1,203,087.00 in legal fees from based on these fraudulent documents.

---

15   The date stamp on the "Settlement agreement" dated July 30, 1997 is August 28, 1997 which was long after the July 30,
     1997 agreement

## **CONCLUSION**

44.  In this case, Ms. Bambi Edwards, her bankruptcy lawyer David Jennis and Probate Lawyer Eric Rothauser[16] all testified and confirmed the July 30, 1997 document wasn't approved by the probate court.

45.  The criminal actions of Wallace D. Franson are no different than the actions of other lawyers criminally charged with fabricating court orders and/or inserting bogus documents into the court record, all of whom were subsequently disbarred, suspended and convicted.

46.  In re *United States v. Dayton*, 03 CR 00057 (C.D. Cal.) Attorney Steven A. Dayton pled guilty to creating false documents including a forged bankruptcy court order. In re *United States v. Thayer* 01 CR 00182 (N.D. Ind) Attorney Robert Thayer was convicted of inserting bogus back dated trust documents on the court record in a bankruptcy case. In re *United States v. Eleazarian*, 05 CR 00428 (E.D. Cal.) Attorney John Eleazarian was convicted of forging a bankruptcy judge's order.

47.  The Former Executor and/or Attorney for the Estate have fabricated evidence and inserted bogus documents with counterfeit date stamps into the court record here and and has concealed the legitimate settlement agreement dated July 9, 1997 from the bankruptcy court, copyright office, IRS and royalty payers.

48.  **The bankruptcy court and US District Court can not rule on various motions and/or appeals without confirmation of what orders of this court are authentic.**

---

16  Eric Rothauser is a Connecticut probate lawyer from Bonee & Weintraub hired to review the probate court files

**WHEREFORE,** Petitioner, Eric Moore, respectfully requests that this matter be OPENED by the granting of this motion, and that the Court issue a declaratory judgment finding:

a. The alleged co-publishing agreement dated August 21, 1997 does not contain the required date stamp nor court seal of the Westport Probate Court and is unenforceable against Bambi Edwards and was not approved by the Order approving the July 9, 1997 Stipulated Agreement and;

b. The alleged settlement agreement dated July 30, 1997 that arrived to the court on August 28,1997 does not contain the seal of the Westport Probate Court, was not approved at the hearing on July 30, 1997 and is unenforceable against Bambi Edwards; and

c. That Bambi Edwards owns *Full and Complete ownership of 37.5%* of the copyrights of her deceased husband Bernard Edwards (including producer & artist royalties, publishers share and Administration rights) pursuant to the stipulated agreement dated July 9, 1997, without further limitation by any other purported agreement; and

d. That the Former Executor of the Estate Wallace D. Franson and/or his firm Jess S. Morgan were awarded no interest in Bernard Edwards Productions/ASCAP and Bernard's other Music/BMI or any of the copyrights awarded to Bambi Edwards on July 9, 1997; and